**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:  Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

**MDL No. 1358**
**Master File C.A. No.**
**1:00-1898 (SAS)**

**This document relates to the following case:**
Orange County Water District v. Unocal, et al.,
Case No. 04 Civ. 4968

**PLAINTIFF ORANGE COUNTY WATER DISTRICTS' LOCAL RULE 56.1**
**STATEMENT OF DISPUTED AND MATERIAL FACTS IN OPPOSITION TO**
**DEFENDANTS' RULE 56.1 STATEMENT IN SUPPORT**
**OF MOTION FOR SUMMARY JUDGMENT**

PLAINTIFF'S RESPONSE TO
DEFENDANTS' RULE 56.1 STATEMENT IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

Page

A.  Issue No. 1: OCWD Cannot Prevail On Nuisance Because There Is No
    Evidence Of The Type Of "Affirmative Conduct" Necessary to Establish
    Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Facts Regarding Exxon Mobil Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Facts Regarding Chevron U.S.A Inc. ("CUSA") . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            a.      G&M #4: 16990 Beach Avenue, Huntington Beach . . . . . . . . . . 3

            b.      Chevron #208554: 8980 Warner Avenue, Fountain Valley . . . . . . . . . 4

            c.      G&M #24: 3301 S. Bristol Street, Santa Ana . . . . . . . . . . . . . . 6

    Facts Regarding Union Oil . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            a.      Beacon Bay Fountain Valley: 10035 Ellis Avenue,
                    Fountain Valley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            b.      Beacon Bay Car Wash SA: 1501 W. MacArthur, Santa Ana . . . . . . . . . 8

    Facts Relevant to Lyondell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Facts Relevant to The Shell Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            a.      Beacon Bay Auto Wash: 10035 Ellis Avenue . . . . . . . . . . . . . . . . 11

            b.      Beacon Bay Carwash: 1501 West MacArthur Blvd . . . . . . . . . . . . . . 14

            c.      Huntington Beach Arco: 6002 Bolsa Avenue . . . . . . . . . . . . . . . . . . 18

            d.      G&M Oil #24: 3301 Bristol Street . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    Facts Relevant to Tesoro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Facts Relevant to BP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            a.      Huntington Beach ARCO: 6002 Bolsa Avenue,
                    Huntington Beach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            b.      World Oil #39,3490 Ball Road, Anaheim . . . . . . . . . . . . . . . . . . . 30

Facts Relevant to VMSC and VRC-CA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Facts Relevant to Ultramar Inc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

B.   Issue No. 2: OCWD Cannot Prevail on Continuing Nuisance Because It
     Lacks Evidence of Reasonable Abatability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

C.   Issue No. 3: OCWD Cannot Prevail Under the OCWD Act Because
     Defendants Have Not Engaged In The Type Of Affirmative Conduct
     Necessary to Prevail   : . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

D.   Issue No. 4: OCWD Cannot Prevail Under The OCWD Act Because It
     Lacks Evidence Of Recoverable Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

E.   Issue No. 5: OCWD Cannot Prove Direct Causation As to Specific
     Defendants Because It Lacks Evidence Tracing Defendants' Gasoline To
     The Stations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

     Facts Specific To Chevron U.S.A. Inc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

     Facts Specific To Lyondell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

     Facts Specific To Tesoro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

     Facts Regarding VMSC and VRC-CA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

     Facts Regarding Ultramar Inc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

     Facts Regarding Shell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

     Proving Direct Causation Was Not Impossible . . . . . . . . . . . . . . . . . . . . . . . . . . 125

     OCWD Failed To Disclose In Discovery That It Intended To Pursue a Commingled
     Product Theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

F.   Issue No. 6: OCWD Cannot Prove Direct Causation Because It Lacks
     Evidence Tracing Particular Defendants' Gasoline From The Stations To
     The Wells . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

G.   Issue No. 7: Claims At Certain Stations Are Barred By The Statute of
     Limitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

     Facts Regarding World Oil #39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

     Facts Regarding Chevron #9-5568 and Mobil 18-HEP . . . . . . . . . . . . . . . . . . . . . 148

H.   Issue No. 8: Summary Judgment Should Be Granted Where OCWD
     Failed To Disclose Information In Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Facts Specific To Lyondell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Facts Specific To Tesoro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

Facts Specific to VMSC and VRC-CA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

Facts Specific to Ultramar Inc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

### PLAINTIFF'S RULE 56.1 STATEMENT IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56.1 of the Southern District of New York's Local Rules, Plaintiff submits the following statement of undisputed facts in opposition to Defendants' Motion for Summary Judgment.

**A.   Issue No. 1: There are Material Issues of Disputed Facts Regarding OCWD's Nuisance Claim.**

**Facts Regarding Exxon Mobil Corporation**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 1.     The real estate, all buildings and structures, and all fuel storage and dispensing equipment at World Oil #39 were owned by World Oil, not Exxon Mobil Corporation. (Roy Dec., Ex. 65 (Rehklau Depo), p. 24:10-26:4, 104:24-106:4.) | 1.  **Disputed.**<br><br>Exxon Mobil ("Exxon") dictated all aspects of the operations of World Oil #39 such that Exxon controlled the operations, not World Oil.  (Massey Decl., Ex. 4 [Rekhlau Depo., Sept. 10, 2010, pp. 43:2-4, 44:16-18, 47:3-6, 47:24-49:20, 49:25-50:1, 51:25-52:24, Ex. 2 & 4] [hereinafter "Massey Ex. 4"].) |
| 2.     World Oil leased the operation of the station to a third party. (Roy Dec., Ex. 65 (Rehklau Depo), p. 105:8-14.) It was not operated by Exxon Mobil Corporation. | 2.  **Disputed.**<br><br>Exxon dictated all aspects of the operations of World Oil #39, including the identify of the station operator, such that Exxon controlled the operations, not World Oil.  (*See* Massey Ex. 4 [Rekhlau Depo., Sept. 10, 2010, pp. 43:2-4, 44:16-18, 47:3-6, 47:24-49:20, 49:25-50:1, 51:25-52:24, Ex. 2 (providing, inter alia, that Steven Roth was the "key person" required to "operate on a daily basis" World Oil # 39)].) |
| 3.     Exxon Mobil Corporation supplied gasoline to World Oil pursuant to a branded distributor agreement beginning July 1, 1996, | 3.  **Undisputed.**<br><br>Exxon gasoline was released at World Oil |

1

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| and continuing through May 15, 2000, but World Oil #39 was not branded as an Exxon station-and therefore not supplied with Exxon branded gasoline-until some time in 1997. (Roy Dec., Ex. 65 (Rehklau Depo), p. 43:2-13, 46:22-47:6, 58:1-5, 58:19-59:5, 76:18-23 & Depo Ex. 2 (Distributor Sales Agreement (Branded)), p. 2, Depo Ex. 3 (1/12/99 Letter from Exxon to World Oil), p. 1; Depo Ex. 4 (Distributor Sales Agreement (Branded), p. 1; Ex. 64 (XOM's Supp. Resp. to 3`d Rogs), p. 5-7; Ex. 61 (XOM's Resp. to 6h Rogs), p. 4-7.) | #39 because leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis. (56.1 ¶ 256, *infra*, and evidence cited therein.) |
| 4.      World Oil was responsible for maintaining the equipment at the station. (Roy Dec., Ex. 65 (Rehklau Depo), p. 93:7-14,105:5-7.) World Oil was also responsible for delivering gasoline to its station, either by its own trucks or companies it hired to do so. ( *Id.*, p. 98:10-16.) | **4.  Disputed.**<br><br>Exxon dictated all aspects of the operations of World Oil #39 such that Exxon controlled the operations, not World Oil, and Exxon retained the right to deliver gasoline to the station and to inspect the station and its equipment (including UST's) at any time. (Massey Decl., Ex. 4 [Rekhlau Depo., Sept. 10, 2010, pp. 43:2-4, 44:16-18, 47:3-6, 47:24-49:20, 49:25-50:1, 51:25-52:24, Ex. 2 (§§ 11(a); Product Schedule, ¶ 3)].) |
| 5.      World Oil was responsible for training the operator at World Oil #39, including providing training on the handling and storage of gasoline and the clean-up of spills and leaks. (Roy Dec., Ex. 65 (Rehklau Depo), p. 105:8-106:6.) | **5.  Disputed.**<br><br>Exxon dictated all aspects of the operations of World Oil #39 such that Exxon controlled the operations, not World Oil, including the management of the station.  (Massey Decl., Ex. 4 [Rekhlau Depo., Sept. 10, 2010, pp. 43:2-4, 44:16-18, 47:3-6, 47:24-49:20, 49:25-50:1, 51:25-52:24, Ex. 2 (§§ 12(b), 14, 19(a)].) |

**Facts Regarding Chevron U.S.A Inc. ("CUSA")**

a.    **G&M #4: 16990 Beach Avenue, Huntington Beach**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 6.    CUSA did not own or operate G&M #4, located at 16990 Beach Avenue in Huntington Beach, California. (Correll Dec., Ex. 2 (CUSA Resp. to CMO #75 dated Jul. 22, 2010), p. 1 (listing those sites at which CUSA owned the USTs and/or the real property); Correll Dec., Ex. 3 (CUSA Resp. to OCWD 3rd Spec. Interrog. at Nos. 1-2 dated Nov. 7, 2008), pp. 5-9 (listing those stations owned and operated by CUSA).) While CUSA supplied MTBE-gasoline to the G&M #4 from December 1991 through December 2002, there is no evidence that CUSA engaged in affirmative conduct at this site. (See Correll Dec., Ex. 4 (T. Bui Declaration dated Aug. 31, 2010), I¶ 10,11; see also Correll Dec., Ex. 5 (Excerpts of Supply Records for G&M #4 dated Dec. 1991), p. CHEVMDL1358 00000666080.) | 6.  **Disputed.** The statement relies in part on Chevron's discovery responses, which are inadmissible for this purpose. (Pltf.'s Objs. to Evid. § II.A., II.B.)<br><br>Chevron has operated G&M #4 since January 1, 2002, when Chevron became a member of G&M Oil Co., LLC (the "G&M LLC" or "LLC"). (Massey Ex. 2 [Gray Depo., Aug. 6, 2010, at pp. 39:1-13, 41:8-14].)<br><br>Chevron has a longstanding, close, branding relationship with G&M stations. (Massey Ex. 2 [Gray Depo., Aug. 6, 2010, p. 17:8-13].) Chevron handles all the gasoline deliveries for the G&M stations, and even installed a system in 2001 or 2002 to allow Chevron to monitor the gasoline inventory in the UST's at the G&M stations. (*Id.* at pp. 17:14-18:8, 64:16-65:5.)<br><br>Chevron supplied *and delivered* gasoline from its Huntington Beach terminal to G&M #4 from October 1992 to December 2002. (Correll Ex. 4 [Tam Bui Decl., ¶ 11].)<br><br>G&M #4 had several equipment test failures and discoveries of MTBE in groundwater and soil from 1993 to 2003, including the discovery of free product in groundwater in 2003. (Massey Ex. 3.c. [Moreau Report on G&M #4].)  In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis. 56.1 ¶ 256, |

*infra*, and evidence cited therein. Those leaks include, as testified to by District expert Marcel Moreau, based in part on a U.S. EPA report entitled *Causes of Release from UST Systems*, and corroborated by Beacon Bay 30(b)(6) witness Patrick Shea, gasoline deliveries often cause spills: "[L]oose delivery fittings and the delivery process, especially the frequent disconnection of large cumbersome delivery hoses that have been incompletely drained, frequently result in the spillage of small quantities of fuel" that can cause contamination. (Massey Ex. 1.a. [Expert Report of Marcel Moreau, p. I-12]; *id.* at Ex. 3 [Shea Depo., pp. 63:16-64:17].)

**b.      Chevron #208554: 8980 Warner Avenue, Fountain Valley**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 7.      CUSA did not own or operate Chevron #208554, located at 8980 Warner Avenue in Fountain Valley, California. (Correll Dec., Ex. 2 (CUSA Resp. to CMO #75 dated Jul. 22, 2010), p. 1 (listing those sites at which CUSA owned the USTs and/or the real property); Correll Dec., Ex. 3 (CUSA Resp. to OCWD 3rd Spec. Interrog. at Nos. 1-2 dated Nov. 7, 2008), pp. 5-9 (listing those stations owned and operated by CUSA).) While CUSA supplied MTBE-gasoline to the site from June 1999 through December 2002, there is no evidence of any affirmative conduct by CUSA at this site. (See Correll Dec., Ex._ 4 (T. Bui Declaration dated Aug. 31, 2010), ¶¶ 6-7.) | 7.  **Disputed.**<br><br>The statement relies in part on Chevron's discovery responses, which are inadmissible for this purpose. (Pltf.'s Objs. to Evid. § II.A., II.B.)<br><br>Chevron has operated Chevron #208554/Exxon #4283 since January 1, 2002, when Chevron became a member of G&M LLC. (Massey Ex. 2 [Gray Depo., Aug. 6, 2010, at pp. 39:1-13, 40:5-16].)<br><br>Chevron has a longstanding, close, branding relationship with G&M stations. (Massey Ex. 2 [Gray Depo., Aug. 6, 2010, p. 17:8-13].) Chevron handles all the gasoline deliveries for the G&M stations, and even installed a system in 2001 or 2002 to allow Chevron to monitor the gasoline inventory in the UST's at the G&M stations. (*Id.* at pp. 17:14-18:8, 64:16-65:5.) |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Chevron supplied *and delivered* gasoline from its Huntington Beach terminal to Chevron #208554 (Chevron-branded) from June 1999 to December 2002.  (Correll Ex. 4 [Tam Bui Decl., ¶ 7].)

The highest detection of MTBE in groundwater at Chevron #208554 was in 2000 at 120,000 parts per billion.  (Massey Ex. 1.b. (Moreau Report on Exxon #7-4283). In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis.  56.1 ¶ 256, *infra*, and evidence cited therein.  Those leaks include, as testified to by District expert Marcel Moreau, based in part on a U.S. EPA report entitled *Causes of Release from UST Systems*, and corroborated by Beacon Bay 30(b)(6) witness Patrick Shea, gasoline deliveries often cause spills:  "[L]oose delivery fittings and the delivery process, especially the frequent disconnection of large cumbersome delivery hoses that have been incompletely drained, frequently result in the spillage of small quantities of fuel" that can cause contamination.  (Massey Ex. 1.a. [Expert Report of Marcel Moreau, p. I-12]; *id.* at Ex. 3 [Shea Depo., pp. 63:16-64:17].) entitled *Causes of Release from UST Systems*, and corroborated by Beacon Bay 30(b)(6) witness Patrick Shea, gasoline deliveries often cause spills:  "[L]oose delivery fittings and the delivery process, especially the frequent disconnection of large cumbersome delivery hoses that have been incompletely drained, frequently result in the spillage of small quantities of fuel" that can cause contamination.  (Massey Ex. 1.a. [Expert Report of Marcel Moreau, p. I-12]; *id.* at Ex. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | 3 [Shea Depo., pp. 63:16-64:17].). |

    c.    **G&M #24: 3301 S. Bristol Street, Santa Ana**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 8.    CUSA did not own or operate G&M #24, located at 3301 S. Bristol Street in Santa Ana, California. Correll Dec., Ex. 2 (CUSA Resp. to CMO #75 dated Jul. 22, 2010), p. 1 (listing those sites at which CUSA owned the USTs and/or the real property); Correll Dec., Ex. 3 (CUSA Resp. to OCWD 3rd Spec. Interrog. at Nos. 1-2 dated Nov. 7, 2008), pp.5-9 (listing those stations owned and operated by CUSA).) While CUSA supplied MTBE-gasoline to G&M #24 from April 1997 through December 2002, there is no evidence of any affirmative conduct by CUSA at this site. (See Correll Dec., Ex. 4 (T. Bui Declaration dated Aug. 31, 2010), ¶¶ 12-13.) | **8.  Disputed.** <br><br>The statement relies in part on Chevron's discovery responses, which are inadmissible for this purpose.  (Pltf.'s Objs. to Evid. § II.A., II.B.) <br><br>Chevron has operated G&M #24 since January 1, 2002, when Chevron became a member of G&M LLC.  (Massey Ex. 2 [Gray Depo., Aug. 6, 2010, at pp. 39:1-13, 41:18-24].) <br><br>Chevron has a longstanding, close, branding relationship with G&M stations.  (Massey Ex. 2 [Gray Depo., Aug. 6, 2010, p. 17:8-13].) Chevron handles all the gasoline deliveries for the G&M stations, and even installed a system in 2001 or 2002 to allow Chevron to monitor the gasoline inventory in the UST's at the G&M stations.  (*Id.* at pp. 17:14-18:8, 64:16-65:5.) <br><br>Chevron supplied *and delivered* gasoline from its Huntington Beach terminal to G&M #24 from April 1997 to December 2002. (Correll Ex. 4 [Tam Bui Decl., ¶ 13].) <br><br>G&M #24 documented a UST release in February 1997 followed by a sharp uptick in MTBE concentrations in 1998 and several |

|  | equipment failures and leaks through 2006. (Massey Ex. 1.d. (Moreau Report on G&M #24). In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis. 56.1 ¶ 256, *infra*, and evidence cited therein. Those leaks include, as testified to by District expert Marcel Moreau, based in part on a U.S. EPA report entitled *Causes of Release from UST Systems*, and corroborated by Beacon Bay 30(b)(6) witness Patrick Shea, gasoline deliveries often cause spills: "[L]oose delivery fittings and the delivery process, especially the frequent disconnection of large cumbersome delivery hoses that have been incompletely drained, frequently result in the spillage of small quantities of fuel" that can cause contamination. (Massey Ex. 1.a. [Expert Report of Marcel Moreau, p. I-12]; *id.* at Ex. 3 [Shea Depo., pp. 63:16-64:17].) |
|---|---|

**Facts Regarding Union Oil**

a.      **Beacon Bay Fountain Valley: 10035 Ellis Avenue, Fountain Valley**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 9.      Union Oil did not own or operate Beacon Bay Car Wash-Fountain Valley, located at 10035 Ellis Avenue in Fountain Valley, California. (See Correll Dec., Ex. 6 (Union Oil Resp. to CMO #75 dated Jul. 22, 2010), p. 2 (listing those sites at which Union Oil owned the USTs and/or the real property); Correll Dec., Ex. 7 (Union Oil Resp. to OCWD 3rd Spec. Interrog. at Nos. 1-2 dated Nov. 7, 2008), pp. 5-10 (listing those stations owned and operated by Union Oil). While Union Oil supplied gasoline to Beacon Bay Car Wash FV from 1986 until August 24, 1994, there is no evidence of affirmative conduct by Union | 9.  **Disputed.**

The statement relies in part on Union Oil's discovery responses, which are inadmissible for this purpose. (Pltf.'s Objs. to Evid. § II.C., II.D.)

Union Oil had a "lease/leaseback" relationship with Beacon Bay from at least 1983 to 1994, in which Union Oil leased all Beacon Bay stations and the equipment thereon, including Beacon Bay Fountain Valley, and then leased them back to Beacon Bay. (Massey Ex. 3 [Shea Depo., July 30, 2010, pp. 94:16-98:14, Ex. 7].) Union Oil |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Oil at this site. (See Correll Dec., Ex. 8 (G. Chan Declaration dated July 13, 2011), ¶¶ 5,6; Correll Dec., Ex. 9 (Excerpts of Supply Records dated Aug. 1994), p. CHEVMDL00000710217.) | handled all deliveries of gas to the stations for a longer period of time dating to the 1960's. (*Ibid.*)<br><br>Documented releases at Beacon Bay Fountain Valley span the period from at least 1989 to 2000. (Massey Decl., Ex. 1.e. (Moreau Report on Beacon Bay Fountain Valley). In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis. 56.1 ¶ 256, *infra*, and evidence cited therein. |

**b.    Beacon Bay Car Wash SA: 1501 W. MacArthur, Santa Ana**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 10.      Union Oil did not own or operate Beacon Bay Car Wash-Santa Ana, located at 1501 West MacArthur Boulevard in Santa Ana, California. (See Correll Dec., Ex. 6 (Union Oil Resp. to CMO #75 dated Jul. 22, 2010), p. 2 (listing those sites at which Union Oil owned the USTs and/or the real property); Correll Dec., Ex. 7 (Union Oil Resp. to-OCWD 3rd Spec. Interrog. at Nos. 1-2 dated Nov. 7, 2008), pp. 5-10 (listing those stations owned and operated by Union Oil). While Union Oil supplied gasoline to Beacon Bay Car Wash SA from 1986 through August 23, 1994, there is no evidence of any affirmative conduct by Union Oil at this site. (See Correll Dec., Ex. 8 (G. Chan Declaration dated July 13, 2011), ¶T 5,7; see also Correll Dec., Ex. 10 (Excerpts of Supply Records dated Aug. 1994), p. | **10.   Disputed.**<br><br>The statement relies on Union Oil's discovery responses, which are inadmissible for this purpose. (Pltf.'s Objs. to Evid. § II.C., II.D.)<br><br>Union Oil had a "lease/leaseback" relationship with Beacon Bay from at least 1983 to 1994, in which Union Oil leased all Beacon Bay stations and the equipment thereon, including Beacon Bay Santa Ana, and then leased them back to Beacon Bay. (Massey Ex. 3 [Shea Depo., July 30, 2010, pp. 94:16-98:14, Ex. 7].) Union Oil handled all deliveries of gas to the stations for a longer period of time dating to the 1960's. (*Ibid.*)<br><br>Documented releases at Beacon Bay Santa Ana span the period from at least 1983 to |

| CHEVMDL00000710159.) | 2001. (Massey Ex. 1.f. [Moreau Report on Beacon Bay Santa Ana].) In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis. (56.1 ¶ 256, *infra*, and evidence cited therein.) |
| --- | --- |

**Facts Relevant to Lyondell**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
| --- | --- |
| 11.      At all times relevant to this action, Lyondell manufactured neat MTBE for sale in bulk quantities to oil refiners and others, who either blended it into some portion of their gasoline or sold it to other entities for that purpose. (Declaration of Alex Blagojevic ("Blagojevic Dec."), ¶ 5.); (Third Am. Complaint 1135-37.) | 11.  **Undisputed**. |
| 12.      After Lyondell sold bulk MTBE to a customer, Lyondell had no way of knowing where, when, or by whom that MTBE was blended into gasoline, or where, when, or to whom the gasoline into which the MTBE was blended was shipped or sold. Lyondell does not know the identities of the customers to whom its customers sell their gasoline because Lyondell's ownership and control over the MTBE ends when title is transferred to its customers. (Blagojevic Dec., ¶¶ 6-7.) | **12.  Disputed**<br><br>Lyondell has provided extensive records of the refiners to whom it sold neat MTBE, including the major defendants in this litigation. (See 56.1 ¶¶ 119-139, *infra*.)  No. 11, *supra*, affirmatively states that neat MTBE was sold for the purpose of blending into gasoline.  Lyondell therefore knew who blended its neat MTBE into gasoline – it was Lyondell's refiner customers.<br><br>Lyondell also had "a way of knowing" the identities of the customers to whom the refiners sold gasoline containing MTBE.  Many of Lyondell's refiner customers also conducted retail operations and supplied those operations from the refineries where they blended Lyondell neat MTBE into their gasoline.  Lyondell, for example, was the exclusive supplier of neat MTBE to Chevron's El Segundo refinery during a ten |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
|  | year period when Chevron was the exclusive supplier of MTBE gasoline to its branded stations in Orange County.  (56.1 ¶¶ 119-139, *infra*.) |
| 13.     Lyondell has never sold, either in bulk or at retail, or delivered any MTBE in or to the Orange County area. (Blagojevic Dec., 1 8.) | **13.  Undisputed** that Lyondell did not itself directly sell, supply or distribute MTBE-gasoline in Orange County.<br><br>**Disputed** that Lyondell was not aware that gasoline containing its MTBE was being sold into retail gasoline stations in Orange County that would leak and spill that MTBE gasoline and contaminate groundwater. (56.1 ¶¶ 119-139, 256, *infra*.) |
| 14.     Lyondell has never sold, supplied, or delivered any gasoline (with or without MTBE) or branded goods (whether gasoline or MTBE) in the Orange County area. (Blagojevic Dec., ¶¶ 10-11, 16.); (Third Am. Complaint ¶¶ 10-34, 40-45 .) | **14.  Undisputed** that Lyondell did not itself sell, supply or distribute MTBE-gasoline in Orange County.<br><br>**Disputed** that Lyondell was not aware that gasoline containing its MTBE was being sold into retail gasoline stations in Orange County that would leak and spill that MTBE gasoline and contaminate groundwater. (56.1 ¶¶ 119-139, 256, *infra*.) |
| 15.     Lyondell has never exercised any control of or oversight over the manufacture, design, formulation, compounding, packaging, marketing, shipping, storage, dispensing, sale, or use of its customers' gasoline products containing MTBE. (Blagojevic Dec., ¶ 17.) | **15.  Undisputed** that Lyondell had no direct control or oversight over these elements of its customers' MTBE-gasoline products.<br><br>**Disputed** that Lyondell had no control at all over its customers use and handling of the neat MTBE Lyondell supplied.  Lyondell, through its Product Safety Bulletins of 1993 and 2003, provided instructions on the proper storage and dispensing of MTBE-gasoline, as well as warnings on the environmental hazards if such Bulletins were not followed. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | (Miller Ex. 4 [Lee Depo., Oct. 24, 2007, pp. 79:6-84:24, 94:16-98:22, Exs.  11, 12].) |
| 16.     Lyondell has never owned, operated, or leased any gasoline service stations or other facilities at which gasoline was stored or used that are located in the Orange County area, including the 34 service stations and facilities located within the focus plumes selected by OCWD and Defendants for trial ("Focus Stations"), the real estate on which the Focus Stations are located, or underground storage tanks at the Focus Stations. (Blagojevic Dec., ¶¶ 12, 14-15.); (Third Am. Complaint ¶¶ 40-45.) | **16.  Undisputed.** |
| 17.     Lyondell has never exercised oversight or control over any Focus Stations, and never had any right or ability to do so. (Blagojevic Dec., ¶¶ 18-21.) | **17.  Undisputed** that Lyondell had no direct control over any Focus station.<br><br>**Disputed** that Lyondell never had any ability or right to do so.  Lyondell, through its Product Safety Bulletins of 1993 and 2003, provided instructions on the proper storage and dispensing of MTBE-gasoline, as well as warnings on the environmental hazards if such Bulletins were not followed.  (Miller Ex. 4 [Lee Depo., Oct. 24, 2007, pp. 79:6-84:24, 94:16-98:22, Exs.  11, 12].) |

**Facts Relevant to The Shell Defendants**

     a.       **Beacon Bay Auto Wash: 10035 Ellis Avenue**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 18.    Texaco Refining and Marketing Inc. supplied gasoline to Beacon Bay Fountain Valley at 10035 Ellis Avenue pursuant to a supply agreement during the time period 1994 to 1998. From 1998 through 2001, Equilon Enterprises LLC supplied Texaco-branded gasoline to this location. (Condron Dec., Ex. 32, Styslinger Dec. at ¶ 5; Condron Dec., Ex. 33, Shea Dep. at 106:13-22.) | **18.  Disputed.**<br><br>The Shell Defendants supplied *and delivered* gasoline to Beacon Bay Fountain Valley from 1994 to 2001 (pursuant to supply agreements in the name of Texaco Refining & Marketing and Equilon Enterprises).  (CMO No. 116; Massey Ex. 3 [Shea Depo., July 30, 2010, p. 63:2-10, 116:21-118:2, 119:14-25, Ex. 13].)<br><br>Documented releases at Beacon Bay Fountain Valley span the period from at least 1989 to 2000.  (Massey Decl., Ex. 1.e. [Moreau Report on Beacon Bay Fountain Valley].)  In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis.  56.1 ¶ 256, *infra*, and evidence cited therein.  Those leaks include, as testified to by District expert Marcel Moreau, based in part on a U.S. EPA report entitled *Causes of Release from UST Systems*, and corroborated by Beacon Bay 30(b)(6) witness Patrick Shea, gasoline deliveries often cause spills:  "[L]oose delivery fittings and the delivery process, especially the frequent disconnection of large cumbersome delivery hoses that have been incompletely drained, frequently result in the spillage of small quantities of fuel" that can cause contamination.  (Massey Ex. 1.a. [Expert Report of Marcel Moreau, p. I-12]; *id.* at Ex. 3 [Shea Depo., pp. 63:16-64:17].) |
| 19.    Beacon Bay had a retail sales agreement with Texaco Refining and Marketing from 1994 through 1997, and from 1997 through 2000. (Condron Dec., Ex. 33, Shea Dep. at 126:24-127:3, 129:22-25.) | **19.  Undisputed.** |
| 20.    Beacon Bay then entered into a sales | **20.  Undisputed.** |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| agreement with Equilon, effective January 1, 2001. (Condron Dec., Ex. 33, Shea Dep. at 130:16-131:8.) | |
| 21.    Equilon terminated its sales agreements with Beacon Bay at each of Beacon Bay's stations in November 2001. (Condron Dec., Ex. 33, Shea Dep. at 123:23-124:1.) | **21.  Undisputed.** |
| 22.    In April 2006, Beacon Bay Fountain Valley received Remedial Action Completion Certification from the Orange County Health Care Agency, finding that "site investigation and corrective action carried out at [Beacon Bay's] underground storage tank(s) site is in compliance" with the requirements of the pertinent sections of the Health and Safety Code and that "no further action related to the petroleum release(s) at the site is required." (Condron Dec., Ex. 34, Letter from Orange County Health Care Agency.) A case closure summary by the Leaking Underground Fuel Tank Program was approved by the Regional Water Quality Control Board on April 14, 2006. (Condron Dec., Ex. 35, Case Closure Summary.) | **22. Disputed.**<br><br>The letter from the Health Care Agency is conditioned on "information in the above-referenced file and with the provision that the information provided to this agency was accurate and representative of site conditions." (Condron Ex. 34.)  The Regional Board summary acknowledges the Beacon Bay MTBE plume is commingled with a plume from a nearby "ARCO station" and that MTBE continues to be present in groundwater.  (*Id.* at Ex. 35.)<br><br>As District expert Anthony Brown opined, MTBE (and TBA) contamination from Beacon Bay Fountain Valley remains in groundwater, based on data collected after 2006, and further CPT testing should be done as part of the remedial process.  (Massey Ex. 5 [Brown Depo., Feb. 6, 2012, pp. 1363:14-1364:12, 1364:24-1365:12].) |
| 23.    Neither Texaco nor Equilon ever owned or operated Beacon Bay Fountain Valley. (Condron Dec., Ex. 33, Shea Dep. at 32:4-6.) | **23. Disputed.**<br><br>The Shell Defendants dictated all aspects of the operations of Beacon Bay Fountain Valley such that they controlled the operations, not Beacon Bay.  (Massey Ex. 6.a.-6.c. [dealer agreements controlling all aspects of |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | operations and granting Shell Defendants the right of inspection at all times]; Massey Ex. 3 [Shea Depo., July 30, 2010, p. 55:12-15].) |

### b.   Beacon Bay Carwash: 1501 West MacArthur Blvd.

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 24.   Texaco Refining and Marketing Inc. supplied gasoline to Beacon Bay Santa Ana at 1501 West MacArthur Boulevard pursuant to a supply agreement during the time period 1994 to 1998. From 1998 through December 2000, Equilon Enterprises LLC supplied Texacobranded gasoline to this location. (Condron Dec., Ex., 32, Styslinger Dec. at ¶ 5; Condron Dec., Ex. 33, Shea Dep. at 53:2-20, 106:13-22.) | 24.   **Disputed.** The Shell Defendants supplied *and delivered* gasoline to Beacon Bay Santa Ana from 1994 to 2001 (pursuant to supply agreements in the name of Texaco Refining & Marketing and Equilon Enterprises).  (CMO No. 116; Massey Ex. 3 [Shea Depo., July 30, 2010, p. 63:2-10, 116:21-118:2, 119:14-25, Ex. 12].) Releases at Beacon Bay Santa Ana span the period from 1983 to 2001.  (Massey Ex. 1.f. (Moreau Report on Beacon Bay Santa Ana). In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis.  56.1 ¶ 256, *infra*, and evidence cited therein.  Those leaks include, as testified to by District expert Marcel Moreau, based in part on a U.S. EPA report entitled *Causes of Release from UST Systems*, and corroborated by Beacon Bay 30(b)(6) witness Patrick Shea, gasoline deliveries often cause spills:  "[L]oose delivery fittings and the delivery process, especially the frequent disconnection of large cumbersome delivery hoses that have been incompletely drained, frequently result in the spillage of small quantities of fuel" that can cause |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | contamination. (Massey Ex. 1.a. [Expert Report of Marcel Moreau, p. I-12]; *id.* at Ex. 3 [Shea Depo., pp. 63:16-64:17].) |
| 25.     Beacon Bay Santa Ana had a retail sales agreement with Texaco Refining and Marketing from May 1994 through April 1997, and from September 1997 through August 2000. (Condron Dec., Ex. 33, Shea Dep. at 53:2-20, 106:13-22.) | **25.   Undisputed.** |
| 26.     Texaco Refining and Marketing Inc. entered into a supply agreement with Beacon Bay Enterprises Inc., effective from May 1, 1994 to April 30, 1997. (Condron Dec., Ex. 36, Texaco Refining and Marketing Inc. Retail Sales Agreement for Motor Fuels at 1.) Under this agreement, Beacon Bay, at its expense, was to be "responsible for all spill response action and environmental remediation required as a result of ... discharges..." (Condron Dec., Ex. 36, Texaco Refining and Marketing Inc. Retail Sales Agreement for Motor Fuels at 5.) The agreement also specified that Beacon Bay was "at all times, an independent business entity that is free to select its customers, set its own selling prices and terms of sale, and generally conduct its business as it determines...." (Condron Dec., Ex. 36, Texaco Refining and Marketing Inc. Retail Sales Agreement for Motor Fuels at 7.) | **26.   Disputed.** The Shell Defendants dictated all aspects of the operations of Beacon Bay Santa Ana such that they controlled the operations, not Beacon Bay. (Massey Ex. 7.a.-7.c. [dealer agreements controlling all aspects of operations and granting Shell Defendants the right of inspection at all times]; Massey Ex. 3 [Shea Depo., July 30, 2010, p. 55:12-15].) |
| 27.     Beacon Bay owned and maintained the underground storage tank and dispensing equipment at Beacon Bay Santa Ana. (Condron Dec., Ex. 33, Shea Dep. at 58:14-17.) Beacon Bay installed new underground storage tanks at Beacon Bay Santa Ana by December 1998. (Condron | **27.   Disputed.** Union Oil had an ownership interest in, and control of, Beacon Bay Santa Ana (and Fountain Valley). (*Supra,* ¶¶ 9-10.) The Shell Defendants dictated all aspects of |

15

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Dec., Ex. 33, Shea Dep. at 119:14-19.) | the operations of Beacon Bay Santa Ana such that they controlled the operations, not Beacon Bay. (Massey Ex. 7.a.-7.c. [dealer agreements controlling all aspects of operations and granting Shell Defendants the right of inspection at all times];Massey Ex. 3 [Shea Depo., July 30, 2010, p. 55:12-15].) |
| 28.    When releases or leaks of gasoline occurred at this station, Beacon Bay was "on the hook" for them. (Condron Dec., Ex. 33, Shea Dep. at 90:13-20.) | **28.  Disputed.**<br><br>This is a legal argument that requires no response. (*See* S.D.N.Y. Local Rule 56.1(a) [requiring a statement of "material facts"].).<br><br>The Shell Defendants supplied *and delivered* gasoline to Beacon Bay Santa Ana from 1994 to 2001 (pursuant to supply agreements in the name of Texaco Refining & Marketing and Equilon Enterprises). (CMO No. 116; Massey Ex. 3 [Shea Depo., July 30, 2010, p. 63:2-10, 116:21-118:2, 119:14-25, Ex. 12].)<br><br>Releases at Beacon Bay Santa Ana span the period from 1983 to 2001. (Massey Ex. 1.f. (Moreau Report on Beacon Bay Santa Ana). In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis. 56.1 ¶ 256, *infra*, and evidence cited therein. Those leaks include, as testified to by District expert Marcel Moreau, based in part on a U.S. EPA report entitled *Causes of Release from UST Systems*, and corroborated by Beacon Bay 30(b)(6) witness Patrick Shea, gasoline deliveries often cause spills: "[L]oose delivery fittings and the delivery process, especially the frequent disconnection of large cumbersome delivery hoses that have been incompletely drained, frequently result in the spillage of small quantities of fuel" that can cause |

16

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | contamination.  (Massey Ex. 1.a. [Expert Report of Marcel Moreau, p. I-12]; *id.* at Ex. 3 [Shea Depo., pp. 63:16-64:17].)<br><br>In any event, the issue is in dispute.  (Third Amd. Complaint.) |
| 29.     Beacon Bay leased the property on which Beacon Bay Santa Ana was located and left the property when the rent was raised. It removed the buildings and structures per its lease. (Condron Dec., Ex. 33, Shea Dep. at 32:11-23.) Beacon Bay had already removed the underground storage tanks at Beacon Bay Santa Ana when the property was vacated (Condron Dec., Ex. 33, Shea Dep. at 32:6-9), having removed the tanks in 2001. (Condron Dec., Ex. 33, Shea Dep. at 37:19-23, 214:1-14.) | **29. Disputed.**<br><br>Union Oil leased Beacon Bay Santa Ana (and Fountain Valley) and all equipment thereon. (*Supra,* ¶¶ 9-10.) |
| 30.     In February 2004, the California Regional Water Quality Control Board sent a site closure letter regarding Beacon Bay Santa Ana, stating that no further action was required. (Condron Dec., Ex. 37, Letter from California Regional Water Quality Control Board at 2.) | **30. Disputed.**<br><br>The letter from the Regional Board is conditioned on "information in the above-referenced file and with the provision that the information provided to this agency was accurate and representative of site conditions." (Condron Ex. 37.)<br><br>As District expert Anthony Brown opined, MTBE contamination from Beacon Bay Santa Ana remains in groundwater and further CPT testing should be done as part of the remedial process.  (Massey Ex. 5 [Brown Depo., Feb. 6, 2012, pp. 1393:2-22].) |
| 31.     Neither Texaco nor Equilon ever owned or operated Beacon Bay Santa Ana. (Condron Dec., Ex. 33, Shea Dep. at 32:11-23, 58:14-17.) | **31. Disputed.**<br><br>The Shell Defendants dictated all aspects of the operations of Beacon Bay Santa Ana such |

17

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | that they controlled the operations, not Beacon Bay. (Massey Ex. 7.a.-7.c. [dealer agreements controlling all aspects of operations and granting Shell Defendants the right of inspection at all times]; Massey Ex. 3 [Shea Depo., July 30, 2010, p. 55:12-15].) |

c.   **Huntington Beach Arco: 6002 Bolsa Avenue**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 32.     Texaco Refining and Marketing Inc. supplied gasoline to the station at 6002 Bolsa Avenue pursuant to a supply agreement, from 1987 to 1990. (Condron Dec., Ex. 32, Styslinger Dec. at 1 5.) | **32.   Disputed**.<br><br>The Shell Defendants supplied *and delivered* gasoline to Huntington Beach ARCO from 1987 to 1990 (pursuant to supply agreements in the name of Texaco Refining & Marketing and Equilon Enterprises). (E.g., CMO No. 116; (Massey Ex. 9.a. [SHELL413484-413490]; Condron Ex. 39; Condron Ex. 38.)<br><br>Documented releases, and detections of MTBE, span the period from 1994 to 1997 at Huntington Beach ARCO. (Massey Ex. 1.g. [Moreau Report on Huntington Beach ARCO].) In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis. 56.1 ¶ 256, *infra*, and evidence cited therein. Those leaks include, as testified to by District expert Marcel Moreau, based in part on a U.S. EPA report entitled *Causes of Release from UST Systems*, and corroborated by Beacon Bay 30(b)(6) witness Patrick Shea, gasoline deliveries often cause spills: "[L]oose delivery fittings and the delivery process, |

18

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | especially the frequent disconnection of large cumbersome delivery hoses that have been incompletely drained, frequently result in the spillage of small quantities of fuel" that can cause contamination.  (Massey Ex. 1.a. [Expert Report of Marcel Moreau, p. I-12]; *id.* at Ex. 3 [Shea Depo., pp. 63:16-64:17].) |
| 33.      Texaco Refining and Marketing Inc. entered into a supply agreement with Ali Seyedgavadi to supply gasoline to the station at 6002 Bolsa Avenue, effective from June 1987 through May 1988. (Condron Dec., Ex. 38, Trial Franchise Sales Agreement at 2.) This supply agreement specified that Texaco Refining and Marketing would not be held liable for actions or litigation arising from liability for the station's "storage, transportation or delivery" of the gasoline supplied to it. (Condron Dec., Ex. 38, Trial Franchise Sales Agreement at 3.) The agreement also specified that the purchaser, the station, was an "independent business entity that is free to select its customers, purchase and sell products from sources other than Seller, set its own selling prices and terms of sale, and generally conduct its business as it determines." (Condron Dec., Ex. 38, Trial Franchise Sale Agreement at 5.) | **33.  Disputed.**<br><br>The Shell Defendants dictated all aspects of the operations of Huntington Beach ARCO such that they controlled the operations, not Mr. Seyedgavadi.  (Massey Ex. 9.a. [SHELL413484-413490]; Condron Ex. 39; Condron Ex. 38.) |
| 34.      Texaco Refining and Marketing Inc. entered into another supply agreement with Ali Seyedgavadi to supply gasoline to the station at 6002 Bolsa Avenue, effective June 1988 to May 1991. (Condron Dec., Ex. 39, Sales Agreement at 2.) The Sales Agreement contains the same clauses as the Trial Franchise Sale Agreement. The contract was terminated in 1990. (Condron Dec., Ex. 32, Styslinger Dec. at ¶ 5.) | **34.  Disputed.**<br><br>The Shell Defendants dictated all aspects of the operations of Huntington Beach ARCO such that they controlled the operations, not Mr. Seyedgavadi.  (Massey Ex. 9.a. [SHELL413484-413490]; Condron Ex. 39; Condron Ex. 38.) |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 35.     Texaco Refining and Marketing Inc. never owned or operated the station at 6002 Bolsa Avenue. (Condron Dec., Ex. 38, Trial Franchise Sale Agreement at 5.) | **35.   Disputed.**<br><br>The Shell Defendants dictated all aspects of the operations of Huntington Beach ARCO such that they controlled the operations, not Mr. Seyedgavadi.  (Massey Ex. 9.a. [SHELL413484-413490]; Condron Ex. 39; Condron Ex. 38.) |

      d.     <u>G&M Oil #24: 3301 Bristol Street</u>

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 36.     Texaco Refining and Marketing Inc. supplied gasoline to G&M Oil #24, 3301 Bristol Street pursuant to a supply agreement during the time period from 1991 to 1994. (Condron Dec., Ex. 32, Styslinger Dec. at ¶ 5.) | **36.   Undisputed.**<br><br>G&M #24 documented a UST release in February 1997 followed by a sharp uptick in MTBE concentrations in 1998 and several equipment failures and leaks through 2006. (Massey Ex. 1.d. (Moreau Report on G&M #24).  In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis.  56.1 ¶ 256, *infra*, and evidence cited therein. |
| 37.     The real estate at to G&M Oil #24, 3301 Bristol Street was owned by a real estate investment trust and was leased by G&M Oil, beginning in 1985. (Condron Dec., Ex. 41, Gray Dep. at 33:16-20, 34:1-5.) | **37.   Disputed.**<br><br>The Shell Defendants dictated all aspects of the operations of G&M #24 such that they controlled the operations, not G&M Oil. (Massey Ex. 8 [SHELL416314-416324]; Condron Ex. 42.) |
| 38.     Texaco Refining and Marketing Inc. entered into a supply agreement with G&M Oil Co. Inc. to supply the station at 3301 Bristol Street. This agreement was effective from December 15, 1991 to November 30, | **38.   Disputed.**<br><br>The Shell Defendants dictated all aspects of the operations of G&M #24 such that they controlled the operations, not G&M Oil. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 1994. (Condron Dec., Ex. 42, Sales Agreement at 1.) The agreement specified that G&M Oil Co. Inc. was "an independent business entity that is free to select its customers, purchase and sell products from sources other than Seller, set its own selling prices and terms of sale, and generally conduct its business as it determines." (Condron Dec., Ex. 42. Sales Agreement at 6.) | (Massey Ex. 8 [SHELL416314-416324]; Condron Ex. 42.) |
| 39.     G&M Oil #24, 3301 Bristol Street was operated by G&M Oil Co. Inc. until January 1, 2002 and was then operated by G&M Oil Co. LLC. (Condron Dec., Ex. 41, Gray Dep. at 41:18-24.) | **39.  Disputed.** From 1991 to 1994, the Shell Defendants dictated all aspects of the operations of G&M #24 such that they controlled the operations, not G&M Oil.  (Massey Ex. 8 [SHELL416314-416324]; Condron Ex. 42.). |

**Facts Relevant to Tesoro**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 40.     In May 2010, Plaintiff alleged Tesoro product was delivered to the following five focus plume stations, based on (i) Tesoro's supply of gasoline to PDI and (ii) PDI's alleged sales of gasoline to G&M Oil: (1) 8980 Warner Ave., Fountain Valley, CA; (2) 16990 Beach Blvd., Huntington Beach, CA; (3) 3301 Bristol St., Santa Ana, CA; (4) 5992 Westminster Blvd., Westminster, CA; and (5) 14600 Edwards St., Westminster, CA. (Martin Dec., ¶ 5.) | **40. Undisputed** that the District responded to specific interrogatories about these five stations. **Disputed** that defendants comprehensively recite the 66-page responses.  The District responded subject to an objection that discovery was ongoing and reserving the right to supplement or amend the responses.  The District provided subsequent discovery responses that supplemented and amended the first set of interrogatories.  (Han Ex. 14.) |
| 41.     In November 2010, Plaintiff | **41. Undisputed** that the District responded to |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| contended product was released at the five focus plume stations it alleged received Tesoro product in its May 2010 discovery responses. Plaintiff did not identify the source of the product. (Martin Dec., ¶ 7.) | Tesoro's second set of interrogatories in November, 2010.<br><br>**Disputed** that defendants comprehensively recite the 86-page responses.  The District specifically incorporated its responses to multiple prior discovery responses (Han Ex. 14) which, combined with the November, 2010 responses, explained in detail the evidence and conduct by defendants upon which the District intended to hold Tesoro liable.  The District incorporates its responses to ¶¶ 259-264, 269, *infra*. |
| 42.      Also in November 2010, Plaintiff alleged Tesoro product was released at an additional 17 focus plume stations, bringing the total number of stations where it alleged Tesoro liability to 22. The additional 17 stations were as follows: (1) 18025 Magnolia St., Fountain Valley, CA; (2) 3201 Harbor Blvd., Costa Mesa, CA; (3) 13142 Goldenwest St., Westminster, CA; (4) 10035 Ellis Ave., Fountain Valley, CA; (5) 1501 West MacArthur Blvd., Santa Ana,. CA; (6) 16230 Harbor Blvd., Fountain Valley, CA; (7) 9024 Warner Ave., Fountain Valley, CA; (8) 3470 Fairview Rd., Costa Mesa, CA; (9) 8471 Warner Ave., Huntington Beach, CA; (10) 6502 Bolsa Ave., Huntington Beach, CA; (11) 8520 Warner Ave., Fountain Valley, CA; (12) 18520 Brookhurst St., Fountain Valley, CA; (13) 6311 Westminster Blvd., Westminster, CA; (14) 9475 Warner Ave., Fountain Valley, CA; (15) 6322 Westminster Ave., Westminster, CA; (16) 8971 Warner Ave., Huntington Beach, CA; and (17) 5981 Westminster Ave., Westminster, CA. (Martin Dec., ¶ 7.) | 42. **Undisputed** that the District responded to Tesoro's Second Set of Interrogatories in November, 2010.  (Han Ex. 14.)<br><br>**Disputed** that defendants comprehensively recite the 86-page responses.  The District specifically referenced and incorporated its responses to multiple prior discovery responses (Han Ex. 14, pp. 53-54).  The multiple discovery responses explained in detail the evidence and conduct by defendants upon which the District intended to hold Tesoro liable.  The District incorporates its responses to ¶¶ 259-265, 269, *infra*. |

| **DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE:** | **PLAINTIFF'S RESPONSE AND EVIDENCE** |
|---|---|
| 43.      In April 2013, Plaintiff developed a revised station matrix alleging Tesoro liability at the following 24 focus plume stations, based on Tesoro's status as a "refiner/supplier": (1) 16742 Beach Blvd., Huntington Beach, CA; (2) 16990 Beach Blvd., Huntington Beach, CA; (3) 8520 Warner Ave., Fountain Valley, CA; (4) 8971 Warner Ave., Huntington Beach, CA; (5) 9475 Warner Ave., Fountain Valley, CA; (6) 9525 Warner Ave., Fountain Valley, CA; (7) 3201 Harbor Blvd., Costa Mesa, CA; (8) 18480 Brookhurst St., Fountain Valley, CA; (9) 18520 Brookhurst St., Fountain Valley, CA; (10) 18025 Magnolia St., Fountain Valley, CA; (11) 3301 Bristol St., Santa Ana, CA; (12) 3361 S. Bristol St., Santa Ana, CA; (13) 3801 S. Bristol St., Santa Ana, CA; (14) 6002 Bolsa Ave., Huntington Beach, CA; (15) 6502 Bolsa Ave., Huntington Beach, CA; (16) 14600 Edwards St., Westminster, CA; (17) 14972 Springdale St., Huntington Beach, CA; (18) 5981 Westminster Blvd., Westminster, CA; (19) 5992 Westminster Blvd., Westminster, CA; (20) 6311 Westminster Blvd., Westminster, CA; (21) 6322 Westminster Ave., Westminster, CA; (22) 4002 Ball Rd., Cypress, CA; (23) 13142 Goldenwest St., Westminster, CA; and (24) 12541 Seal Beach Blvd., Seal Beach, CA. (Roy Dec., ¶ 23, Ex. 76.) | **43. Undisputed** in part and disputed in part.<br><br>The District prepared a matrix at the direction of the Court in an effort to condense hundreds of thousands of documents and hundreds of depositions into a table reflecting the focus plume stations and defendants associated with each station.<br><br>The District incorporates its responses to Nos. 41-42. |
| 44.      By letters dated May 24, 2013 and January 23, 2014, Tesoro's counsel attempted to meet and confer with Plaintiffs counsel regarding Tesoro's objections to the April 2013 station matrix. (Martin Dec., ¶¶ 9-10.) | **44. Disputed.**<br><br>The District responded to Tesoro's May 24, 2013 letter with a letter dated May 31, 2013 (and later April 15, 2014), which addressed the issues in Tesoro's letter.  (Han Ex. 12 [May 31, 2013, letter, pp. 3-4].) |

23

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 45.      By letter dated January 31, 2014, Plaintiffs counsel indicated it would "provide ... a response shortly" to Tesoro's January 2014 letter. Plaintiff provided no response. (Martin Dec., ¶ 11.) | **45.  Disputed.**<br><br>Tesoro sent a letter dated January 23, 2014, which specifically addressed the District's use of an alternative theory and Tesoro's defense to the co-mingled product theory.  (Han Ex. 12 [Jan. 23, 2014,letter].) The District had already responded to Tesoro's contentions in its discovery responses and in the May 31, 2013 letter. (*Ibid.* [May 31, 2013, letter].)  Nonetheless, the District repeated its position in a letter dated April 15, 2014.  (Han Ex. 12.) |
| 46.      On Match 25, 2014, Plaintiff's counsel sent a letter to defendants, stating, "In order to make the meet and confer meeting as efficient and productive as possible, we hereby request that [] defendants who have [] factually based objections to specific stations on the Service Station Matrix serve these objections no later than Friday, March 28, 2014, so that we have adequate time to vet and respond to these issues." (Martin Dec., ¶ 12.) | **46.  Undisputed.** |
| 47.      Pursuant to Plaintiff counsel's request, on March 28, 2014, Tesoro's counsel resent its May 2013 and January 2014 letters and requested a response in advance of a scheduled April 8, 2014 meet and confer. Plaintiff provided no response. (Martin Dec., ¶ 13.) | **47.  Disputed.**<br><br>The District incorporates its responses to No. 44-45.<br><br>In light of the correspondence with Tesoro, the District had no obligation to further respond prior to the scheduled meeting. |
| 48.      At the April 8, 2014 meet and confer, Plaintiff's counsel indicated for the first time its intent to rely on a commingling theory of causation to allege Tesoro liability. (Martin Dec., ¶ 14.) | **48.  Disputed.**<br><br>The District incorporates its Response to Nos. 243, 259-265, 243; *see also* Han Ex. 10 [Resp. to Interrogatory Nos. 5 & 6, pp. 100, 104].) |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Further, this Court stated in April, 2014, "they never denied, they just objected.  It seems to me that under our rule, which is very limited on interrogatories, it was probably an appropriate objection.  Unless you had asked me to overrule it, and then I would have said while it is an appropriate objection in this case, it would be wise to know, you have to answer.  But that never happened.  Given that you had an objection, not a denial, I don't think I can say that Mr. Axline misled you.  All he did was object to your question.  He didn't deny that he was going to use it." Han Decl. ¶ 12, Ex. 10 [R.T., Apr. 16, 2004, p. 12].) |
| 49.    In an April 15, 2014 letter, Plaintiff contended Tesoro product was delivered to the following 26 focus plume stations: (1) 16742 Beach Blvd., Huntington Beach, CA; (2) 16990 Beach Blvd., Huntington Beach, CA; (3) 8471 Warner Ave., Huntington Beach; (4) 8520 Warner Ave., Fountain Valley, CA; (5) 8971 Warner Ave., Huntington Beach, CA; (6) 9475 Warner Ave., Fountain Valley, CA; (7) 9525 Warner Ave., Fountain Valley, CA; (8) 3201 Harbor Blvd., Costa Mesa, CA; (9) 18480 Brookhurst St., Fountain Valley, CA; (10) 18520 Brookhurst St., Fountain Valley, CA; (11) 18025 Magnolia St., Fountain Valley, CA; (12) 10035 Ellis Ave., Fountain Valley, CA; (13) 3301 Bristol St., Santa Ana, CA; (14) 3361 S. Bristol St., Santa Ana, CA; (15) 3801 S. Bristol St., Santa Ana, CA; (16) 1501 W. MacArthur Blvd., Santa Ana, CA; (17) 6002 Bolsa Ave., Huntington Beach, CA; (18) 6502 Bolsa Ave., Huntington Beach, CA; (19) 14972 Springdale St., | **49.  Undisputed** that the April 15, 2014 letter alleges that focus plume stations received Tesoro product, but affirmatively state this information was provided in responses to discovery requests.  (E.g., Han Ex. 6, 7 and 14.) Tesoro withheld relevant information about its sales of MTBE gasoline that supplied the OCWD service area.  A year after the close of discovery, Tesoro produced new evidence revealing MTBE gasoline sales and exchanges to terminals that supplied Orange County.  (Han Ex. 14 [July 14, 2011, letter from B. Parseghian to T. O'Reilly; July 19, 2011, letter from B. Parseghian to T. O'Reilly]). |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Huntington Beach, CA; (20) 5981 Westminster Blvd., Westminster, CA; (21) 5992 Westminster Blvd., Westminster, CA; (22) 6311 Westminster Blvd., Westminster, CA; (23) 6322 Westminster Ave., Westminster, CA; (24) 4002 Ball Rd., Cypress, CA; (25) 13142 Goldenwest St., Westminster, CA; and (26) 12541 Seal Beach Blvd., Seal Beach, CA. (Martin Dec., ¶ 15, Ex. 45.) | |
| 50.    Between Plaintiff's May 2010, November 2010, April 201.3 and April 2014 discovery responses and correspondence, Plaintiff alleged a Tesoro nexus at 31 of the 34 focus plume stations. (Martin Dec., ¶ 16.) | 50.  Undisputed that the District provided multiple discovery responses setting out its theory of liability against Tesoro.  (See No. 41-42.) |
| 51.    Tesoro is moving for summary judgment on all 34 focus plume stations because Plaintiff's allegations against Tesoro are continually changing, and Plaintiff has no evidence connecting Tesoro to any of the 34 focus plume stations. (Martin Dec., ¶ 16, Ex. 46.) | 51.  Disputed.

The District incorporates its responses to No. 259-264, *infra*, and No. 49, *supra*. |
| 52.    Plaintiff identified Tesoro as a "refiner/supplier" defendant. (Third Amended Complaint ¶¶ 28, 29, 34.) | 52.  Undisputed.

(Han Decl. ¶ 15.) |
| 53.    Tesoro did not own, operate, lease, or have a retail supply contract with any of the 34 focus plume stations between 1986 and 2003 (the "Relevant Time Period" per CMO #4). (Mills Dec., ¶ 7.) | 53.  Disputed.

The District incorporates its responses to No. 259-264, *infra*. |
| 54.    Tesoro did not provide any of the 34 focus plume stations with instruction manuals or written directions related to their operations, including their handling of gasoline or their choice and maintenance of equipment between 1986 and 2003. (Mills | 54.  Undisputed. *** |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Dec., ¶ 7.) | |

**Facts Relevant to BP**

a.     **Huntington Beach ARCO: 6002 Bolsa Avenue, Huntington Beach**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 55.     The BP Defendants supplied gasoline to Huntington Beach ARCO, located at 6002 Bolsa Avenue pursuant to a supply agreement between April 11, 1990 and 2003. (Declaration of William T. Costley III ¶ 3; Roy Dec. 17, Ex. 60 (BP Defendants' Objections and Responses to OCWD's Sixth Set of Interrogatories to Defendants), p.23.) | **55. Undisputed.** The statement relies in part on the BP Defendants' discovery responses, which are inadmissible for this purpose.  (Pltf.'s Objs. to Evid. § III.A.) The BP Defendants supplied *and delivered* gasoline to Huntington Beach ARCO from *June 13, 1986,* to 2003, pursuant to contracts that dictated all aspects of the operations of Huntington Beach ARCO such that the BP Defendants controlled the operations. (Massey Ex. 9.b.-9.d. [AROCWD003348-003356, AROCWD003357-003365, AROCWD003375-003399].) Documented releases, and detections of MTBE, span the period from 1994 to 1997 at Huntington Beach ARCO.  (Massey Ex. 1.g. [Moreau Report on Huntington Beach ARCO].)  In addition, leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis.  56.1 ¶ 256, *infra,* and evidence cited therein.  Those leaks include, as testified to by District expert Marcel Moreau, based in part on a U.S. EPA report entitled *Causes of Release from UST Systems,* and corroborated by Beacon Bay 30(b)(6) witness Patrick Shea, gasoline |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | deliveries often cause spills: "[L]oose delivery fittings and the delivery process, especially the frequent disconnection of large cumbersome delivery hoses that have been incompletely drained, frequently result in the spillage of small quantities of fuel" that can cause contamination. (Massey Ex. 1.a. [Expert Report of Marcel Moreau, p. I-12]; *id.* at Ex. 3 [Shea Depo., pp. 63:16-64:17].) |
| 56.    The real estate at Huntington Beach ARCO was not owned by BP during the time MTBE was added to gasoline in southern California. (Roy Dec. ¶ 4, Ex. 57 (BP Defendants' Objections and Responses to OCWD's Third Set of Interrogatories to Atlantic Richfield Company and ARCO Products Company), p.41.) | **56. Disputed.**

The statement relies on the BP Defendants' discovery responses, which are inadmissible for this purpose.  (Pltf.'s Objs. to Evid. § III.B.)

The BP Defendants dictated all aspects of the operations of Huntington Beach ARCO such that the BP Defendants controlled the operations.  (Massey Ex. 9.b.-9.d. [AROCWD003348-003356, AROCWD003357-003365, AROCWD003375-003399].) |
| 57.    The underground storage tanks at Huntington Beach ARCO were not owned by BP during the time MTBE was added to gasoline in southern California. (Costley Dec. ¶ 3; Roy Dec. ¶ 4, Ex. 57 (BP Defendants' Objections and Responses to OCWD's Third Set of Interrogatories to Atlantic Richfield Company and ARCO Products Company), pp.41-2.) | **57. Disputed.**

The statement relies on inadmissible testimony and the BP Defendants' discovery responses, which are inadmissible for this purpose.  (Pltf.'s Objs. to Evid. §§ I.A., III.B.)

The BP Defendants dictated all aspects of the operations of Huntington Beach ARCO such that the BP Defendants controlled the operations.  (Massey Ex. 9.b.-9.d. [AROCWD003348-003356, AROCWD003357-003365, AROCWD003375-003399].) |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 58.      The retail service station at Huntington Beach ARCO was not operated by BP during the time MTBE was added to gasoline in southern California. (Costley Dec. ¶ 3.) | **58.  Disputed.**<br><br>The statement relies on inadmissible testimony.  (Pltf.'s Objs. to Evid. § I.A.)<br><br>The BP Defendants dictated all aspects of the operations of Huntington Beach ARCO such that the BP Defendants controlled the operations.  (Massey Ex. 9.b.-9.d. [AROCWD003348-003356, AROCWD003357-003365, AROCWD003375-003399].) |
| 59.      The retail service station at Huntington Beach ARCO was operated by Abdolamir Farsai between April 11, 1990 and June 22 1997. (Roy Dec. ¶ 4, Ex. 57 (BP Defendants' Objections and Responses to OCWD's Third Set of Interrogatories to Atlantic Richfield Company and ARCO Products Company), pp. 42-3.) | **59.  Disputed.**<br><br>The statement relies on the BP Defendants' discovery responses, which are inadmissible for this purpose.  (Pltf.'s Objs. to Evid. § III.B.)<br><br>The BP Defendants dictated all aspects of the operations of Huntington Beach ARCO such that the BP Defendants controlled the operations.  (Massey Ex. 9.b.-9.d. [AROCWD003348-003356, AROCWD003357-003365, AROCWD003375-003399].) |
| 60.      The retail service station at Huntington Beach ARCO was operated by HF & SJ Inc. between June 23, 1997 and 2003. (Roy Dec. 14, Ex. 57 (BP Defendants' Objections and Responses to OCWD's Third Set of Interrogatories to Atlantic Richfield Company and ARCO Products Company), pp. 42-3.) | **60.  Disputed.**<br><br>The statement relies on the BP Defendants' discovery responses, which are inadmissible for this purpose.  (Pltf.'s Objs. to Evid. § III.B.)<br><br>The BP Defendants dictated all aspects of the operations of Huntington Beach ARCO such that the BP Defendants controlled the operations.  (Massey Ex. 9.b.-9.d. [AROCWD003348-003356, |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | AROCWD003357-003365, AROCWD003375-003399].) |

### b.   World Oil #39,3490 Ball Road, Anaheim

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 61.      The BP Defendants supplied gasoline to World Oil #39, located at 3490 Ball Road pursuant to a supply agreement between late summer/early fall 1989 and December 30, 1993. (Costley Dec. ¶ 4.) | 61. Disputed.<br><br>The BP Defendants supplied gasoline to World Oil #39 until 1994.  (Massey Ex. 4 [Rekhlau Depo., Sept. 10, 2010, pp. 16:2-19:14].)<br><br>The BP Defendants' gasoline was released at World Oil #39 because leaks and spills at active retail gasoline stations inevitably occur on a regular and ongoing basis.  56.1 ¶ 256, *infra*, and evidence cited therein. |
| 62.      The underground storage tanks at World Oil #39 were not owned by BP during the time MTBE was added to gasoline in southern California. (Costley Dec. ¶ 4; Roy Dec. ¶ 12, Ex. 65 (Deposition of P. Rehklau) p. 25:4-20.) | 62. Disputed.<br><br>The statement relies on inadmissible and incompetent testimony (from witnesses lacking personal knowledge).  (Pltf.'s Objs. to Evid. § I.B.; Massey Ex. 4 [Rekhlau Depo., Sept. 10, 2010, pp. 10:12-14, 24:10-15].) |
| 63.      The retail service station at World Oil #39 was not operated by BP during the time MTBE was added to gasoline in southern California. (Costley Dec. ¶ 4; Roy Dec. ¶ 12, Ex. 65 (Deposition of P. Rehklau) p. 18:2-7.) | 63. Disputed.<br><br>The statement relies on inadmissible and incompetent testimony (from witnesses lacking personal knowledge).  (Pltf.'s Objs. to Evid. § I.B.; Massey Ex. 4 [Rekhlau Depo., Sept. 10, 2010, pp. 10:12-14, 24:10-15].) |
| 64.      World Oil owned and operated the retail service station located at World Oil #39 | 64. Disputed. |

30

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| during the time MTBE was added to gasoline in southern California. (Roy Dec. ¶ 12, Ex. 65 (Deposition of P. Rehklau) p. 18:2-7; 24:10-25:20) | The statement relies on inadmissible and incompetent testimony (from witnesses lacking personal knowledge). (Massey Ex. 4 [Rekhlau Depo., Sept. 10, 2010, pp. 10:12-14, 24:10-15].) |

### Facts Relevant to VMSC and VRC-CA

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 65.     OCWD named Valero Marketing and Supply Company ("VMSC") and Valero Refining Company-California ("VRC-CA") (collectively "Valero") as "Refiner/Supplier," "Manufacturer/Supplier," and "Owner/Operator" defendants. (3AC, ¶¶ 23-24, 34, 39, 45.) | 65. **Undisputed** that the District named these entities. **Disputed** on the grounds that for all intents and purposes these entities operate as one supply and distribution chain in California. The District further contends that both of these entities are the successors for Ultramar.<br><br>In prior summary judgment submissions to this Court, Valero admitted that its history can be traced back to the Beacon Oil Company and various mergers between Beacon, Ultramar, and Ultramar Diamond Shamrock. (Defendants' Local Rule 56.1 Statement of Material Facts in Support of Defendants' Motion for Summary Judgment for Lack of Evidence Pertaining to Causation (March 15, 2013) at ¶ 50, *City of Fresno v. Chevron U.S.A., Inc., et al.*, Case No. 04-Cv-04973.) The District's Response to Paragraph 262 *supra* details the fact that all of the Valero entities responded to discovery as one entity identified as the "Valero Defendants." Ultramar admitted in a disclosure to this Court that Valero Marketing & Supply Company ("VMSC") took over and continued Ultramar's duties and obligations relating to |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | MTBE activities. (Han Decl. Ex. 13 at 2.) This disclosure further states that Ultramar's liability rests with Valero. (*Id.*) <br><br> This Court specifically required Defendants to disclose successor liability issues back in 2005, so that Defendants would not be assert corporate shuffle shell games at the end of the litigation. For the Valero Defendants to assert *now* that they are not successors to Ultramar – eight years after it was disclosed to the Court and Plaintiff that VMSC had taken over and continued Ultramar's MTBE operations – is disingenuous, at best, particularly when Ultramar and both Valero entities responded to discovery as a single entity. The District asks this Court to reject the Valero Defendants' assertion that they are not successors-in-interest to Ultramar's MTBE operations and activities. |
| 66.    VMSC and VRC-CA are subsidiaries of Valero Energy Corporation. (Declaration of Ethan A. Jones ("E. Jones Dec."), ¶ 3.) | **66. Disputed** on the grounds that these entities operate as one supply and distribution chain in California. The District further contends that both of these entities are the successors for Ultramar. The District further objects to this Paragraph in the grounds that it is a legal argument and not a statement of fact. The District's memorandum in opposition to defendants' summary judgment motion further addresses this legal argument. |
| 67.    VMSC is a distributor of gasoline and other products. (E. Jones Dec., ¶ 4.) VMSC became qualified to do business in California on March 16, 2000; however, VMSC did not purchase, distribute, or market gasoline or other products in the State of California prior to May 15, 2000. ( *Id.*) | **67. Undisputed** that VMSC is a considered distributor by VMSC. **Disputed** that VMSC operates as one supply and distribution chain with VRC-CA. The District further contends that both of these entities are the successors for Ultramar. *See* Response to Paragraph 65 *supra.* |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | **Overview**<br><br>The evidence shows that Ultramar, and both Valero entities participated in the refining, supply and distribution of MTBE gasoline in California.  These entities supplied gasoline directly to a number of the refiners who owned, operated or directly supplied the focus sites.<br><br>Valero admitted that it utilized numerous Los Angeles area terminals, including terminals located in Carson, to supply gasoline to customers in Orange County.  (Boone Decl., Ex. 5, Valero Defendants' Resp. to Preliminary Rogs at 10, 12.)<br><br>Valero admitted that the Valero defendants have sold and/or distributed over **1,150,549.26 barrels of MTBE gasoline** to Orange County from 1997 to 2003.  (Boone Decl., Ex. 4,  Valero Defendants' Resp. to 3rd Rogs (Nov. 7, 2008) at 14-15.)<br><br>**Arco**<br><br>Ultramar and/or Valero sold MTBE gasoline to Arco in 1991-1992, and each year from 1996-2003.  (O'Reilly Decl., Ex. 9, Arco Answers to 1st Rogs at Attachment A.)<br><br>Ultramar and/or Valero sold net MTBE to Arco to Arco in 1991, 1996-1998, and 2001-2003. (O'Reillly Decl., Ex.9, Arco Answers to 1st Rogs re Defendant Identification (Aug. 30, 2004) at Resp. at Attachment B.)<br><br>Sales records produced by Valero relating to gasoline sales in Southern California between |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | 1996-2003 show that Valero sold over 200,000 barrels ("bbls") of MTBE gasoline to Arco Products/BP at terminals Carson in 1997 and 2000-2002.  (Wallace Decl., Ex. 2.) |
| | Arco supplied MTBE gasoline to ten focus sites.  (CMO #116 at 25-28.) |
| | **Chevron** |
| | Sales records produced by Valero relating to gasoline sales in Southern California between 1996-2003 show that Valero sold over 412,000 bbls of MTBE gasoline to Chevron at terminals Carson in 1997 and 2000-2003. (Wallace Decl., Ex. 2.) |
| | Valero sold neat MTBE to Chevron in San Pedro as follows: December 2001, March 2002, July 2002, October 2002, and December 2002.  (O'Reilly Decl., Ex. 18, CUSA Further Resp. to Preliminary Rogs re: Defendant Identification (Aug. 30, 2004) at 7, 14-15.) |
| | Chevron supplied MTBE gasoline to six focus sites, including the G&M Oil stations discussed below.  (CMO #116 at 13-14.) |
| | **Conoco** |
| | Sales records produced by Valero relating to gasoline sales in Southern California between 1996-2003 show that Valero sold over **5,187,980 bbls** of MTBE gasoline to Conoco at terminals Carson in 1997 and 2000-2003. (Wallace Decl., Ex. 2.) |
| | Conoco supplied MTBE gasoline to two |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
| --- | --- |
| | focus sites.  (CMO #116 at 25.) |

**Exxon/Mobil**

Sales records produced by Valero relating to gasoline sales in Southern California between 1996-2003 show that Valero sold over 196,000 bbls of MTBE gasoline to Chevron at terminals Carson in 1997 and 2000-2003. (Wallace Decl., Ex. 2.)

Exxon confirmed that it received MTBE gasoline from Valero in Carson.  (Miller Decl., Ex. 11, ExxonMobil Resp. to Preliminary Rogs at 9 and 11.)

Exxon and/or Mobil supplied MTBE gasoline to seven focus sites.  (CMO #116 at 21-24.)

**G&M Oil**

Valero had direct supply relationships with both G&M Oil stations that are focus sites as well as direct supply contract with G&M Oil.

Valero admitted that it supplied MTBE gasoline to G&M Oil in 1997, 1998, and 1999.  (Boone Decl., Ex. 4, Valero Defendants' Resp. to 3rd Rogs (Nov. 7, 2008) at Ex. A.)

Valero discovery responses stated, moreover, the G&M Oil #4 at 16990 Beach Boulevard was "owned, operated, leased or subject to a retail supply contract" with Valero from 10/04/04 - current (as of date of doc, 12/30/04).  (Boone Decl., Ex. 3, Valero Defendants CMO #4 Decl. [Skillern]; *see also* Ex. 2, Letter of Intent to be branded

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Valero, dated 8/11/04.) |
| | Valero had a "retail supply contract" with G&M Oil #24, 3301 South Bristol, Santa Ana from November 21, 1995 to approximately December 2001.  (Boone Decl., Ex. 4, Valero Defendants' Resp. to  3rd of Rogs (Nov. 7, 2008) at 9.) |
| | Valero admitted it sold and distributed gasoline to Petro Diamond.  (Boone Decl., Ex. 3, Valero CMO #4 [Parker] at Section (i) and Ex. A.)  The District contends that Petro-Diamond supplied MTBE gasoline to G&M Oil as set forth in Paragraph 141, *infra*. |
| | **Shell** |
| | Sales records produced by Valero relating to gasoline sales in Southern California between 1996-2003 show that Valero sold over 128,000 bbls of MTBE gasoline to Chevron at terminals Carson in 1997 and 2003.  (Wallace Decl., Ex. 2.) |
| | Shell stated it received MTBE gasoline from the Valero defendants for delivery to stations within the District's service area.  (O'Reilly Decl., Ex. 16, Shell Defendants' Resp. to 1st Rogs. at 6-7.)  Shell also stated that, since 1996, the Valero defendants have provided Shell with neat MTBE.  (*Id.* at 8.) |
| | **Southern Counties** |
| | Sales records produced by Valero relating to gasoline sales in Southern California between 1996-2003 show that Valero sold over millions of bbls of MTBE gasoline to |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Southern Counties between 1997 and 2003. (Wallace Decl., Ex. 2.) |
| | **World Oil** |
| | Valero admitted it sold and distributed gasoline to World Oil Co. (Boone Decl., Ex. 3, Valero CMO #4 [Parker] at Section (i) and Ex. A at 2.) |
| | Sales records produced by Valero relating to gasoline sales in Southern California between 1996-2003 show that Valero sold over 3,713,971 bbls of MTBE gasoline to World Oil. (Wallace Decl., Ex. 2.) |
| | Valero admitted that it had a "retail supply contract" with the World Oil #39, 3450 West Ball Road, Anaheim. (Boone Decl., Ex. 4, Valero Defendants' Resp. to 3rd Rogs at p. 9; *see also* Valero Defendants CMO #4 Decl. [Skillern].) |
| | Since Exxon had to divest itself of certain assets when it bought Mobil, Valero fulfilled the Exxon branding agreements with World starting in 2000. (Han Decl., Ex. 4c, Rehklau Depo. (Sept. 10, 2010) at 69:2-70:23.) |
| 68.     VMSC purchases refined products from certain Valero refineries and markets those products to various parties. (E. Jones Dec., ¶ 5.) VMSC has neither manufactured MTBE nor refined gasoline. VMSC has never owned, operated, or leased a refinery. ( *Id.*) | **68. Undisputed** that VMSC is a considered distributor by VMSC. **Disputed** that VMSC operates as one supply and distribution chain with VRC-CA. The District further contends that both of these entities are the successors for Ultramar. *See* Response to Paragraph 65 *supra*.<br><br>The District further incorporates the Response to Paragraph 67 *supra*. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 69.     VRC-CA refines crude oil into gasoline and other products. (E. Jones Dec., ¶ 6.) VRC-CA became qualified to do business in California on March 16, 2000. ( *Id.*) On or about May 15, 2000, VRC-CA purchased the Benicia refinery, located at 3400 E. 2nd Street in Benicia, California, from Exxon Mobil Corporation, and has owned and operated the refinery since that date. ( *Id.*) VRC-CA did not refine crude oil into gasoline or other products in the State of California prior to May 15, 2000. ( *Id.*) | 69. **Undisputed** that VRC-A is considered are refiner.  **Disputed** on the grounds that VRC-A for all intents and purposes these entities operate as one supply and distribution chain in California. The District further contends that both of these entities are the successors for Ultramar.  *See* Response to Paragraph 65 *supra*.  The District further incorporates the Response to Paragraph 67 *supra*. |
| 70.     Neither VMSC nor VRC-CA has ever manufactured equipment used for the distribution, handling, storage, dispensing, or sale of gasoline products. (Declaration of David Goodrum Relating to Defendants Valero Marketing and Supply Company and Valero Refining Company-California ("Goodrum Valero Dec."), ¶ 4.) | 70. **Disputed** as irrelevant.  The District's claims relate to the manufacture, supply and distribution of MTBE and MTBE gasoline to refiners who supplied focus sites.  *See* Response to Paragraph 67 *supra*. |
| 71.     Between 1986 and December 2003 (the Relevant Time Period), neither VMSC nor VRC-CA owned, leased, operated, or controlled the retail gas station, real estate, or underground storage tanks at any of the locations listed below. (Goodrum Valero Dec., ¶ 5.) Additionally, during the Relevant Time Period, neither VMSC nor VRC-CA had a retail supply agreement, or any other contractual agreement, with any of the locations listed below. (M) Furthermore, neither VMSC nor VRC-CA provided the locations listed below with instruction manuals or written directions related to their operations, including their handling of gasoline or their choice and maintenance of equipment used during the Relevant Time | 71. **Disputed** as irrelevant and inaccurate.  The District's claims relate to the manufacture, supply and distribution of MTBE and MTBE gasoline to refiners who supplied focus sites.  The District specifically disputes the denial of a supply contract with G&M #4 (16990 Beach Boulevard, Huntington Beach) as this assertion is directly contrary to multiple discovery responses served on behalf of the Valero defendants. *See* Response to Paragraph 67 *supra*. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Period. ( *Id.*) Lastly, neither VMSC nor VRC-CA is in possession or control of any evidence that indicates gasoline products manufactured and/or distributed by VMSC and/or VRC-CA were delivered to the stations listed below during the Relevant Time Period. ( *Id.*) | |

- 16742 Beach Boulevard, Huntington Beach, California (ARCO #1887)
- 16990 Beach Boulevard, Huntington Beach, California (G&M #4)
- 8471 Warner Avenue, Huntington Beach, California (Shell #204359403)
- 8520 Warner Avenue, Fountain Valley, California (Texaco #8520/Texaco #121608)
- 8971 Warner Avenue, Huntington Beach, California (Unocal #5376)
- 8980 Warner Avenue, Fountain Valley, California (Exxon #4283/Chevron #208552)
- 9024 Warner Avenue, Fountain Valley, California (Mobil #18-G6B)
- 9475 Warner Avenue, Fountain Valley, California (Texaco #121681)
- 9525 Warner Avenue, Fountain Valley, California (Unocal #5399)
- 3195 Harbor Boulevard, Costa Mesa, California (Mobil #18-HDR)
- 3201 Harbor Boulevard, Costa Mesa, California (ARCO #613 1)
- 3470 Fairview Road, Costa Mesa, California (Mobil #18-JMY)
- 18480 Brookhurst Street, Fountain Valley, California (ARCO #1912)
- 18520 Brookhurst Street, Fountain Valley, California (Thrifty #383)
- 18025 Magnolia Street, Fountain Valley, California (ARCO #1905)
- 10035 Ellis Avenue, Fountain Valley, California (Beacon Bay Car Wash FV)
- 2921 South Bristol Street, Santa Ana, California (Mobil #18-HEP)
- 3301 South Bristol Street, Santa Ana, California (G&M #24)
- 3361 South Bristol Street, Santa Ana, California (ARCO #3085)
- 3801 South Bristol Street, Santa Ana, California (Chevron #1921)
- 1501 West MacArthur Boulevard, Santa Ana, California (Beacon Bay Car Wash SA)
- 6002 Bolsa Avenue, Huntington Beach, California (Huntington Beach ARCO)
- 6502 Bolsa Avenue, Huntington Beach, California (Shell #6502)
- 14600 Edwards Street, Westminster, California (USA Gasoline #141)
- 14972 Springdale Street, Huntington Beach, California (Unocal #5123)
- 5981 Westminster Avenue, Westminster, California (Westminster Shell)
- 5992 Westminster Boulevard, Westminster, California (Chevron #9-5401)
- 6311 Westminster Boulevard, Westminster, California (Thrifty #368)
- 6322 Westminster Avenue, Westminster, California (Unocal #5226)
- 4002 Ball Road, Cypress, California (Unocal #5792/ConocoPhillips #5792)
- 13142 Goldenwest Street, Westminster, California (ARCO #6036)

- 12541 Seal Beach Boulevard, Seal Beach, California (Chevron #9-5568)
- 16230 Harbor Boulevard, Fountain Valley, California (Mobil #18-668)

( *Id.*)

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 72.      Between 1986 and December 2003, neither VMSC nor VRC-CA owned, leased, or operated the retail gas station, real estate, or underground storage tanks located at 3450 West Ball Road, Anaheim, California ("World Oil #39"). (Goodrum Valero Dec., ¶ 6.) Additionally, between 1986 and May 14, 2000, neither VMSC nor VRC-CA had a retail supply agreement, or any other contractual agreement, with World Oil #39. ( *Id.*) Furthermore, neither VMSC nor VRC-CA provided World Oil #39 with instruction manuals or written directions related to its operations, including its handling of gasoline or its. choice and maintenance of equipment used. ( *Id.*) Neither VMSC nor VRC-CA is in possession or control of any evidence that indicates gasoline products manufactured and/or distributed by VMSC and/or VRC-CA were delivered to World Oil #39 between 1986 and May 14, 2000. ( *Id.*) VRC-CA, however, was assigned a retail supply contract with World Oil #39 on May 15, 2000. ( *Id.*) On May 15, 2000, VRC-CA began supplying fuel to World Oil Marketing Company for delivery to World Oil #39. ( *Id.*) | **72. Disputed**.<br><br>Valero admits that its relationship was governed by the retail supply contract between Exxon and World Oil. The District contends that, pursuant to this contract Exxon and then Valero dictated all aspects of the operations of World Oil #39 such that Exxon controlled the operations, not World Oil. The District incorporates its Responses to Paragraphs 1-5 *supra*. |
| 73.      VRC-CA's relationship with World Oil #39 began on May 15, 2000 (Goodrum Valero Dec., ¶ 6), when it was assigned ExxonMobil's distributor sales agreement with World Oil Marketing Company, the terms of which required VRC-CA to supply World Oil stations in Southern California | **73. Disputed.**<br><br>The District incorporates its Response to Paragraph 72 *supra*. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| with gasoline. (Declaration of Amy Parker in Support of Defendants' Motion for Summary Judgment ("Parker Dec."), 13, Ex. 18 (Memorandum of Agreement (Los Angeles Area) Between Valero Refining Company-California and World Oil Marketing Company, November 16, 2001) at p. 3.) | |

**Facts Relevant to Ultramar Inc.**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 74.      OCWD named Ultramar Inc. as a "Refiner/Supplier" and "Owner/Operator" defendant. (3AC, ¶ 22, 34, 45.) | 74. **Undisputed** that the District named Ultramar. **Disputed** that the Valero entities are not successors to Ultramar. The District incorporates its response to Paragraph 65 *supra.* |
| 75.      Ultramar Inc. is a subsidiary of Valero Energy Corporation. (Declaration of David Goodrum Relating to Defendant Ultramar Inc. ("Goodrum Ultramar Dec."), ¶ 3.) | 75. **Undisputed** that the District named Ultramar. **Disputed** that the Valero entities are not successors to Ultramar. The District incorporates its response to Paragraph 65 *supra.* |
| 76.      Ultramar Inc. has never manufactured equipment used for the distribution, handling, storage, dispensing, or sale of gasoline products. (Goodrum Ultramar Dec., ¶ 4.) | 76. **Disputed** as irrelevant. The District's claims relate to the manufacture, supply and distribution of MTBE and MTBE gasoline to refiners who supplied focus sites. *See* Response to Paragraph 67 *supra.* |
| 77.      Between 1986 and December 2003 (the "Relevant Time Period"), Ultramar Inc. did not own, lease, operate, or control the retail gas station, real estate, or underground storage tanks at any of the locations listed below. (Goodrum Ultramar Dec., ¶ 5.) Additionally, during the Relevant Time | 77. **Disputed** as irrelevant. The District's claims relate to the manufacture, supply and distribution of MTBE and MTBE gasoline to refiners who supplied focus sites. *See* Response to Paragraph 67 *supra.* |

41

| **DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE:** | **PLAINTIFF'S RESPONSE AND EVIDENCE** |
|---|---|
| Period, Ultramar Inc. did not have a retail supply agreement, or any other contractual agreement, with any of the locations listed below. ( *Id.*) Furthermore, Ultramar Inc. did not provide the locations listed below with instruction manuals or written directions related to their operations, including their handling of gasoline or their choice and maintenance of equipment used during the Relevant Time Period. ( *Id.*) Lastly, Ultramar Inc. is not in possession or control of any evidence that indicates gasoline products manufactured and/or distributed by Ultramar Inc. were delivered to the stations listed below during the Relevant Time Period. (1d) | |

- 16742 Beach Boulevard, Huntington Beach, California (ARCO #1887)
- 16990 Beach Boulevard, Huntington Beach, California (G&M #4)
- 8471 Warner Avenue, Huntington Beach, California (Shell #204359403)
- 8520 Warner Avenue, Fountain Valley, California (Texaco #8520/Texaco #121608)
- 8971 Warner Avenue, Huntington Beach, California (Unocal #5376)
- 8980 Warner Avenue, Fountain Valley, California (Exxon #4283/Chevron #208552)
- 9024 Warner Avenue, Fountain Valley, California (Mobil #18-G6B)
- 9475 Warner Avenue, Fountain Valley, California (Texaco #121681)
- 9525 Warner Avenue, Fountain Valley, California (Unocal #53 99)
- 3195 Harbor Boulevard, Costa Mesa, California (Mobil #18-HDR)
- 3201 Harbor Boulevard, Costa Mesa, California (ARCO #6131)
- 3470 Fairview Road, Costa Mesa, California (Mobil #18-JMY)
- 18480 Brookhurst Street, Fountain Valley, California (ARCO #1912)
- 18520 Brookhurst Street, Fountain Valley, California (Thrifty #383)
- 18025 Magnolia Street, Fountain Valley, California (ARCO #1905)
- 10035 Ellis Avenue, Fountain Valley, California (Beacon Bay Car Wash FV)
- 2921 South Bristol Street, Santa Ana, California (Mobil #18-HEP)
- 3301 South Bristol Street, Santa Ana, California (G&M #24)
- 3361 South Bristol Street, Santa Ana, California (ARCO #3085)
- 3801 South Bristol Street, Santa Ana, California (Chevron #1921)
- 1501 West MacArthur Boulevard, Santa Ana, California (Beacon Bay Car Wash SA)
- 6002 Bolsa Avenue, Huntington Beach, California (Huntington Beach ARCO)

- 6502 Bolsa Avenue, Huntington Beach, California (Shell #6502)
- 14600 Edwards Street, Westminster, California (USA Gasoline #141)
- 14972 Springdale Street, Huntington Beach, California (Unocal #5123)
- 5981 Westminster Avenue, Westminster, California (Westminster Shell)
- 5992 Westminster Boulevard, Westminster, California (Chevron #9-5401)
- 6311 Westminster Boulevard, Westminster, California (Thrifty #368)
- 6322 Westminster Avenue, Westminster, California (Unocal #5226)
- 4002 Ball Road, Cypress, California (Unocal #5792/ConocoPhillips #5792)
- 13142 Goldenwest Street, Westminster, California (ARCO #6036)
- 12541 Seal Beach Boulevard, Seal Beach, California (Chevron #9-5568)
- 16230 Harbor Boulevard, Fountain Valley, California (Mobil #18-668)
- 3450 West Ball Road, Anaheim, California (World Oil #39)

(Id.)

**B.    Issue No. 2: OCWD Cannot Prevail on Continuing Nuisance Because It Lacks Evidence of Reasonable Abatability.**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 78.    OCWD's expert, Anthony Brown, did not perform site-specific analyses to determine the remediation costs at any sites other than Arco 1905 and G&M #4. (Correll Dec., Ex. 1 I (A. Brown Report, Appx. B.8 re Arco 1905), p. 5; Correll Dec., Ex. I I (A. Brown Report, Appx. B.2 re G&M #4), p. 4.) | **78. Disputed.** Anthony Brown performed a site-specific analysis for each site that is the subject of his report.  Mr. Brown detailed his analyses in meticulous and lengthy reports, each of which was produced as an appendix to his May 2011 expert report in this matter.  *See* Barnhart Decl., Ex. 1 (Brown Report), pp. 2-3. Anthony Brown provided complete remediation estimates for two stations, G&M Oil #4 ($13, 229,611) and ARCO 1905 ($3,186,627).  *See* Barnhart Decl., Ex. 1 at p. 2. Anthony Brown then conducted a detailed site-specific analysis at each remaining station, all of which had less information available than G&M Oil # 4 and ARCO 1905. This site-specific analysis included |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | consideration of site-specific CPT drilling and testing, conducted at the direction and expense of the District.  At each station, after considering site-specific conditions, Mr. Brown prepared an estimate using that site's specific conditions and the cost estimates for G&M Oil #4 ($13, 229,611) and ARCO 1905 ($3,186,627).  *See* Barnhart Decl., Ex. 1 at p. 2, Ex. 12 at p. 3 (ARCO 1905), Ex. 13 at pp. 3-4 (G&M Oil # 4), Ex. 13 at pp. 6-7 (Shell #6502).

Mr. Brown qualified each estimate by stating: "However, it should be noted that the full lateral and vertical extent of contamination at these facilities is not known. Therefore, the costs to fully investigate the contamination at these facilities will likely be more than the costs presented to address the currently known extent of contamination.  That is, the costs presented herein are conservative." *See* Barnhart Decl., Ex. 1 at 2.

Anthony Brown also opined that "[w]hile the cost to remediate the MTBE and TBA emanating from each facility will be significant, the cost to address the contamination once it reaches drinking water wells, including operational costs, would be far greater." *See* Barnhart Decl., Ex. 1 at 2.

At each station, Mr. Brown expressed the opinion that it would cost at least $79,050 to advance the remedial process and determine if further work was required.

Mr. Brown's opinion that remediating MTBE contamination sooner is more cost-effective that doing it later is supported by report of |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | defense expert Richard Sloan.  According to Sloan, failures to "respond[] to known gasoline leaks/spills in a timely and appropriate manner" is the primary reason that MTBE "threat[ens] potable water wells in [the District's] service area."  Mr. Sloan also opined that "timely application of a site-specific remediation sequence" determines the "cost and difficulty of remediation."  *See* Barnhart Decl., Ex. 1 (Sloan Report, Oct. 7, 2011) at 11-12.<br><br>Defendants expressly deny and disavow any intent to contend that MTBE is not reasonably abatable.  Motion at 5, fn. 4.  Defendants cite no evidence that MTBE is <u>not</u> reasonably abatable.  *See generally* Motion. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 79.    Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Arco #1887, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B. 1 re Arco #1887), p. 5.) Mr. Brown further-opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **79.  Disputed.**<br><br>Mr. Brown produced a 133-page report of his site-specific analysis of Arco #1887.<br><br>As of April 2011 – more than 22 years after MTBE contamination was detected at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 1 (Brown Report, App. B.1) at pp. 1-5; *see also* 56.1 ¶ 78. |
| 80.    Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Texaco #8520/Texaco #121608, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.3 re Texaco #8520/Texaco #121608), p. 6) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could | **80.  Disputed.**<br><br>Mr. Brown produced a 97-page report of his site-specific analysis of Texaco #8520/Texaco #121608.<br><br>As of December 2010 – more than 25 years after MTBE contamination was detected at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| determine the scope and extent of additional remediation needed, if any. ( *Id.*) | Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 1 (Brown Report, App. B.3) at 1; Ex. 2 (Brown Report, App. B.3) at 2-6); *see also* 56.1 ¶ 78. |
| 81.     Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Texaco #121681, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.5 re Texaco #121681), p. 4.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **81. Disputed.**<br><br>Mr. Brown produced a 73-page report of his site-specific analysis of Texaco #121681.<br><br>As of December 2010 – 26 years after gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | can be derived using his own site-specific work and costs estimates at Arco #1905 and G&M #4. *See* Barnhart Decl., Ex. 2 (Brown Report, App. B.5) at 1-4; *see also* 56.1 ¶ 78. |
| 82.    Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Unocal #5399, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.6 re Unocal #5399), p. 3.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **82. Disputed.** Mr. Brown produced a 39-page report of his site-specific analysis of Unocal #5399. As of May 2011 – more than 17 years after gasoline was reported spilled at this site – defendants still have not fully delineated the vertical and lateral extent of the plume. Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished. Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a conservative cost estimate for fully remediating this site can be derived using his own site-specific work and costs estimates at Arco #1905 and G&M #4. *See* Barnhart Decl., Ex. 2 (Brown Report, App. B.6) at 1-3; *see also* 56.1 ¶ 78. |
| 83.    Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Arco #1912, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, | **83. Disputed.** Mr. Brown produced a 152-page report of his site-specific analysis of Arco #1912. Mr. Brown's analysis included results of CPT |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Appx. B.7 re Arco #1912), pp. 4, 5.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | drilling and testing conducted at the direction and expense of the District to better determine the off-site location and movement of MTBE.

As of December 2010 – more than 25 years after gasoline was reported spilled at this site – defendants still have not fully delineated the vertical and lateral extent of the plume.

Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.

Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a conservative cost estimate for fully remediating this site can be derived using his own site-specific work and costs estimates at Arco #1905 and G&M #4.

*See* Barnhart Decl., Ex. 3 (Brown Report, App. B.7) at 1-5; *see also* 56.1 ¶ 78. |
| 84.    Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Thrifty #383, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.9 re Thrifty #383), p. 5.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional | **84.  Disputed.**

Mr. Brown produced a 99-page report of his site-specific analysis of Thrifty #383.

As of December 2010 – more than 23 years after gasoline was reported spilled at this site – defendants still have not fully delineated the vertical and lateral extent of the plume.

Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| remediation needed, if any. ( *Id.*) | investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 3 (Brown Report, App. B.9) at 1-5; *see also* 56.1 ¶ 78. |
| 85.      Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Beacon Bay Fountain Valley, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B. 10 re Beacon Bay Car Wash- FV), p. 4.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **85. Disputed.**<br><br>Mr. Brown produced a 64-page report of his site-specific analysis of Beacon Bay Fountain Valley.<br><br>As of December 2010 – more than 21 years after gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
|  | G&M #4.<br><br>*See* Barnhart Decl., Ex. 3 (Brown Report, App. B.10) at 1-3; Ex. 4 (Brown Report, App. B.10) at 4; *see also* 56.1 ¶ 78. |
| 86.    Mr. Brown did not perform a site-specific analysis to determine the remediation costs at G&M #24, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B. 11 re G&M Oil #24), p. 3.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **86. Disputed.**<br><br>Mr. Brown produced a 89-page report of his site-specific analysis of G&M #24.<br><br>As of May 2011 – 14 years after gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 4 (Brown Report, App. B.11) at 1-3; *see also* 56.1 ¶ 78. |
| 87.    Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Arco #3085, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B. 14 re Arco #3085), p. 3.) Mr. Brown | **87. Disputed.**<br><br>Mr. Brown produced a 153-page report of his site-specific analysis of Arco #3085.<br><br>As of December 2010 – 17 years after |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 4 (Brown Report, App. B.14) at 1-3; *see also* 56.1 ¶ 78. |
| 88.     Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Chevron #9-1921, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.13 re Chevron #9-1921), p. 3.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **88.  Disputed.**<br><br>Mr. Brown produced a 106-page report of his site-specific analysis of Chevron #9-1921.<br><br>As of December 2010 – 26 years after gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 4 (Brown Report, App. B.13) at 1-3; *see also* 56.1 ¶ 78. |
| 89.    Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Beacon Bay Car Wash SA, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.12 re Beacon Bay Car Wash- SA), pp. 3, 4.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **89. Disputed.**<br><br>Mr. Brown produced a 66-page report of his site-specific analysis of Beacon Bay Car Wash SA.<br><br>As of December 2010 – 27 years after remediation activities began at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 4 (Brown Report, App. B.12) at 1; Ex. 5 (Brown Report, App, B.12) at 2-4; *see also* 56.1 ¶ 78. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 90.　　Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Huntington Beach Arco, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.21 re Huntington Beach Arco), p. 5.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **90. Disputed.** Mr. Brown produced a 80-page report of his site-specific analysis of Huntington Beach Arco. As of May 2011 – more than 16 years after gasoline was reported spilled at this site – defendants still have not fully delineated the vertical and lateral extent of the plume. Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished. Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a conservative cost estimate for fully remediating this site can be derived using his own site-specific work and costs estimates at Arco #1905 and G&M #4. *See* Barnhart Decl., Ex. 5 (Brown Report, App. B.21) at 1-5; *see also* 56.1 ¶ 78. |
| 91.　　Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Unocal #5123, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. I 1 (A. Brown Report, Appx. B.16 re Unocal #5123), p. 7.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he | **91. Disputed.** Mr. Brown produced a 183-page report of his site-specific analysis of Unocal #5123. As of March 2011 – more than 23 years after gasoline was reported spilled at this site – defendants still have not fully delineated the vertical and lateral extent of the plume. Mr. Brown estimates that it will cost at least |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished. Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4. *See* Barnhart Decl., Ex. 5 (Brown Report, App. B.16) at 1-5; Ex. 6 (Brown Report, App. B.16) at 6-7; *see also* 56.1 ¶ 78. |
| 92.      Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Westminster Shell, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.20 re Westminster Shell), p. 8.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **92.  Disputed.** Mr. Brown produced a 102-page report of his site-specific analysis of Westminster Shell. As of December 2010 – 25 years after gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume. Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished. Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | work and costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 6 (Brown Report, App. B.20) at 4-8; *see also* 56.1 ¶ 78. |
| 93.   Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Chevron #9-5401, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.15 re Chevron #9-5401), p. 6.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **93. Disputed.**<br><br>Mr. Brown produced a 101-page report of his site-specific analysis of Chevron #9-5401.<br><br>As of December 2010 – 28 years after gasoline was reported spilled at this site – defendants still have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a conservative cost estimate for fully remediating this site can be derived using his own site-specific work and costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 6 (Brown Report, App. B.15) at 1-6; *see also* 56.1 ¶ 78. |
| 94.   Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Thrifty #368, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B. 18 re Thrifty #368), p. 4.) Mr. | **94. Disputed.**<br><br>Mr. Brown produced a 96-page report of his site-specific analysis of Thrifty #368.<br><br>As of December 2010 – 22 years after |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | gasoline was reported spilled at this site – defendants still have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a conservative cost estimate for fully remediating this site can be derived using his own site-specific work and costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 7 (Brown report, App. B.18) at 1-4; *see also* 56.1 ¶ 78. |
| 95.      Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Unocal #5226, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.19 re Unocal #5226), p. 5.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **95.  Disputed.**<br><br>Mr. Brown produced a 107-page report of his site-specific analysis of Unocal #5226.  Mr. Brown's analysis included results of CPT drilling and testing conducted at the direction and expense of the District to better determine the off-site location and movement of MTBE.<br><br>As of December 2010 – 26 years after gasoline was reported spilled at this site – defendants still have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
|  | Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 7 (Brown Report, App. B.19) at 1-5; *see also* 56.1 ¶ 78. |
| 96.   Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Unocal #5792, /ConocoPhillips #5792, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.23 re ConocoPhillips #5792), p. 4.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **96.  Disputed.**<br><br>Mr. Brown produced a 68-page report of his site-specific analysis of Unocal #5792, /ConocoPhillips #5792.<br><br>As of March 2010 – more than 12 years after gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 7 (Brown Report, |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
|  | App. B.23) at 1-3; Ex. 8 (Brown Report, App. B.23) at 4; *see also* 56.1 ¶ 78. |
| 97.      Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Arco #6036, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.24 re Arco #6036), p. 3.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **97. Disputed.**  Mr. Brown produced a 68-page report of his site-specific analysis of Unocal #5792, /ConocoPhillips #5792.  As of March 2010 – more than 12 years after gasoline was reported spilled at this site – defendants still have not fully delineated the vertical and lateral extent of the plume.  Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.  Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a conservative cost estimate for fully remediating this site can be derived using his own site-specific work and costs estimates at Arco #1905 and G&M #4.  *See* Barnhart Decl., Ex. 8 (Brown Report, App. B.24) at 1-3; *see also* 56.1 ¶ 78. |
| 98.      Mr. Brown did not perform a site-specific analysis to determine the remediation costs at Chevron #9-5568, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.25 re Chevron #9-5568) p. 5.) Mr. Brown further opined that he could not provide comprehensive estimates of the | **98. Disputed.**  Mr. Brown produced a 104-page report of his site-specific analysis of Chevron #9-5568.  As of May 2011 – more than 24 years after gasoline was reported spilled at this site – defendants still have not fully delineated the |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his own site-specific work <u>and</u> costs estimates at Arco #1905 and G&M #4.<br><br>*See* Barnhart Decl., Ex. 8 (Brown Report, App. B.25) at 1-5; *see also* 56.1 ¶ 78. |
| 99.      Mr. Brown did not perform a site-specific analysis to determine the remediation costs at World Oil #39, but instead cited the costs for Arco #1905 and G&M #4. (Correll Dec., Ex. 11 (A. Brown Report, Appx. B.26 re World Oil #39), p. 5.) Mr. Brown further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **99. Disputed.**<br><br>Mr. Brown produced a 87-page report of his site-specific analysis of World Oil #39.<br><br>As of May 2011 – 25 years after gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Mr. Brown estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Mr. Brown also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | cost estimate for fully remediating this site can be derived using his own site-specific work and costs estimates at Arco #1905 and G&M #4. *See* Barnhart Decl., Ex. 8 (Brown Report, App. B.26) at 1-3; Ex. 9 (Brown Report, App. B.26) at 4-5; *see also* 56.1 ¶ 78. |
| 100.    OCWD's expert, Robert Stollar, did not perform site-specific analyses to determine the remediation costs at any site other than at Mobil #18-HDR. (See Correll Dec., Ex. 12 (R. Stollar Report, Appx. B.4 re Mobil #18HDR), p. 5.) | **100. Disputed.** Robert Stollar performed a site-specific analysis for each site that is the subject of his report.  Mr. Stollar detailed his analyses in meticulous and lengthy reports, each of which was produced as an appendix to his May 2011 expert report in this matter.  Barnhart Decl., Ex. 9 (Expert Report of Robert Stollar, May 28, 2011) at 2-3. Robert Stollar provided a complete remediation estimate for Mobil #18-HDR ($9,420,843).  This site-specific analysis included consideration of site-specific CPT drilling and testing, conducted at the direction and expense of the District.  Ex. 9 (Stollar Report, App. B.4) at 1-5. Robert Stollar then conducted a detailed site-specific analysis at each remaining station, all of which had less information available than Robert Stollar.  At each station, after considering site-specific conditions, Robert Stollar prepared an estimate using that site's specific conditions and the cost estimate for Mobil #18-HDR. Robert Stollar qualified each estimate by stating: "However, it should be noted that the full lateral and vertical extent of contamination at these facilities is not known. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Therefore, the costs to fully investigate the contamination at these facilities will likely be more than the costs presented to address the currently known extent of contamination. That is, the costs presented herein are conservative." Barnhart Decl., Ex. 9 (Stollar Report) at 3. |
| | Robert Stollar also opined that "[w]hile the cost to remediate the MTBE and TBA emanating from each facility will be significant, the cost to address the contamination once it reaches drinking water wells, including operational costs, would be far greater." *Id.* |
| | At each station, Robert Stollar expressed the opinion that it would cost at least $79,050 to advance the remedial process and determine if further work was required. *Id.* |
| | Robert Stollar's opinion that remediating MTBE contamination sooner is more cost-effective that doing it later is supported by report of defense expert Richard Sloan. According to Sloan, failures to "respond[] to known gasoline leaks/spills in a timely and appropriate manner" is the primary reason that MTBE "threat[ens] potable water wells in [the District's] service area." Mr. Sloan also opined that "timely application of a site-specific remediation sequence" determines the "cost and difficulty of remediation." Barnhart Decl., Ex. 1 ((Sloan Report, Oct. 7, 2011) at 11-12. |
| | Defendants expressly deny and disavow any intent to contend that MTBE is not reasonably abatable. Motion at 5, fn. 4. Defendants cite |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | no evidence that MTBE is not reasonably abatable. *See generally* Motion. |
| 101.   Mr. Stollar did not perform a site-specific analysis to determine the remediation costs at Unocal #5376, but instead cited the costs for Mobil #18-HDR. (Correll Dec., Ex. 12 (R. Stollar Report, Appx. B.3 re Unocal #5376), p. 6.) Mr. Stollar further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **101. Disputed.** Robert Stollar produced a 106-page report of his site-specific analysis of Unocal #5376. As of April 2011 – 31 years after gasoline was reported spilled at this site – defendants still have not fully delineated the vertical and lateral extent of the plume. Robert Stollar estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished. Robert Stollar also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a conservative cost estimate for fully remediating this site can be derived using his site-specific work, and from costs estimates for remediating Mobil #18-HDR. *See* Barnhart Decl., Ex. 9 (Stollar Report, App. B.3) at 1-3; Ex. 10 (Stollar Report, App. B.3) at 4-6; *see also* 56.1 ¶ 100. |
| 102.   Mr. Stollar did not perform a site-specific analysis to determine the remediation costs at Exxon #4283/Chevron #208554, but instead cited the costs for Mobil #18-HDR. (Correll Dec., Ex. 12 (R. Stollar Report, Appx. B. 1 re Exxon #4283), p. 4.) Mr. Stollar further opined that he could not | **102. Disputed.** Robert Stollar produced a 106-page report of his site-specific analysis of Exxon #4283/Chevron #208554.  This site-specific analysis included consideration of site-specific CPT drilling and testing conducted at |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | the direction and expense of the District.<br><br>As of March 2011 – 18 years after gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Robert Stollar estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Robert Stollar also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his site-specific work, and from costs estimates for remediating Mobil #18-HDR.<br><br>*See* Barnhart Decl., Ex. 10 (Stollar Report, App. B.1) at 1-4; *see also* 56.1 ¶ 100. |
| 103.    Mr. Stollar did not perform a site-specific analysis to determine the remediation costs at Mobil #18-G6B, but instead cited the costs for Mobil #18-HDR. (Correll Dec., Ex. 12 (R. Stollar Report, Appx. B.2 re Mobil #18-G6B), p. 4.) Mr. Stollar further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **103. Disputed.**<br><br>Robert Stollar produced a 69-page report of his site-specific analysis of Mobil #18-G6B.<br><br>As of April 2011 – more than 12 years after gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Robert Stollar estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Robert Stollar also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his site-specific work, and from costs estimates for remediating Mobil #18-HDR.<br><br>*See* Barnhart Decl., Ex. 10 (Stollar Report, App. B.2) at 1-4; *see also* 56.1 ¶ 100. |
| 104.   Mr. Stollar did not perform a site-specific analysis to determine the remediation costs at Arco #613 1, but instead cited the costs for Mobil #18-HDR. (Correll Dec., Ex. 12 (R. Stollar Report, Appx. B.5 re Arco #6131), p. 4.) Mr. Stollar further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **104. Disputed.**<br><br>Robert Stollar produced a 65-page report of his site-specific analysis of Arco #6131.<br><br>As of March 2011 – more than 10 years after gasoline was reported spilled at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Robert Stollar estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Robert Stollar also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his site-specific work, and from costs estimates for remediating Mobil #18-HDR.<br><br>*See* Barnhart Decl., Ex. 11 (Stollar Report, App. B.5) at 1-4; *see also* 56.1 ¶ 100. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 105.    Mr. Stollar did not perform a site-specific analysis to determine the remediation costs at Mobil #18-JMY, but instead cited the costs for Mobil #18-HDR. (Correll Dec., Ex. 12 (R. Stollar Report, Appx. B.6 re Mobil #18-JMY), p. 4.) Mr. Stollar further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **105. Disputed.**

Robert Stollar produced a 108-page report of his site-specific analysis of Mobil #18-JMY. This site-specific analysis included consideration of site-specific CPT drilling and testing conducted at the direction and expense of the District.

As of March 2011 – 24 years after groundwater contamination gasoline was discovered at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.

Robert Stollar estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.

Robert Stollar also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his site-specific work, and from costs estimates for remediating Mobil #18-HDR.

*See* Barnhart Decl., Ex. 12 (Stollar Report, App. B.6) at 1-4; *see also* 56.1 ¶ 100. |
| 106.    Mr. Stollar did not perform a site-specific analysis to determine the remediation costs at Mobil #18-HEP, but instead cited the costs for Mobil #18-HDR. (Correll Dec., Ex. 12 (R. Stollar Report, Appx. B.7 re Mobil #18-HEP), p. 3.) Mr. Stollar further opined that he could not | **106. Disputed.**

Robert Stollar produced a 71-page report of his site-specific analysis of Mobil #18-HEP.

As of March 2011 – 12 years after groundwater contamination gasoline was |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | discovered at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Robert Stollar estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Robert Stollar also concluded that – while defendants' failure to complete their own investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his site-specific work, and from costs estimates for remediating Mobil #18-HDR.<br><br>*See* Barnhart Decl., Ex. 12 (Stollar Report, App. B.7) at 1-3; *see also* 56.1 ¶ 100. |
| 107.    Mr. Stollar did not perform a site-specific analysis to determine the remediation costs at Mobil #18-668, but instead cited the costs for Mobil #18-HDR. (Correll Dec., Ex. 12 (R. Stollar Report, Appx. B.8 re Mobil #18-668), p. 3.) Mr. Stollar further opined that he could not provide comprehensive estimates of the scope and cost of required remediation at the site and that it would cost at least $79,050 to perform additional investigation before he could determine the scope and extent of additional remediation needed, if any. ( *Id.*) | **107. Disputed.**<br><br>Robert Stollar produced a 110-page report of his site-specific analysis of Mobil #18-668.<br><br>As of May 2011 – more than a decade after groundwater contamination gasoline was discovered at this site – defendants <u>still</u> have not fully delineated the vertical and lateral extent of the plume.<br><br>Robert Stollar estimates that it will cost at least $79,050 to finish the pre-remediation investigatory work that defendants have left unfinished.<br><br>Robert Stollar also concluded that – while defendants' failure to complete their own |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
|  | investigations "inhibits comprehensive estimates of the scope and cost of required remediation at this facility" – a <u>conservative</u> cost estimate for fully remediating this site can be derived using his site-specific work, and from costs estimates for remediating Mobil #18-HDR.<br><br>*See* Barnhart Decl., Ex. 12 (Stollar Report, App. B.8) at 1-3; *see also* 56.1 ¶ 100. |
| 108.     Many sites have received regulatory closure. (See, e.g., Correll Dec., Ex. 13 (OCHCA Resp. to Low Threat Closure Request dated June 19, 2013 re Chevron #9-540 1); Correll Dec., Ex. 14 (Remedial Action Completion Certificate dated Apr. 19, 2006 re Beacon Bay Car Was FV; Correll Dec., Ex. 15 (Case Closure Summary dated Feb. 11, 2004 re Beacon Bay Car Wash SA).) | **108. Disputed.**<br><br>Defendants identify only three sites. (*See also* 56.1 ¶¶ 78 and 100.)  Even if the asserted fact was true, three is not "many."<br><br>"[R]egulatory closure" is inaccurate because, even for these three stations, at least one has ongoing monitoring requirements.  (Correll Ex. 13.)  Whatever definition of "regulatory closure" defendants choose, there are continuing obligations at such sites.<br><br>Further, none of the cited documents address defendants' <u>off-site</u> contamination.  To the contrary, all three specifically state that they relate only to contamination at defendants' sites.  In fact, for Chevron #9-5401, the letter suggests that defendants' "groundwater plume" impacts properties other than the defendants' site.  (Correll Ex. 13.)<br><br>District expert Anthony Brown's 101-page, site-specific report regarding Chevron #9-5401 establishes that significant amounts of MTBE have migrated off this site.  As of December 2010 – 28 years after gasoline was reported spilled at this site – the off-site plume still has not been fully delineated, must |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
|  | less remediated.  (Barnhart Ex. 6.) <br><br> For Beacon Bay Fountain Valley, the letter is conditioned on the fact that the information provided is accurate and "representative of site conditions," which is impossible given the failure of any responsible party to delineate the plume.  (Correll Ex. 14.)  As District expert Anthony Brown's 64-page, site-specific report regarding Beacon Bay Fountain Valley demonstrates, over 21 years after gasoline was reported spilled at this site defendants still have not delineated the vertical and lateral extent of this site's off-site MTBE plume.  (Barnhart Ex. 3.) <br><br> District expert Anthony Brown's 66-page, site-specific report regarding Beacon Bay Santa Ana shows that – 27 years after remediation activities began at this site – defendants still have not delineated the vertical and lateral extent of this site's off-site MTBE plume.  (Barnhart Ex. 4-5.) |

C.   **Issue No. 3: There are Disputed Issues of Material Fact Whether Defendants Engaged in Affirmative Conduct Necessary to Prevail on an OCWD Act Claim.**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 109.    Defendants refer to and incorporate Fact Nos. 1-77 set forth in Issue No. 1 above. | **109.  Disputed.** <br><br> The District refers to and incorporates its responses to Fact Nos. 1-77 set forth in Issue No. 1 above. |

D.   **Issue No. 4: There are Issues of Material Fact Whether there is Evidence of Recoverable Costs .**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 110.     Since the Court granted judgment in Defendants' favor at 14 sites on this claim Defendants have repeatedly asked OCWD to identify the specific costs that it seeks to recover under the OCWD Act at the remaining sites. (Roy Dec., ¶ 24.) | **110. Disputed.**<br><br>The cited evidence does not support the asserted fact.<br><br>The District has fully responded to defendants' requests that the District "identify the specific costs that it seeks to recover under the OCWD Act."  The District has produced written discovery responses, supplemented pursuant to FRCP 26(e)(1)(A), documents, and witnesses. Those responses, documents, and witnesses provided the costs the District seeks, and the basis therefor.  (E.g., Massey Ex. 10 [Herndon Depo., July 26, 2012, pp. 104:3-24, 169:2-170:14, 69:18-70:1, 207:1-24, 180:25-181:5, Ex. 3].)<br><br>PTO No. 62 provides that all depositions agreed to by the parties (or ordered by Special Master Warner) to take place after the August 31, 2010, fact discovery cutoff "may be used as if taken prior to the . . . cutoff."  (Massey Ex. 11 [Pre-Trial Order No. 62].)  When Special Master Warner issued PTO No. 62, a dispute was pending before him concerning the deposition of the District's 30(b)(6) witness "Re Damages and Remedy."  During that dispute, defendants acknowledged that they understood the District was incurring remedial costs on an ongoing basis and they anticipated the District would provide an accounting of those costs.  (Massey Ex. 12 [R.T., Sept. 29, 2010, p. 27:6-13 ("MR. ANDERSON: Right.  And, Mr. Warner, just to put this in the context of what I said |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | earlier.  Mr. Bolin said, 'Well, we're doing the CPT testing now; we may have to do remediation wells and, you know, we will go from there.'  I would expect at some point there will be an accounting, whether it's in paper form or a witness, to tally up what all those things cost.")<br><br>After hearings with the Special Master and extensive meeting and conferring, the parties agreed that the deposition would take place on July 26, 2012.  (Massey Ex. 13 [Email from Whitney Roy to Tracey O'Reilly, July 19, 2012].)  Notice of the deposition, with comprehensive requests for production of documents related to the District's damages, was served on the District on July 19, 2012, and the deposition took place as agreed on July 26 (and August 3, 2012).  (Massey Ex. 10 [Herndon Depo., July 26, 2012, Ex. 1].)<br><br>At the deposition, defendants questioned the District extensively about its costs, including its CPT and sonic drilling costs, and Roy Herndon, the District's 30(b)(6) witness, provided the accounting defendants requested.  (Massey Ex. 10 [Herndon Depo., July 26, 2012, pp. 104:3-24, 169:2-170:14, 69:18-70:1, 207:1-24, 180:25-181:5, Ex. 3]; see Massey Ex. 14 [table regarding CPT costs with invoices, payment records, and location diagrams produced to defendants for 30(b)(6) deposition].) |
| 111.     Each time, OCWD refused to respond with any specificity, instead directing Defendants generally to a set of discovery responses, a deposition transcript, and the Herndon Declaration that the Court refused | **111. Disputed.**<br><br>The cited evidence does not support the asserted fact. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| to consider on the prior motion. (Roy Dec., ¶ 24.) | The District has fully responded to defendants' requests that the District "identify the specific costs that it seeks to recover under the OCWD Act." The District has produced written discovery responses, supplemented pursuant to FRCP 26(e)(1)(A), documents, and witnesses. Those responses, documents, and witnesses provided the costs the District seeks, and the basis therefor. (E.g., Massey Decl., Ex. 10 [Herndon Depo., July 26, 2012, pp. 104:3-24, 169:2-170:14, 69:18-70:1, 207:1-24, 180:25-181:5, Ex. 3].)

PTO No. 62 provides that all depositions agreed to by the parties (or ordered by Special Master Warner) to take place after the August 31, 2010, fact discovery cutoff "may be used as if taken prior to the . . . cutoff." (Massey Decl., Ex. 11 [Pre-Trial Order No. 62].) When Special Master Warner issued PTO No. 62, a dispute was pending before him concerning the deposition of the District's 30(b)(6) witness "Re Damages and Remedy." During that dispute, defendants acknowledged that they understood the District was incurring remedial costs on an ongoing basis and they anticipated the District would provide an accounting of those costs. (Massey Decl., Ex. 12 [R.T., Sept. 29, 2010, p. 27:6-13 ("MR. ANDERSON: Right. And, Mr. Warner, just to put this in the context of what I said earlier. Mr. Bolin said, 'Well, we're doing the CPT testing now; we may have to do remediation wells and, you know, we will go from there.' I would expect at some point there will be an accounting, whether it's in paper form or a |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | witness, to tally up what all those things cost.") |
| | After hearings with the Special Master and extensive meeting and conferring, the parties agreed that the deposition would take place on July 26, 2012.  (Massey Decl., Ex. 13 [Email from Whitney Roy to Tracey O'Reilly, July 19, 2012].)  Notice of the deposition, with comprehensive requests for production of documents related to the District's damages, was served on the District on July 19, 2012, and the deposition took place as agreed on July 26 (and August 3, 2012).  (Massey Decl., Ex. 10 [Herndon Depo., July 26, 2012, Ex. 1].) |
| | At the deposition, defendants questioned the District extensively about its costs, including its CPT and sonic drilling costs, and Roy Herndon, the District's 30(b)(6) witness, provided the accounting defendants requested.  (Massey Decl., Ex. 10 [Herndon Depo., July 26, 2012, pp. 104:3-24, 169:2-170:14, 69:18-70:1, 207:1-24, 180:25-181:5, Ex. 3]; see Massey Ex. 14 [table regarding CPT costs with invoices, payment records, and location diagrams produced to defendants for 30(b)(6) deposition].) |
| 112.     After the Court issued its decision on the OCWD Act, OCWD failed to request that the court address the issue of reopening discovery at the subsequent status conference. (Roy Dec., ¶ 15, Ex. 69.) | 112. Disputed.  The cited evidence does not support the asserted fact.  In *In Re MTBE*, 279 F.R.D. 131, 138 (S.D.N.Y. 2011), the court found that, "[i]f OCWD seeks to recover these costs it *may have to* re-open discovery . . . ." (emphasis added).  At the time, however, the Court |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | had not been notified that a dispute was pending before Special Master Warner concerning the deposition of the District's 30(b)(6) witness "Re Damages and Remedy." To resolve that dispute, the parties agreed, after meeting and conferring, to hold the deposition on July 26, 2012. (Massey Decl., Ex. 13 [Email from Whitney Roy to Tracey O'Reilly, July 19, 2012].) At the deposition, defendants questioned the District extensively about its costs, including its CPT and sonic drilling costs, and Roy Herndon, the District's 30(b)(6) witness, provided an accounting of those costs. (Massey Decl., Ex. 10 [Herndon Depo., July 26, 2012, pp. 104:3-24, 169:2-170:14, 69:18-70:1, 207:1-24, 180:25-181:5, Ex. 1, Ex. 3]; ; see Massey Ex. 14 [table regarding CPT costs with invoices, payment records, and location diagrams produced to defendants for 30(b)(6) deposition].)  PTO No. 62 provides that all depositions agreed to by the parties (or ordered by Special Master Warner) to take place after the August 31, 2010, fact discovery cutoff "may be used as if taken prior to the . . . cutoff." (Massey Decl., Ex. 11 [Pre-Trial Order No. 62].) |
| 113.    Counsel for OCWD did not attend the November 2011 status conference. (Roy Dec., ¶ 16, Ex. 70, p. 1:12-15.) | **113. Undisputed.**  The District and other parties to the MDL commonly do not attend status conferences at which the primary issues pertain to or are addressed by or other parties. |
| 114.    Although two and a half years have passed since the Court's ruling, OCWD still | **114. Disputed.** |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| has not sought leave of Court to re-open discovery regarding Hargis's bore hole drilling and depth-sampling activities. (Roy Dec., ¶ 24.) | The cited evidence does not support the asserted fact.<br><br>In *In Re MTBE*, 279 F.R.D. 131, 138 (S.D.N.Y. 2011), the court found that, "[i]f OCWD seeks to recover these costs it *may have to* re-open discovery . . . ." (emphasis added).  At the time, however, the Court had not been notified that a dispute was pending before Special Master Warner concerning the deposition of the District's 30(b)(6) witness "Re Damages and Remedy."  To resolve that dispute, the parties agreed, after meeting and conferring, to hold the deposition on July 26, 2012. (Massey Decl., Ex. 13 [Email from Whitney Roy to Tracey O'Reilly, July 19, 2012].)  At the deposition, defendants questioned the District extensively about its costs, including its CPT and sonic drilling costs, and Roy Herndon, the District's 30(b)(6) witness, provided an accounting of those costs.  (Massey Decl., Ex. 10 [Herndon Depo., July 26, 2012, pp. 104:3-24, 169:2-170:14, 69:18-70:1, 207:1-24, 180:25-181:5, Ex. 1, Ex. 3]; ; see Massey Ex. 14 [table regarding CPT costs with invoices, payment records, and location diagrams produced to defendants for 30(b)(6) deposition].)<br><br>PTO No. 62 provides that all depositions agreed to by the parties (or ordered by Special Master Warner) to take place after the August 31, 2010, fact discovery cutoff "may be used as if taken prior to the . . . cutoff."  (Massey Decl., Ex. 11 [Pre-Trial Order No. 62].) |
| 115.     As Defendants informed OCWD at | **115.  Disputed.** |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| that time in 2012, there was no need to take discovery regarding work performed by Mr. Ross or Hargis for OCWD before the fact discovery cutoff because the Court had already ruled that OCWD cannot recover costs relating to that work under the OCWD Act. (Roy Dec., ¶ 21, Ex. 75.) | This is a legal argument that misrepresents the scope of the Court's ruling on the District's claims under the OCWD Act and requires no response. (*See* S.D.N.Y. Local Rule 56.1(a) [requiring a statement of "material facts"].) |
| | The ruling to which defendants refer pertained, in any event, to routine testing of production wells and  commissioning reports summarizing the work of others at 14 stations. *In Re MTBE*, 279 F.R.D. 131, 138 (S.D.N.Y. 2011). |
| | Defendants' decision not to conduct discovery regarding work performed by Mr. Ross or Hargis based upon their erroneous characterization of the Court's ruling was entirely defendants' doing. *Ibid.* ("OCWD is asking this Court to grant summary judgement for costs *that were not the subject of its previous motion* for partial summary judgment and that OCWD has not previously presented to the Court.  I decline to do so. . . . I find that OCWD's claims are ripe with respect to the costs of production well testing and the commissioning of the consultant reports. . . .  This finding, however, will not prejudice OCWD's ability to seek future relief for other remedial costs.") |
| | The District offered to produce Mr. Ross for deposition, complying with any conceivable legal obligation it had: |
| | "Please be advised that Mr. Ross remains a non-retained expert upon whose testimony the District intends to rely at trial on this |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | matter.  Mr. Ross is available for deposition on December 19 or 20, 2011, in San Diego, California.  Defendants failure to go forward with this deposition on one of those two dates will be considered a waiver of their right to depose Mr. Ross as this is <u>third time</u> we have offered dates for Mr. Ross' deposition."<br><br>(Massey Decl., Ex. 15 [Letter from Tracey O'Reilly to James Finsten, Nov. 2, 2011]); *see* FRCP 26(b)(4)(A) ("A party *may* depose any person who has been identified as an expert whose opinions may be presented at trial.") (emph. added).<br><br>Defendants repeatedly flip-flopped on taking Mr. Ross' deposition – for example, defendants purported to accept the December 19 and 20, 2011, dates, then apparently decided (two months later) not to take the deposition.  (Roy Dec., ¶ 21, Ex. 75.) |

**E.      Issue No. 5: There are Disputed Issues of Material Fact Regarding Causation of the Issue 5 Defendants.**

**Facts Specific To Chevron U.S.A. Inc.**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 116.     CUSA-refined gasoline was not delivered to Chevron #208554 at the time when OCWD alleges releases occurred at that site. OCWD's expert, Marcel Moreau, identified two potential releases at Chevron #208554 in 1992. (See Correll Dec., Ex. 16 | **116. Disputed** for the reasons setforth in ¶ 256. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| (M. Moreau Report (Exxon 7-4283) pp. 2, 3, 6.) CUSA, however, only supplied gasoline to Chevron #208554 from June 22, 1999 to December 31, 2002. (See Correll Dec., Ex. 4 (T. Bui Declaration dated Aug. 31, 2010), ¶¶ 6-7.) It was therefore not ordered to clean-up the alleged 1992 releases, but instead, the Orange County Health Care Agency directed the former owner to investigate to assess the extent of the contamination at this site. (See Correll Dec., Ex. 17 (Expert Report of Thomas Maguire, Table 3-1), p. 1.) Furthermore, the tanks at the site were replaced in 1997 before CUSA began supplying this site. ( *Id.*) | |

### Facts Specific To Lyondell

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 117.    At all times relevant to this action, Lyondell manufactured neat MTBE for sale in bulk quantities to oil refiners and others, who either blended it into some portion of their gasoline or sold it to other entities for that purpose. (Blagojevic Dec., ¶ 5.); (Third Am. Complaint ¶¶ 3537.) | **117. Undisputed** that Lyondell sold neat MTBE to refiners who blended it into their gasoline.  Disputed that Lyondell a/k/a Arco Chemical Company sold MTBE for use as anything other than a blending component. (Miller Decl., Ex. 1, An MTBE Primer at 1 & 3.) |
| 118.    OCWD alleges that Lyondell is liable in this case as a result of its supply of MTBE from 1986 to at least 1999 to the following Defendants: (1) Atlantic Richfield Company, BP Products North America Inc., and BP West Coast Products LLC (collectively, "Arco"); (2) Chevron U.S.A. Inc. ("Chevron"); (3) Exxon Mobil Corporation and ExxonMobil Oil Corporation ("Mobil") | **118. Undisputed.** |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| (collectively, "ExxonMobil Defendants"); (4) Shell Oil Company and Equilon Enterprises LLC (collectively, "Shell"); (5) TMR Company (formerly known as Texaco Refining and Marketing Inc.) ("Texaco"); and (6) Union Oil Company of California ("Unocal"). (Declaration of John J. DiChello in Support of Defendants' Motion for Summary Judgment "DiChello Dec."), ¶ 15, Ex. 31 (Letter from M. Axline to Hon. Shira A. Scheindlin dated Apr. 11, 2014), p. 2.) | |
| 119.   OCWD further alleges that Defendants Arco, Chevron, the ExxonMobil Defendants, Shell, Texaco, and Union Oil blended MTBE that was manufactured or sold by Lyondell ("Lyondell-supplied MTBE") into gasoline at certain of their refineries that became part of a commingled product that was distributed to some of the Focus Stations, and OCWD's only evidence to support these allegations is certain discovery responses of those Defendants. (DiChello Dec., ¶ 15, Ex. 31 (Letter from M. Axline to Hon. Shira A. Scheindlin dated Apr. 11, 2014), p. 2.) | 119. **Undisputed** that Lyondell MTBE became part of a product that was sold at focus stations.  Disputed that this fact is the "only evidence" the District has to associate Lyondell with focus stations.  As shown in the following paragraphs, the District has ample evidence that Lyondell sold MTBE directly to refiner defendants who owned, operated, or directly supplied the focus stations.  Those refiners blended Lyondell's MTBE into gasoline that they sold directly to the focus stations.  The District that has ample evidence that MTBE manufactured by Lyondell was present in gasoline delivered to the focus stations.<br><br>In 1987, Lyondell provided approximately one half of the entire neat MTBE market in the U.S.  (Miller Decl., Ex. 2, Aug. 1987, MTBE Health Effects Task Force Participation Agreement at 12.) |
| 120.   OCWD is relying solely upon the commingled product theory to establish the required causal nexus for Lyondell in this case. (DiChello Dec., ¶ 15, Ex. 31 (Letter from M. Axline to Hon. Shira A. Scheindlin dated Apr. 11, 2014), pp. 2-3.) | 120. **Disputed.**<br><br>The cited document does not state that the District is relying "solely" on the commingled product theory. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | As shown in the following paragraphs, the District has ample evidence that Lyondell sold MTBE directly to refiner defendants who owned, operated, or directly supplied the focus stations.<br><br>In 1987, Lyondell provided approximately one half of the entire neat MTBE market in the U.S.  (Miller Decl., Ex. 2, Aug. 1987, MTBE Health Effects Task Force Participation Agreement at 12.)<br><br>Market share data provided by defendants show that Arco (Lyondell's predecessor) had 19% of the California gasoline market in 1990 and 18.5% in 1995.  (Miller Decl., Ex. 3, Energy Almanac.) |
| 121. OCWD does not have any direct evidence to show delivery of gasoline containing Lyondell-supplied MTBE to any of the Focus Stations. (DiChello Dec., ¶ 15, Ex. 31 (Letter from M. Axline to Hon. Shira A. Scheindlin dated Apr. 11, 2014), pp. 2-3.) | **121.  Undisputed** that Lyondell did not itself directly sell, supply or distribute MTBE-gasoline in Orange County.<br><br>Disputed that Lyondell was not aware that gasoline containing its MTBE was being sold into retail gasoline stations in Orange County that would leak and spill that MTBE gasoline and contaminate groundwater<br><br>Overview<br><br>Whether characterized as "direct" or "indirect" the District has ample evidence that Lyondell directly sold substantial volumes of MTBE to refiners who directly owned, operated, or supplied focus sites, and was a major supplier of neat MTBE in the California market.<br><br>In the 1960s Lyondell (as Arco Chemical) developed a patented process to manufacture |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | MTBE, and vigorously promoted MTBE's use as a gasoline blending component. (Miller Decl., Ex. 4, MTBE Gasoline Blending Component; Ex. 5, Arco Chemical MTBE.)  By its own admission (and in its advertising) Lyondell claimed it was "the largest producer" of MTBE and had a worldwide MTBE capacity of over 60 thousand barrels per day.  (*Id.*)  Lyondell was also fully aware that MTBE was primarily, if not exclusively, being used as a gasoline blending component.  (*Id.*; *see also* Miller Decl., Ex. 1, An MTBE Primer at 1 & 3.) <br><br> By 1987, Lyondell provided approximately one half of the entire neat MTBE market in the U.S.  (Miller Decl., Ex. 2, Aug. 1987, MTBE Health Effects Task Force Participation Agreement at 12.) <br><br> Lyondell admitted that from 1987 to 1998 it supplied MTBE to thirteen different refiners who manufactured gasoline "for delivery [to stations] in the Orange County Water District Service Area."  (Miller Decl., Ex. 6, Lyondell Decl. re CMO #4.)  These refiners include Atlantic Richfield, Chevron, Exxon, Mobil, Shell, Texaco, Tosco (Conoco), Ultramar, and Unocal/Union Oil.  (*Id.*)  Indeed, Lyondell/Arco Chemical had substantial sales contracts with all of these major Southern California refiners which expressly stated that it was being sold as a "gasoline blending component." (Miller Decl., Ex. 6.)  Lyondell was clearly aware that its neat MTBE was being blended into gasoline by its customers who would supply it to their gasoline stations in Southern California. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | In Case Management Order #116, Chevron, Exxon, Shell, Texaco, Arco, and Unocal all admitted that they directly supplied the gasoline for their associated focus stations. As described in more detail below, sales charts prepared by Lyondell show that Lyondell shipped over 54,125,000 million barrels of MTBE to these refiners, both directly to their refineries and to terminals in Southern California.  (Miller Decl., Ex. 7, Declaration of Alexander Blagojevic (May 4, 2000) at Ex. A, *South Tahoe* ("Blagojevic Decl., *South Tahoe*").)

Arco/BP

Arco/BP affirmatively identified Arco Chemical/Lyondell as "Entities that Sold MTBE to BP or its affiliates from 1989 through 2003." (Miller Decl., Ex. 8.)  The Attachment shows, in fact, that Arco Chemical was the sole supplier of MTBE to BP in 1992 and 1993.  Gasoline supplied to an Arco branded station in Orange County was supplied by Arco.  (CMO #116.)

Chevron:

Lyondell (then known as Arco Chemical) was the *sole* supplier of neat MTBE to Chevron's El Segundo Refinery during the ten year period from 1987 through 1997 (with one small exception in 1995).  Lyondell sold hundreds of millions of gallons of neat MTBE to the El Segundo refinery during this period.  (Miller Decl., Ex.7, Blagojevic Decl.; Ex. 9, 1991 MTBE Sales Contract.)  Chevron's El Segundo refinery supplied all of the MTBE gasoline |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | delivered to Chevron stations in Orange County.  (Miller Decl., Ex. 10 Chevron CMO #4 Decls., Lines & Means.)  Thus any MTBE gasoline supplied to a Chevron station in Orange County between 1987 and 1997, including the Chevron focus plume stations, would have contained Lyondell's MTBE.  Chevron has not identified any other refinery which supplied MTBE gasoline to its focus sites in Orange County.<br><br>Exxon<br><br>From 1992 to 1996 Lyondell also supplied Exxon's Los Angeles Refinery with 100,000 barrels per month of neat MTBE during the months of October through January, when the winter time oxygenate requirements were in effect.  (Miller Decl., Ex. 7, Blagojevic Decl., *South Tahoe*; Ex. 11, Exxon Resp. Interrogatories re Defendant Identification (Aug. 30, 2004) at Resp. To Rog No. 2 & Attachment B.)  Lyondell was the primary, if not exclusive supplier, from 1990 to 1994.  (*Id.*)  In addition to the MTBE Lyondell supplied to Exxon's refinery, Lyondell supplied large volumes of neat MTBE to Exxon at terminals that served the Orange County area from 1989-93, and 1996.  (Miller Decl., Ex. 12, Exxon Resp. to 3rd Rogs (Nov. 7, 2008) at 17.)<br>Lyondell's chart of sales shows deliveries directly to these same terminals.  (Miller Decl., Ex. 7, Blagojevic Decl., *South Tahoe*.)  Exxon supplied all of the gasoline delivered to Exxon stations in Orange County.  (CMO #116.)  Exxon has not identified any other refinery which supplied MTBE gasoline to its focus sites in Orange County. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Shell<br><br>From 1990 to at least the end of 1992, Lyondell sold 150,000 barrels per month to Shell's Wilmington refinery and terminals in Long Beach in Southern California. (Miller Decl., Ex. 7, Blagojevic Decl., *South Tahoe*.) Gasoline refined at the Wilmington refinery was delivered to stations in Orange County, and Shell was the supplier of Shell gasoline stations in Orange County. (Miller Decl., Ex. 13, Sexton Decl. at 4, *see also* CMO #116.) Shell has not identified any other refinery which supplied MTBE gasoline to focus sites in Orange County.<br><br>Texaco<br><br>From 1992 to at least March, 1997, Lyondell sold 150,000 barrels per month of neat MTBE to Texaco Refining and Marketing, Inc. at its Los Angeles refineries and terminals, including Long Beach, Wilmington, and El Segundo. (Miller Decl., Ex. 7, Blagojevic Decl., *South Tahoe*.) Gasoline refined by Texaco's Los Angeles area refinery was delivered to stations in Orange County, and Texaco was the supplier of Texaco gasoline stations in Orange County. (Miller Decl., Ex. 13, Sexton Decl. at 4, *see also* CMO #116.) Texaco has not identified any other refinery which supplied MTBE gasoline to its focus sites in Orange County.<br><br>Union Oil (Unocal)<br><br>From 1992 until at least March, 1997, Lyondell sold 120,000 barrels per month of |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | neat MTBE to Union Oil Company of California at the Los Angeles refiner and Long Beach terminal. (Miller Decl., Ex. 7, Blagojevic Decl., *South Tahoe*.) Union Oil specifically identified the Wilmington refinery as the source  MTBE gasoline delivered to stations in Orange County. (Miller Decl., Ex. 14, Decl. of Grace Chan.) Union Oil also confirmed that it never "manufactured MTBE" at any time for gasoline delivered to Orange County.  (Miller Decl., Ex. 15, Unocal/Union Oil Decl. re CMO #4 at 24.)  Union Oil supplied stations in Orange County from its Los Angeles refinery, as was the supplier for Unocal stations in Orange County.  (Miller  Decl.15, Clark Decl. at 6; *see also* CMO #116.)  Union Oil has not identified any other refinery which supplied MTBE gasoline its focus sites in Orange County. |
| 122. After Lyondell sold bulk MTBE to a customer, Lyondell had no way of knowing where, when, or by whom that MTBE was blended into gasoline, or where, when, or to whom the gasoline into which the MTBE was blended was shipped or sold. Lyondell does not know the identities of the customers to whom its customers sell their gasoline because Lyondell's ownership and control over the MTBE ends when title is transferred to its customers. (Blagojevic Dec., ¶¶ 6-7.) | **122.  Disputed**  Lyondell has provided extensive records of the refiners to whom it sold neat MTBE, including the major defendants in this litigation. See ¶ * , *infra*.  Lyondell's State of Fact ¶ 11, *supra*, affirmatively states that neat MTBE was sold for the purpose of blending into gasoline.  Lyondell therefore knew who blended its neat MTBE into gasoline - it was Lyondell's refiner customers.  Lyondell also had "a way of knowing" the identities of the customers to whom the refiners sold gasoline containing MTBE. Many of Lyondell's refiner customers also conducted retail operations and supplied those |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | operations from the refineries where they blended Lyondell neat MTBE into their gasoline.  Lyondell, for example, was the exclusive supplier of neat MTBE to Chevron's El Segundo refinery during a ten year period when Chevron was the exclusive supplier of MTBE gasoline to its branded stations in Orange County.<br><br>Lyondell knew that MTBE was being sold to Southern California refiners for use as a gasoline blending component. |
| 123.    Lyondell has never sold, either in bulk or at retail, or delivered any MTBE in or to the Orange County area. (Blagojevic Dec., 1 8.) | **123. Undisputed** that Lyondell did not itself directly sell, supply or distribute MTBE-gasoline in Orange County.<br><br>Disputed that Lyondell was not aware that gasoline containing its MTBE was being sold into retail gasoline stations in Orange County that would leak and spill that MTBE gasoline and contaminate groundwater.<br><br>In addition to the MTBE Lyondell supplied to Exxon's refinery, Lyondell supplied large volumes of neat MTBE to Exxon at terminals that served the Orange County area from 1989-93, and 1996.  (Miller Decl., Ex. 12, Exxon Resp. to 3rd Rogs (Nov. 7, 2008) at 17.)<br><br>Lyondell's chart of sales shows deliveries directly to these same terminals. (Miller Decl., Ex. 7, Blagojevic Decl., *South Tahoe*.) |
| 124.    Lyondell has never owned, operated, or leased any facilities in California for the manufacture, transportation, or storage of neat MTBE. (Blagojevic Dec., ¶ 9.) | **124. Disputed.**<br><br>Lyondell admitted that it "did enter into contracts with some customers by which we agreed to arrange for shipment to terminals in |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | California. (Miller Decl., Ex. 7, Blagojevic Decl., *South Tahoe*.) The District incorporates by reference its Responses to Paragraphs 12-17 *supra*. |
| 125.    Many refiners have at various times themselves manufactured MTBE to blend into their gasoline. (Blagojevic Dec., ¶ 22.); (Third Am. Complaint at ¶¶ 38-39.) | **125. Undisputed** that some refiners, at some times, manufactured MTBE.  Disputed that these refiners did not get the bulk of their MTBE from Lyondell.<br><br>The evidence shows that Lyondell was a substantial, if not sole supplier of MTBE to Southern California refiners during much of the relevant time period.  By 1987, Lyondell provided approximately one half of the entire neat MTBE market in the U.S.  (Miller Decl., Ex. 2, Aug. 1987, MTBE Health Effects Task Force Participation Agreement at 12.)<br><br>Lyondell admitted that from 1987 to 1998 it supplied MTBE to thirteen different refiners who manufactured gasoline "for delivery [to stations] in the Orange County Water District Service Area."  (Miller Decl., Ex. 6, Lyondell Decl. re CMO #4.)  These refiners include Atlantic Richfield, Chevron, Exxon, Mobil, Shell, Texaco, Tosco (Conoco), Ultramar, and Unocal/Union Oil.  (*Id.*)  Indeed, Lyondell/Arco Chemical had substantial sales contracts with all of these major Southern California refiners which expressly stated that it was being sold as a "gasoline blending component." (Miller Decl., Ex. 6.)  Lyondell was clearly aware that its neat MTBE was being blended into gasoline by its customers who would supply it to their gasoline stations in Southern California.<br><br>In Case Management Order #116, Chevron, Exxon, Shell, Texaco, Arco, and Unocal all |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | admitted that they directly supplied the gasoline for their associated focus stations. As described in more detail below, sales charts prepared by Lyondell show that Lyondell shipped over 54,125,000 million barrels of MTBE to these refiners, both directly to their refineries and to terminals in Southern California.  (Miller Decl., Ex. 7, Declaration of Alexander Blagojevic (May 4, 2000) at Ex. A, *South Tahoe* ("Blagojevic Decl., *South Tahoe*").)<br><br>The District incorporates by reference its Responses to Paragraphs 12-17 *supra*. |
| 126.    Defendants Arco, Chevron, Mobil, Shell, and their related entities or predecessors-in-interest owned or operated MTBE production units at various times that manufactured MTBE to blend into their gasoline. (DiChello Dec., ¶ 9, Ex. 28 (Arco's Resp. to Discovery Requests in CMO #4, p. 5, Ex. 3 (Dec. of Gary A. Youngman ("Youngman Dec.")), ¶ 3; Dec. of Bill Engibous in Compliance with CMO #4 ("Engibous Dec."), ¶ 4, p. 2; Exxon Mobil Corp.'s Dec. on behalf of Former Mobil Corp. in Response to CMO #4, Subsec. III(B)(2)(ii);; Dec. of David A. Sexton ("Sexton Dec."), p. 2).); (DiChello Dec., ¶ 7, Ex. 27 (Chevron's Resp. to OCWD's 3rd Spec. Interrogs.), pp. 13-15.); (DiChello Dec., ¶ 14, Ex. 30 (Expert Report of John B. O'Brien), ¶¶ 129-130, pp. 60-61, Exs. Y and Z.); (Third Am. Complaint at ¶¶ 38-39.) | 126. Disputed.  *See* Response to Paragraphs 121 and 125 *supra*. |
| 127.    In those instances in which refiners were unable to manufacture their own MTBE or required more, they would acquire additional MTBE from a variety of sources. | 127. Disputed.<br><br>Lyondell has not submitted any evidence from the "refiners" to show (1) when this |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| (Blagojevic Dec., ¶ 22.) | occurred, (2) how much was supplied each time.  The evidence shows that Lyondell was a substantial, if not sole supplier of MTBE to Southern California refiners during much of the relevant time period. *See* Response to Paragraph 121 and 125 *supra*.

The District also objects to the declaration as hearsay. |
| 128.    Lyondell has never been the exclusive supplier of MTBE to Defendants Arco, Chevron, the ExxonMobil Defendants, Shell, Texaco, or Union Oil. (Blagojevic Dec., ¶ 22.); (DiChello Dec., ¶ 6, Ex. 26 (Arco's Answers to Plaintiff's 1st Interrogs. re: Defendant Identification, pp. 4-5, Ex. 1 (Dec. of Gregory B. Hammond ("Hammond Dec.")), 18, p. 16, Attach. B; Further Resp. of Chevron to Plaintiffs' Prelim. Interrogs. re: Defendant Identification, pp. 7-15; Exxon's Resp. to Plaintiffs' Prelim. Interrogs. re: Defendant Identification, pp. 8-9, 11, Attach. B; Shell's Resp. to Plaintiff's 1st Interrogs., pp. 7-8; Union Oil's Further Resp. to Plaintiffs' Prelim. Interrogs., pp. 10-11).); (DiChello Dec., ¶ 7, Ex. 27 (Chevron's Resp. to OCWD's 3rd Spec. Interrogs., pp. 13-15; Exxon's Resp. to OCWD's 3rd Interrogs., pp. 12-14; Shell's Resp. to OCWD's 3rd Interrogs., pp. 17-20).); (DiChello Dec., ¶ 9, Ex. 28 (Arco's Resp. to Discovery Requests in CMO #4, p. 5, Ex. 3 (Youngman Dec.), ¶ 3; Engibous Dec., 14, p. 2; Exxon Mobil Corp.'s Dec. on behalf of Former Mobil Corp. in Resp. to CMO #4, Subsec. III(B)(2)(ii); Sexton Dec., p. 2).); (DiChello Dec., ¶ 14, Ex. 30 (Expert Report of John B. O'Brien), ¶¶ 129-130, pp. 60-61, Exs. Y and Z.) | **128. Disputed.**

The evidence shows that Lyondell was a substantial, if not sole supplier of MTBE, to Southern California refiners during much of the relevant time period.  *See* Response to Paragraph 121 and 125 *supra*. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 129.    Defendants Arco, Chevron, the ExxonMobil Defendants, Shell, Texaco, and Union Oil collectively purchased supplemental supplies of MTBE from approximately 50 distinct companies, which MTBE may have been added to gasoline delivered to the Focus Stations. (DiChello Dec., ¶ 6, Ex. 26 (Arco's Answers to Plaintiff's 1st Interrogs. re: Defendant Identification, pp. 4-5, Ex. 1 (Hammond Dec.), 18, p. 16, Attach. B; Further Resp. of Chevron to Plaintiffs' Prelim. Interrogs. re: Defendant Identification, pp. 7-15; Exxon's Resp. to Plaintiffs' Prelim. Interrogs. re: Defendant Identification, pp. 8-9, 11, Attach. B; Shell's Resp. to Plaintiff's 1st Interrogs., pp. 7-8; Union Oil's Further Resp. to Plaintiffs' Prelim. Interrogs., pp. 10-11).); (DiChello Dec., ¶ 7, Ex. 27 (Chevron's Resp. to OCWD's 3rd Spec. Interrogs., pp. 13-15; Exxon's Resp. to OCWD's 3rd Interrogs., pp. 12-14; Shell's Resp. to OCWD's 3rd Interrogs., pp. 17-20).) | **129.  Disputed.**<br><br>The evidence shows that Lyondell was a substantial, if not sole supplier of MTBE, to Southern California refiners during much of the relevant time period.  *See* Response to Paragraph 121 and 125 *supra*.  The evidence cited by Lyondell does not establish the dates or the amounts. |
| 130.    At least 16 importers of foreign-produced neat MTBE supplied the Los Angeles area with MTBE from 1993 to 2003. (DiChello Dec., ¶ 14, Ex. 30 (Expert Report of John B. O'Brien), ¶ 130, p. 61, Ex. Z.) | **130. Disputed.**<br><br>The evidence shows that Lyondell was a substantial, if not sole supplier of MTBE, to Southern California refiners during much of the relevant time period.  *See* Response to Paragraph 121 and 125 *supra*.  The evidence cited by Lyondell does not establish the dates or the amounts. |
| 131.    According to File & Serve Xpress, OCWD did not issue any subpoenas for documents or deposition to any third party suppliers of MTBE to any Defendants that were identified in discovery in this case. (DiChello Dec., ¶ 10.) | **131. Disputed** as irrelevant.<br><br>The evidence shows that Lyondell was a substantial, if not sole supplier of MTBE, to Southern California refiners during much of the relevant time period.  *See* Response to |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Paragraph 121 and 125 *supra*.<br><br>Lyondell provides no evidence that Lyondell served subpoenas for documents or depositions of any third party suppliers of MTBE to the refiners. As a party to this matter, Lyondell would have the ability to serve subpoenas for documents or depositions of third parties Lyondell considered relevant. |
| 132.    OCWD has not presented any evidence regarding the timing or quantities of any shipments of MTBE manufactured or sold by any third party suppliers of MTBE to Defendants Arco, Chevron, the ExxonMobil Defendants, Shell, Texaco, and Union Oil or that was manufactured by any of those Defendants. (DiChello Dec., ¶ 15, Ex. 31 (Letter from M. Axline to Hon. Shira A. Scheindlin dated Apr. 11, 2014), pp. 2-3.); (DiChello Dec., ¶ 10.); (DiChello Dec., ¶ 6, Ex. 26 (Arco's Answers to Plaintiffs 1st Interrog. re: Defendant Identification, pp. 46, Ex. 1 (Hammond Dec.), 18, p. 16, Attach. B; Further Resp. of Chevron to Plaintiffs' Prelim. Interrogs. re: Defendant Identification, pp. 7-15; Exxon's Resp. to Plaintiffs' Prelim. Interrogs.<br>re: Defendant Identification, pp. 8-9, 11, Attach. B; Shell's Resp. to Plaintiffs 1st Interrogs., pp. 7-8; Union Oil's Further Resp. to Plaintiffs' Prelim. Interrogs., pp. 10-11).); (DiChello Dec., ¶ 7, Ex. 27 (Arco's Answers to OCWD's 3rd Spec. Interrogs., Interrog. No. 6; Chevron's Resp. to OCWD's 3rd Spec. Interrogs., pp. 13-15; Exxon's Resp. to OCWD's 3rd Interrogs., pp. 12-14; Shell's Resp. to OCWD's 3rd Interrogs., pp. 17-20; Union Oil's Resp. to OCWD's 3rd Spec.Interrogs., pp. 14-16).); (DiChello Dec., | **132. Disputed** as irrelevant.<br><br>The evidence shows that Lyondell was a substantial, if not sole supplier of MTBE, to Southern California refiners during much of the relevant time periods. *See* Response to Paragraph 121 and 125 *supra*. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| ¶ 9, Ex. 28 (Arco's Responses to Discovery Requests in CMO #4, p. 5, Ex. 3 (Youngman Dec.), ¶ 3; Engibous Dec., ¶ 4, p. 2; Exxon Mobil Corp.'s Dec. on behalf of Former Mobil Corp. in Resp. to CMO #4, Subsecs. III(B)(2)(ii), (iv); Exxon Mobil Corp.'s Dec. on behalf of Former Exxon Corp. in Resp. to CMO #4, Subsecs. III(B)(2)(ii), (v); Sexton Dec., pp. 2-4; Dec. of Union Oil in Compliance with CMO #4, ¶ 29, p. 6).) | |
| 133.    Arco cannot determine which MTBE supplier's product was delivered to the Carson refinery that supplied gasoline to the Orange County area. (DiChello Dec., ¶ 6, Ex. 26 (Arco's Answers to Plaintiff's 1st Interrogs. re: Defendant Identification), p. 6.) | **133. Disputed.**<br><br>Arco/BP affirmatively identified "Entities that Sold MTBE to BP or its affiliates from 1989 through 2003" in the discovery responses cited by Lyondell.  (Miller Decl., Ex. 6.)  The Attachment shows, in fact, that Arco Chemical was the sole supplier of MTBE to BP in 1992 and 1993. |
| 134.    MTBE purchased by Chevron from Lyondell "may have been" used to manufacture gasoline containing MTBE at the El Segundo Refinery that supplied Orange County between June 1987 and March 2003. (DiChello Dec., ¶ 7, Ex. 27 (Chevron's Resp. to OCWD's 3rd Spec. Interrogs.), pp. 14-15.) | **134. Disputed.**<br><br>Lyondell (then known as Arco Chemical) was the *sole* supplier of neat MTBE to Chevron's El Segundo Refinery during the ten year period from 1987 through 1997 (with one small exception in 1995).  Lyondell sold hundreds of millions of gallons of neat MTBE to the El Segundo refinery during this period.  (Miller Decl., Ex.7, Blagojevic Decl.; Ex. 9, 1991 MTBE Sales Contract.)  Chevron's El Segundo refinery supplied all of the MTBE gasoline delivered to Chevron stations in Orange County.  (Miller Decl., Ex. 10 Chevron CMO #4 Decls., Lines & Means.)  Thus any MTBE gasoline supplied to a Chevron station in Orange County between 1987 and 1997, including the Chevron focus plume stations, |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
|  | would have contained Lyondell's MTBE. |
| 135.    Mobil's refinery in Torrance, California produced gasoline containing MTBE that "may have been" delivered to stations in Orange County. (DiChello Dec., 17, Ex. 27 (Exxon's Resp. to OCWD's 3rd Interrogs.), p. 13.); (DiChello Dec., ¶ 6, Ex. 26 (Exxon's Responses to Plaintiffs' Prelim. Interrogs. re: Defendant Identification), p. 8.) | **135. Disputed.**<br><br>Mobil was the supplier of gasoline to Mobil branded stations in Orange County.  (CMO #116.)  Mobil identified the Torrance refinery as the only California (Southern California) based refinery that supplied gasoline to Orange County stations.  (MillerDecl., Ex. 16, CMO #4 Resp. at Subsection III(B)(2)(iv).) |
| 136.    It cannot be determined which MTBE supplier's MTBE product provided to Shell or Texaco in California was blended into gasoline that was shipped to the Orange County area. (DiChello Dec., ¶ 7, Ex. 27 (Shell's Resp. to OCWD's 3rd Interrogs.), p. 20.); (DiChello Dec., ¶ 6, Ex. 26 (Shell's Resp. to Plaintiff's 1st Interrogs.), p. 8.) | **136.  Disputed.**<br><br>From 1990 to at least the end of 1992, Lyondell sold 150,000 barrels per month to Shell's Wilmington refinery and terminals in Long Beach in Southern California.  (Miller Decl., Ex. 7, Blagojevic Decl., *South Tahoe*.) Gasoline refined at the Wilmington refinery was delivered to stations in Orange County, and Shell was the supplier of Shell gasoline stations in Orange County.  (Miller Decl., Ex. 13, Sexton Decl. at 4, *see also* CMO #116.) |
| 137.    Union Oil's former refinery in Wilmington, California supplied gasoline to the Orange County area only "in part" between 1986 and 1997. (DiChello Dec., ¶ 9, Ex. 28 (Dec. of Union Oil in Compliance with CMO #4), ¶ 29, p. 6.) | **137. Disputed.**<br><br>Union Oil supplied stations in Orange County from its Los Angeles refinery, as was the supplier for Unocal stations in Orange County.  (Miller Decl., Clark Decl. at 6; Ex. 15, *see also* CMO #116.)  Union Oil, moreover, specifically identified the Wilmington refinery as the source of MTBE gasoline delivered to stations in Orange County.  (Miller Decl., Ex. 14, Decl. of Grace Chan.) Union Oil's Wilmington refinery obviously served other areas of the Los |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Angeles basin. Union Oil, moreover, has not identified any other refinery which was utilized to supply Orange County gasoline stations. |
| 138.    Although Union Oil's former refinery in Wilmington, California began blending MTBE into certain grades of gasoline in 1986, it is unknown whether any gasoline containing MTBE from that refinery was delivered to the Orange County area at that time. (DiChello Dec., ¶ 7, Ex. 27 (Union Oil's Resp. to OCWD's 3rd Spec. Interrogs.), p. 16.) | **138. Disputed** for the reasons set forth in Response to Paragraph 137, *supra*. |
| 139.    OCWD has not presented any evidence that Defendants Arco, Chevron, the ExxonMobil Defendants, Shell, Texaco, and Union Oil delivered gasoline containing Lyondellsupplied MTBE to the Orange County area as opposed to any other part of California, much less any of the Focus Stations. (DiChello Dec., ¶ 15, Ex. 31 (Letter from M. Axline to Hon. Shira A. Scheindlin dated Apr. 11, 2014), pp. 2-3.); (DiChello Dec., ¶ 10.); (DiChello Dec., ¶ 6, Ex. 26 (Arco's Answers to Plaintiff's 1st Interrogs. re: Defendant Identification, pp. 4-6, Ex. I (Hammond Dec.), ¶ 8, p. 16, Attach. B; Chevron's Further Response to Plaintiffs' Prelim. Interrogs. re: Defendant Identification, pp. 7-15; Exxon's Resp. to Plaintiffs' Prelim. Interrogs. re: Defendant Identification, pp. 8-9, 11, Attachs. A and B; Shell's Resp. to Plaintiff's 1st Interrogs., pp. 7-8; Union Oil's Further Response to Plaintiffs' Prelim. Interrogs., pp. 10-11).); (DiChello Dec., ¶ 7, Ex. 27 (Arco's Answers to OCWD's 3rd Spec. Interrogs., Interrog. No. 6; Chevron's Resp. to OCWD's 3rd Spec. | **139. Disputed** for the reasons set forth in Response to Paragraphs 122, 126, 133-135 and 137 *supra*. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Interrogs., pp. 13-15; Exxon's Responses to OCWD's 3rd Interrogs., pp. 12-14; Shell's Resp. to OCWD's 3rd Interrogs., pp. 17-20; Union Oil's Resp. to OCWD's 3rd Spec. Interrogs., pp. 14-16).); (DiChello Dec., ¶ 9, Ex. 28 (Arco's Resp. to Discovery Requests in CMO #4, pp. 5, 7, Ex. 3 (Youngman Dec.), ¶ 3; Engibous Dec., ¶ 4, p. 2; Exxon Mobil Corp.'s Dec. on behalf of Former Mobil Corp. in Resp. to CMO #4, Subsecs. III(B)(2)(ii), (iv); Exxon Mobil Corp.'s Dec. on behalf of Former Exxon Corp. in Resp. to CMO #4, Subsets. III(B)(2)(ii), (v); Sexton Dec., pp. 2-4; Dec. of Union Oil in Compliance with CMO #4, ¶ 29, p. 6).); (DiChello Dec., ¶ 13, Ex. 29 (Dec. of Defendant Lyondell Chemical Company, ¶¶ 3-4, pp. 1-2, Ex. A).); (DiChello Dec., ¶ 14, Ex. 30 (Expert Report of John B. O'Brien), ¶¶ 79, 124, 127, 129-130, pp. 39, 57-58, 60-61, Exs. Y and Z.); (Blagojevic Dec., ¶¶ 5-9, 11, 22.) | |

**Facts Specific To Tesoro**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 140.    Tesoro herein incorporates by reference Paragraphs 40-51 of the 56.1 Statement and Martin Dec. ¶¶ 5-16, and Ex. 46. | **140. Undisputed.** |
| 141.    OCWD does not have any direct evidence to show delivery of Tesoro gasoline to any of the Focus Stations. (Martin Dec., ¶ 28.) | **141. Disputed.**<br><br>Overview<br><br>The District has evidence that Tesoro sold |

95

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | substantial quantities of MTBE gasoline directly to defendants who owned, operated, and/or supplied MTBE gasoline to the focus sites during the relevant time period.  There is evidence that Tesoro sold MTBE gasoline directly to Arco, Shell, Eqilon and Texaco who collectively directly supplied twenty-three focus sites.  (CMO #116.)  The evidence, moreover, specifically identifies the time periods when Tesoro was supplying these refiners. |
| | The District contends, moreover, that Tesoro failed to disclose substantial evidence of its gasoline sales and distribution until well after the close of fact discovery. |
| | Tesoro's 2009 discovery responses stated, for example, that "Between 1986 and 2003, Tesoro did not . . . deliver gasoline . . . in the Orange County Water District service area . . ."  (O'Reilly Decl., Ex. 1, Tesoro Resp. to Fifth Rogs (Aug. 17, 2009) at 6.) |
| | In July 2011, just prior to the deposition of Tesoro's market share experts, George Schink, Tesoro produced substantial information concerning its sales and distribution of MTBE gasoline to Southern California, including the refiner defendants listed above. |
| | Based on records provided to him by Tesoro, Mr. Schink, Tesoro's market share expert, prepared and produced a detailed, twenty-one page spreadsheet of Tesoro's sales of MTBE gasoline, including customers, location of sales, volumes and product codes.  (Hydrick Decl., Ex. 1; O'Reilly Decl., Ex. 2, Schink |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Expert Report at 7 ["engaged . . . to perform analyses . . . regarding Tesoro's role in the production, marketing, and distribution of oxygenated gasoline . . ."].)  These records show that between 1986 and 2003, Tesoro sold more than 1 billion gallons of MTBE gasoline to customers and terminals that served the Orange County Water District's service area.  Tesoro's customers included most of the major defendants in this case, including Chevron (neat MTBE), ConocoPhillips (MTBE gasoline) Shell (neat MTBE and MTBE gasoline) Union Oil (MTBE gasoline), and Valero (neat MTBE). (Hydrick Decl., Ex. 1.)

Total sales volume spreadsheets prepared by Schink show that between 1993 and 1999 (a time period Tesoro claims it did not distribute any gasoline to California), Tesoro sold and distributed nearly 1.3 billion gallons of gasoline to various terminals throughout California, including numerous terminals which served Orange County.  (Hydrick Decl., Ex. 1, at Tesoro Supply Data, 1993-1999, Bates 2211.) Similarly, for the years 1999 to 2003, Tesoro supplied over 3.2 billion gallons of gasoline throughout California.  (*Id.* at Tesoro Supply Data, Bates 2212.)

Tesoro owned and operated two refineries which supplied the California market, one of which was located in California.  (O'Reilly Decl., Ex. 3, Tesoro Supp. Resp. to 3rd Rogs. at 6-8.)  Tesoro fails to disclose in its facts that Tesoro was an active participant in the California gasoline market since 1993, buying, selling and exchanging gasoline with |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
|  | numerous parties.  (O'Reilly Decl., Ex. 2, Schink Expert Report at ¶ 11.)<br><br>A declaration provided by Tesoro claims that "Tesoro does have gasoline supply contracts with customers that may have supplied gasoline service stations within the Orange County Water District service area." (O'Reilly Decl., Ex. 4, Donovan Decl. re CMO #4 (Jan. 25, 2005) at ¶ 5.)  To the District's knowledge Tesoro never identified (or specifically produced) the "supply contracts" relied upon by Mr. Donovan to determine that Tesoro supplied gasoline to Orange County.<br><br>Tesoro supplied gasoline to numerous Kinder Morgan terminals which served Orange County, including Colton and Carson, and which were utilized by Southern California refiners.  (Hydrick Decl., Ex. 1.)  Schink testified that "[a]ll the refiners in Southern California can pretty much get to any terminal supplied by Kinder Morgan . . ."  (O'Reilly Decl., Ex. 5, Schink Depo. at 36:14-17.)<br><br>Schink testified that Kinder Morgan did not announce plans to accept ethanol gasoline until October 2003. (O'Reilly Decl., Ex. 5, Schink Depo. 59:17-10.)  Schink testified that the Kinder Morgan did not permit delivery of ethanol gasoline at the Carson terminal until November of 2003 which led him "to believe that 2003 was the first time [Kinder Morgan] permitted" [the distribution of ethanol gasoline from their terminals.  (*Id.* Schink Depo. at 44:7-14.)<br><br>Equilon |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Mr. Schink also produced Form 10-K405 forms for Tesoro which conceded that Tesoro's "Washington refinery sells up to 35% of its gasoline to Equilon . . " (O'Reilly Decl., Ex. 6.)  Tesoro has not produced any documents concerning its relationship with Equilon.  Equilon confirmed that it directly supplied MTBE gasoline to five focus stations during the relevant time period. (CMO #116 at 20-21.) Tesoro did not reveal its direct supply contract with Equilon during discovery, nor did Tesoro identify the locations, dates, or volumes of its supply to Equilon.<br><br>Equilon directly supplied MTBE gasoline to five focus sites during the same time periods that Equilon was receiving MTBE gasoline from Tesoro.  (CMO #116 at 19-20.)<br><br>Texaco<br><br>Tesoro admitted, that it utilized and Texaco's Los Angeles terminals, to sell and distribute gasoline to Southern California. (O'Reilly Decl., Ex. 7, Tesoro 3rd  Supp Resp to 3rd Rog. (June 1, 2011) at 10.)  Mr. Schink's spreadsheets confirm that Tesoro sold substantial amounts of MTBE gasoline to Texaco:<br><br>-Tesoro sold substantial amounts of Midgrade Unleaded RFG (193) to Texaco in 1994 and 1995.<br><br>-Tesoro also sold substantial amounts of Prem UnLead wMTBE (167) to Texaco in 1993 and 1994. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | -Tesoro Product Code 167 is identified as "Premium Unleaded With MTBE." |
| | (Hydrick Decl., Ex. 1.) |
| | Texaco directly supplied MTBE gasoline to six focus sites during the same time periods that Texaco was receiving MTBE gasoline from Tesoro.  (CMO #116 at 17-18.) |
| | Shell |
| | Tesoro admitted, that it utilized Shell's and Texaco's Los Angeles terminals, to sell and distribute gasoline to Southern California.  (O'Reilly Decl., Ex. 7, Tesoro 3rd  Supp Resp to 3rd Rog. (June 1, 2011) at 10.)  Shell similarly identified Tesoro as an exchange partner that provided Shell with gasoline for stations in Orange County.  (Shell Resp. to 3rd Rogs (Nov. 10, 2008) at pp. 20-23.) |
| | Evidence shows that Tesoro indeed sold 20,729,030 gallons of Carb Unl RFG (195) to Shell in 1998 at the Carson terminal.  (Hydrick Decl., Ex. 1.) |
| | Shell specifically identified the Carson Terminal as source of supply for Orange County gasoline stations from the 1920s to the present.  (O'Reilly Decl., Ex. 8, Shell Resp. to 3rd Rogs (Nov. 10, 2008) at 20-23.)  Shell specifically identified Tesoro as an exchange partner at the Wilmington terminal which supplied MTBE gasoline to Orange County.  (*Id.* at 22.)  Shell also identified the Kinder Morgan Bloomington and Long Beach terminals as sources of MTBE gasoline for its Orange County stations.  (*Id.* at 25-27.) |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Shell also purchased neat MTBE from Tesoro for use in gasoline it distributed to Orange County stations. (O'Reilly Decl., Ex. 8, Shell Resp. to 3rd Rogs (Nov. 10, 2008) at 19.) |
| | Shell (and its successor Equilon) directly supplied MTBE gasoline to six focus sites during the same time periods that Shell was receiving MTBE gasoline from Tesoro. (CMO #116 at 19-20.) |
| | Arco |
| | Tesoro sold MTBE gasoline to Arco each year from 1998-2002. (O'Reilly Decl., Ex. 9, Arco Resp. to 1st Rogs re Defendant Identification (Aug. 30, 2004) |
| | at 20.) Arco utilized the Carson terminal to supply gasoline to "the focus plume sites" (O'Reilly Decl., Ex. 10, Smith Decl. at ¶ 7-8.) Arco supplied MTBE gasoline directly to ten focus plume sites. (CMO #116 at 25-28.) |
| | Petro Diamond |
| | G&M Oil operated two focus sites, G&M Oil #4 and G&M Oil #24. (O'Reilly Decl., Ex. 11, G&M Oil CMO #75 at 3.) G&M Oil identified Petro Diamond as a supplier of MTBE gasoline its focus site stations in Orange County. (O'Reilly Decl., Ex. 12, G&M Oil Resp. to Preliminary Rogs (Sept. 5, 2004) at p. 4; *see also* Ex. 13, Pearson Depo. (July 22, 2010) at 94:18-95:13.) |
| | There is ample evidence that Tesoro, in turn, supplied MTBE gasoline to Petro Diamond in |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | the relevant area.  (O'Reilly Decl., Ex. 14, Mills Amended CMO #4 Decl. (Feb. 25, 2005) at ¶ 4, p. 2.)  From July 2001 to December 2001, Petro Diamond had a Product Sales Contract for MTBE containing gasoline with Tesoro.  (O'Reilly Decl., Ex. 15, Keating Depo. (March 23, 2010) at 19: 11-14, 65:16-67:5 and Ex. 15.)  Mr. Schink's spreadsheets confirm that Tesoro, fact, sold 26,715,939 gallons of Carb Unl 2% to PDI in 2001 which contained MTBE.   (Hydrick Decl., Ex. 1.)<br><br>Texaco identified Petro Diamond as a supplier of MTBE gasoline from 1999 to 2003 at the Wilmington location.  (O'Reilly Decl., Ex. 16, Shell Resp. to 1st Rogs. at 7.)<br><br>Union Oil/Unocal<br><br>Tesoro sold MTBE gasoline to Union Oil (Unocal) in July 1993, June-August 1995, March-April 1996, June 1996, and October 1996.  (O'Reilly Decl., Ex. 17, Unocal/Union Oil Further Resp. to Preliminary Rogs (Aug. 30, 2004) at 8.)  Consistent with this evidence, the spreadsheet prepared by Schink confirms, moreover, that Tesoro directly supplied substantial volumes of gasoline to Unocal at its Colton terminal in 1996 and 1996.  (Hydrick Decl., Ex. 1.)  Tesoro did not provide codes for the gasoline products sold to Unocal, but Unocal's discovery responses identified this gasoline as containing MTBE.<br><br>Chevron<br><br>Tesoro sold neat MTBE to Chevron for its Southern California El Segundo refinery in |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | April 1993, September 1993, and December 2002. (O'Reilly Decl., Ex. 18, Further Response of CUSA to Preliminary Rogs (Aug. 30, 2004) at 8, 13, and 15.)  As demonstrated in Paragraph 126 *supra*, Chevron utilized it El Segundo refinery to supply each of its focus sites.<br><br>Chevron also identified the Kinder Morgan Carson terminal as a source of supply for Orange County from 2002- present. (*Id.* at 16.)  Tesoro admitted that it supplied MTBE gasoline to this terminal commencing in October 2001 which is specifically tracks Tesoro's direct supply of MTBE gasoline to Chevron. (O'Reilly Decl., Ex. 7, Tesoro 3rd Supp Resp. to 3rd  Rogs (June 1, 2011) at 10.)  Chevron also identified the Colton terminal as a source of gasoline for Orange County Stations. (O'Reilly Decl., Ex. 18, Further Response of CUSA to Preliminary Rogs (Aug. 30, 2004) at 16.)  Schink's spreadsheet shows Tesoro supplied substantial volumes of MTBE gasoline to the Colton terminal in 1993, 1994, 1995, 1996 and 1997.   (Hydrick Decl., Ex. 1.)<br><br>Conoco<br><br>Tesoro supplied Conoco with MTBE-blended gasoline for delivery into Orange County. (O'Reilly Decl., Ex. 19, Conoco Resp. to Preliminary Rogs (Aug. 27, 2004) at Ex. B.) Conoco directly supplied MTBE gasoline to two focus sites in Orange County.  (CMO #116 at 25.) |
| 142.    OCWD is relying solely upon the commingled product theory to establish the required causal nexus for Tesoro in this case. | **142 Disputed.**<br><br>As demonstrated in Response to Paragraph |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| (Martin Dec., ¶ 28.) | 141 *supra*, the District has ample evidence that Tesoro sold both neat MTBE and MTBE gasoline directly to refiner defendants who owned, operated, or directly supplied the focus stations. |
| 143.    Tesoro did not directly sell, deliver, or market gasoline containing MTBE in the Relevant Geographic Area ("RGA", defined in CMO #4 as the OCWD service area), including the 34 focus plume stations. (Mills Dec., ¶ 8.) | **143. Disputed.**<br><br>Tesoro directly sold both MTBE and MTBE gasoline to Arco, Chevron, Equilon, Shell, Texaco, and Unocal. *See* Response to Paragraph 141 *supra*. Tesoro's own expert, George Schink prepared extensive spreadsheets showing that Tesoro, in fact, directly sold, supplied, and delivered more than 1 billion gallons of MTBE gasoline to customers and terminals that served stations in Orange County. (Hydrick Decl., Ex. 1.)<br><br>The spreadsheets prepared by Schink demonstrate that Tesoro supplied a substantial portion of this gasoline to Kinder Morgan terminals in Southern California, including multiple terminas in Carson, Orange County, Colton (identified as SFPP), and Los Angeles. (Hydrick Decl., Ex. 1.) |
| 144.    Tesoro did not purchase, sell or exchange gasoline containing MTBE at any sales terminal located in the RGA. (Mills Dec., ¶ 9.) | **144. Disputed.**<br><br>The records prepared by Tesoro's market share expert, George Schink show that Tesoro sold and distributed gasoline from the Kinder Morgan Orange terminal in 2003 which is located in Orange County. (Hydrick Decl., Ex. 1.)  The spreadsheet identifies this gasoline as containing "ethanol" as well as neat ethanol. (*Id.*)  Next to the neat ethanol, the spreadsheet, however, states "DO NOT USE." (*Id.*)  Schink testified that the Kinder |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | Morgan did not permit delivery of ethanol gasoline at the Carson terminal until November of 2003 which led him "to believe that 2003 was the first time [Kinder Morgan] permitted" [the distribution of ethanol gasoline from their terminals.  (O"Reilly Decl., Ex. 5, Schink Depo. at 44:7-14, *see also* 59:17-60:10 [Kinder Morgan announced plans to accept ethanol .gasoline at terminals in Oct. 2003].)  Schink testified generally that Kinder Morgan did support ethanol at many terminals "until late 2003." (*Id.* at 81:17-21.) |
| 145.    Tesoro did not own a refinery in Southern California between 1986 and 2003. (Mills Dec., ¶ 10.) | **145.  Disputed** on grounds that Tesoro owned a refinery which supplied substantial volumes of gasoline to the California market, including MTBE gasoline, from 1992 to 2003. (Hydrick Decl., Ex. 1.) |
| 146.    Tesoro sold gasoline free on board ("FOB"), meaning title to gasoline transferred at the time of the sale, to jobbers at the following Los Angeles County sales terminals during the time periods noted: Shell Carson terminal (1998); Texaco Los Angles terminal (1993-1995); and ATSC (1995-1996). (Mills Dec., ¶ 11.) | **146. Disputed** on the grounds that Tesoro knew that it was supply gasoline to "major oil companies." (O'Reilly Decl., Ex. 6, Tesoro 1999 and 2002 Form 10-Ks.) |
| 147.    Tesoro did not sell gasoline at sales terminals in Los Angeles County between 1999 and July 2001. (Mills Dec., ¶ 17.) | **147. Disputed.** Spreadsheets prepared by Schink show that Tesoro sold 444,153,792 gallons of gasoline to the "Los Angeles Geographical" area vrom 1992-2002.  (Hydrick Decl., Ex. 1.)  These spreadsheets, moreover, show that Tesoro sold 221,152,074 gallons of gasoline from the Kinder Morgan Carson terminal (located in L.A. county) from 2001-2003.  (*Id.*) |
| 148.    Tesoro acquired the Anacortes, Washington refinery in August 1998. Tesoro | **148. Disputed.** |

| **DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE:** | **PLAINTIFF'S RESPONSE AND EVIDENCE** |
|---|---|
| did not add MTBE to gasoline it manufactured at its Anacortes Refinery. (Martin Dec., ¶ 2, Ex. 44 (Am. Stevenson Declaration, ¶¶ 6, 7).) | Tesoro admits that the Anacortes Refinery manufactured MTBE for blending with gasoline, and that the Anacortes Refinery shipped both the MTBE and gasoline to Petro-Diamond for distribution in the RGA. *See* Paragraph 150, *infra*. |
| 149.    Tesoro began shipping gasoline manufactured at its Anacortes Refinery to Southern California in July 2001. (Martin Dec., ¶ 2, Ex. 44 (Am. Stevenson Dec., ¶ 7).) | **149. Disputed.**<br><br>Total sales volume spreadsheets prepared by Schink show that between 1993 and 1999 Tesoro sold and distributed nearly 1.3 billion gallons of gasoline to various terminals throughout California, including numerous terminals which served Orange County. (*Id.* at Tesoro Supply Data, 1993-1999, 2211.) Schink did not identify the source. |
| 150.    Between July 2001 and December 2001, Tesoro shipped gasoline without oxygenate manufactured at its Anacortes Refinery to Petro Diamond Inc.'s ("PDI") Long Beach facility where it was blended with MTBE. Tesoro sold this gasoline containing MTBE to PDI. (Martin Dec., ¶¶ 2, 4, Ex. 44(Am. Stevenson Dec., ¶ 7); Dep. Tr. of Keating, pp. 156:8-157:23 (including Ex. 27).) | **150. Disputed.**<br><br>There is ample evidence that Tesoro, in turn, supplied MTBE gasoline to Petro Diamond in the relevant area. (*See* Mills Amended CMO #4 Decl. at ¶ 4; Ex. 15, Keating Depo. (March 23, 2010) at 19: 11-14, 65:16-67:5, and Ex. 15.) From July 2001 to December 2001, Petro Diamond had a Product Sales Contract for MTBE containing gasoline (CARB Phase II) with Tesoro for Petro-Diamond's Long Beach facility. (O'Reilly Decl., Ex. 15, Keating Depo. at 65:16-67:5 and Ex. 15.) Mr. Schink's spreadsheets confirm that Tesoro, fact, sold 26,715,939 gallons of Carb Unl 2% to PDI in 2001 which contained MTBE. (Hydrick Decl., Ex. 1) |
| 151.    Tesoro supplied gasoline containing MTBE for sale to jobbers FOB at the Kinder Morgan Carson terminal in Los Angeles | **151. Undisputed** as to jobbers. Disputed as to refiners. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| County starting in October 2001 and ending no later than December 31, 2003. (Mills Dec., ¶ 19.) | The evidence set forth in Responses to Paragraphs 141-150 *supra* shows that Tesoro supplied neat MTBE and MTBE gasoline to refiners and others Kinder Morgan's Carson terminal.  These refiners then directly supplied MTBE gasoline to focus sites at issue in this motion from the Kinder Morgan Carson terminal during the relevant time period. |
| 152.     In February 2005, in response to CMO #4, Tesoro identified jobbers it supplied at the Kinder Morgan Carson terminal at some point between October 2001 and no later than December 31, 2003, including Cool Fuel Inc., Falcon Fuels Inc., ITL Inc., Nickey Petroleum Co., Inc., Petro Diamond Inc., Southern Counties Oil Co., The Jankovich Co., USA Petroleum Corp., and World Oil Corp. (Mills Dec., ¶¶ 5, 19.) | **152. Undisputed** as to jobbers.  Disputed as to refiners.  See Response to Paragraph 151 *supra*. |
| 153.     Tesoro acquired the Golden Eagle Refinery in Northern California in May 2002. Tesoro blended neat MTBE it manufactured at the Golden Eagle Refinery into gasoline manufactured at the Golden Eagle Refinery between May 2002 through approximately October 18, 2003. (Martin Dec., ¶ 2, Ex. 44( Am. Stevenson Dec.), ¶¶ 4, 5, 10.) | **153. Undisputed** as to ownership. Disputed as to sole source of supply.  The evidence set forth in Responses to Paragraphs 141-150 *supra* shows that Tesoro supplied neat MTBE and MTBE gasoline to refiners and others in Southern California long before Tesoro acquired the Golden Eagle Refinery.  These refiners then directly supplied MTBE gasoline to focus sites at issue in this motion. |
| 154.     Tesoro shipped gasoline manufactured at its Golden Eagle Refinery to Kinder Morgan Carson between March 2003 and October 2003. (Martin Dec., ¶ 2, Ex. 44 (Am. Stevenson Dec., ¶¶ 7, 10); Mills Dec., ¶ 19.) | **154. Undisputed** as to ownership. Disputed as to sole source of supply.  See Response to Paragraph 151 & 153 *supra*. |
| 155.     On June 2, 2011, Tesoro served a Motion to Compel to confirm the identities of | **155. Undisputed** as to jobbers.  Disputed as to refiners. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| jobbers to whom Plaintiff had issued subpoenas and produce all documents or declaration of no records received from those jobbers. (Martin Dec., ¶ 17.) | The evidence set forth in Responses to Paragraphs 141-150 *supra* shows that Tesoro supplied neat MTBE and millions of gallons of MTBE gasoline to refiners and others in Southern California for a decade from 1993 to 2003. These refiners then directly supplied MTBE gasoline to focus sites at issue in this motion. |
| 156.    During a September 14, 2011 hearing before Special Master Warner, Plaintiff confirmed the jobbers upon which it served subpoenas and that it received no jobber records. (Martin Dec., ¶ 17.) | **156. Undisputed** as to jobbers.  Disputed as to refiners.<br><br>*See* Response to Paragraph 155 *supra*. |
| 157.    In May 2010 and April 2013, Plaintiff alleged Tesoro liability at the following five stations associated with G&M Oil: (1)16990 Beach Blvd., Huntington Beach; (2) 8980 Warner Ave., Fountain Valley (not identified in April 2013); (3) 3301 Bristol St., Santa Ana; (4) 14600 Edwards St., Westminster; and (5) 5992 Westminster Blvd., Westminster. (Martin Dec., ¶ 5.) | **157. Undisputed.**<br><br>As explained in detail in the District's Response to Paragraphs 259-264, *infra*, the District identified Tesoro with these stations long before the station matrix in April 2013. |
| 158.    Plaintiff bases this alleged liability on (i) Tesoro's supply of gasoline to PDI between July 2001 and December 2001, as outlined above and (ii) PDI's alleged sales of gasoline to G&M Oil. (Martin Dec., ¶ 5.) | **158. Disputed.**<br><br>The evidence also shows that Chevron and Texaco supplied G&M Oil focus stations for substantial periods of time.  (CMO #116 at 14, 18.)  The evidence set forth in the Response to Paragraphs 141-150 *supra* demonstrate that Tesoro supplied neat MTBE and MTBE gasoline to Chevron and Texaco. |
| 159.    PDI's records do not show sales to G&M Oil. (Martin Dec., 1 3.) | **159. Disputed.**<br><br>Petro-Diamond has never provided copies of its sales records. |
| 160.    Although G&M Oil's preliminary | **160. Disputed.** |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| discovery responses served in September 2004 indicated PDI supplied gasoline to G&M Oil, G&M Oil subsequently provided declarations in February 2011 based on G&M Oil records indicating PDI did not supply, deliver, sell, broker and/or distribute to any G&M Oil branded stations from 1996 through 2003. (Martin Dec., ¶¶ 18-20, Exs. 47-49 (G&M Oil Company, Inc.'s Answers to Plaintiff's Prelim. Interrog. re Defendant Identification; Declaration of Jennifer L. Talbert re Petro-Diamond, Inc. Deliveries; Declaration of George A. Pearson re Petro-Diamond, Inc. Deliveries).) | As set forth in Responses to Paragraphs 141 & 150 *supra* G&M Oil's witness also testified that G&M Oil received gasoline from Petro Diamond. |
| 161.    The stations where Plaintiff alleges Tesoro liability due to an alleged PDT-G&M Oil nexus were supplied by CUSA with branded gasoline during the period Tesoro supplied gasoline to PDI (July-December 2001):<br>        a.        16990 Beach Blvd., Huntington Beach was supplied by CUSA with branded gasoline between December 1991 and December 2002;<br>        b.        8980 Warner Ave., Fountain Valley was supplied by CUSA with    branded gasoline between June 1999 and December 2002;<br>        c.        3301 Bristol St., Santa Ana was supplied by CUSA with branded gasoline between April 1997 and December 2002; and<br>        d.        5992 Westminster Blvd., Westminster was supplied by CUSA with branded gasoline between September 1995 and January 2002.<br>(Roy Dec., Ex. 80.) | 161. Disputed.<br><br>The evidence shows that Chevron and Texaco supplied G&M Oil focus stations for substantial periods of time.  (CMO #116 at 14, 18.)  The evidence set forth in the Response to Paragraphs 141-150 *supra* demonstrate that Tesoro supplied neat MTBE and MTBE gasoline to Chevron and Texaco. |
| 162.    Plaintiff has no evidence to support its | **162. Disputed** for the reasons set forth in |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| claims of Tesoro liability at each of the G&M Oil-affiliated stations based on: (i) Tesoro's supply of gasoline to PDI between July 2001 and December 2001 and (ii) PDI's alleged sales of gasoline to G&M Oil. According to PDI and G&M Oil records, PDI did not supply the G&M Oil stations. In addition, four of these stations were supplied by CUSA with branded gasoline during the period Tesoro supplied gasoline to PDI. (Martin Dec., ¶¶ 3, 5, 18-20; Roy Dec., Ex. 80.) | Response to Paragraphs 141-150 and 157-162 *supra.* |
| 163.    With respect to 14600 Edwards St., Westminster, Plaintiff alleged a Tesoro nexus based on Tesoro's sale of gasoline to USA Petroleum Corporation ("USA Petroleum"), which owned the property from 1977 to 1987. (Martin Dec., 1 6.) | 163. The District has dismissed the USA #141 station located at 14600 Edwards Street, Westminster, and is thus no longer asserting claims against Tesoro for this station only. |
| 164.    Tesoro supplied gasoline to USA Petroleum at the Kinder Morgan Carson terminal at some point between October 2001 and December 2003. (Mills Dec., ¶¶ 5, 19.) There is no evidence this gasoline was delivered to the RGA or any of the 34 focus plume stations. | 164. The District has dismissed the USA #141 station located at 14600 Edwards Street, Westminster, and is thus no longer asserting claims against Tesoro for this station only. The District reserves its right to dispute this statement if other USA Gasoline stations are at issue in later phases of this litigation. |
| 165.    Since Tesoro did not supply USA Petroleum with gasoline at Kinder Morgan Carson until October 2001 at the earliest, Tesoro cannot be in the chain of title for gasoline delivered to 14600 Edwards St., Westminster based on sales to USA Petroleum prior to that date. (Mills Dec., 115, 19.) | 165. The District has dismissed the USA #141 station located at 14600 Edwards Street, Westminster, and is thus no longer asserting claims against Tesoro for this station only. The District reserves its right to dispute this statement if other USA Gasoline stations are at issue in later phases of this litigation. |
| 166.    In April 2014, Plaintiff alleged Tesoro liability at the following nine stations, based on Tesoro's alleged sales of gasoline to Arco: (1) 16742 Beach Blvd., Huntington Beach; (2) 3201 Harbor Blvd., Costa Mesa; (3) | **166. Disputed.** The District has provided ample evidence that Tesoro directly supplied MTBE gasoline to Arco/BP during the relevant time period, and |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 18480 Brookhurst St., Fountain Valley; (4) 18025 Magnolia St., Fountain Valley; (5) 3361 S. Bristol St., Santa Ana; (6) 13142 Goldenwest St., Westminster; (7) 18520 Brookhurst St., Fountain Valley; (8) 6311 Westminster Blvd., Westminster; and (9) 6002 Bolsa Ave., Huntington Beach. (Martin Dec., ¶ 15, Ex. 45 (T. O'Reilly letter to D. Martin, Apr. 15, 2014).) | that Arco directly supplied each of these stations in Response to Paragraphs 141-150, *supra*. |
| 167.    In response to Plaintiff's First Set of Interrogatories re Defendant Identification served in August 2004, the BP Defendants identified Tesoro as having agreements to supply the BP Defendants with gasoline products anywhere in California that contained or may have contained MTBE in 1996 and between 1998 and 2002. In their responses, the BP Defendants indicated they "cannot be certain whether the transactions that took place pursuant to a particular agreement, if any, occurred in the year in which the agreement was made, in subsequent years or both." (Martin Dec., ¶ 21, Ex. 50 (BP Defendants' Answers and Objections to Plaintiffs First Set of Interrogatories re Defendant Identification).) | 167. Disputed.

The District has provided ample evidence that Tesoro directly supplied MTBE gasoline to Arco/BP during the relevant time period, and that Arco directly supplied each of these stations in Response to Paragraphs 141-150 *supra*. |
| 168.    The stations where Plaintiff alleges Tesoro liability based on Tesoro's sales of gasoline to Arco were supplied by the BP Defendants with branded gasoline.  (Roy Dec., Ex. 80.) | 168. Disputed on the grounds that the District alleges that Tesoro directly supplied MTBE gasoline to Arco/BP during the relevant time period as set forth in Response to Paragraphs 141-150, *supra*. |
| 169.    Plaintiff has no evidence to support its claims of Tesoro liability at the nine stations affiliated with the BP Defendants based on Tesoro's sales of gasoline to Arco. (Martin Dec., ¶¶ 15, 21.) Reliance on records of supply agreements anywhere in California | 169. Disputed.

The District has provided ample evidence that Tesoro directly supplied MTBE gasoline to Arco/BP during the relevant time period, and that Arco directly supplied each of these |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| without knowledge of whether any sales occurred and if so, when they occurred, amounts to mere speculation, not evidence, that gasoline was delivered to the RGA or any of the 34 focus plume stations. In addition, these nine stations were supplied by the BP Defendants with branded gasoline during the period Tesoro had supply agreements with the BP Defendants. (Roy Dec., Ex. 80.) | stations in Response to Paragraphs 141-150 *supra*.<br><br>The District objects to this statement as containing primarily legal argument rather than facts that are purportedly undisputed. The District's memorandum in opposition to defendants' summary judgment motion on Issue No. 5 addresses the legal argument raised in this "fact" concerning the legal significance and relevance of "supply agreements" as asserted by Tesoro. |
| 170.    In April 2014, Plaintiff alleged Tesoro liability at the following three stations, based on Tesoro's sales of neat MTBE to CUSA: (1) 5992 Westminster Blvd., Westminster; (2) 3801 S. Bristol St., Santa Ana; and (3) 12541 Seal Beach Blvd., Seal Beach. (Martin Dec., ¶ 15, Ex. 45 (T. O'Reilly letter to D. Martin, Apr. 15, 2014).) | **170. Undisputed** as to the District's assertion that Tesoro directly supplied neat MTBE to Chevron's El Segundo refinerey.  Disputed on the grounds that the District's basis for its claims against Tesoro at these stations is based on far broader evidence than identified by Tesoro.  The District also asserts that Tesoro directly supplied MTBE gasoline to Chevron. |
| 171.    In response to Preliminary Interrogatories re Defendant Identification served in August 2004, CUSA identified Tesoro as having supplied neat MTBE in December 2002 for use at Chevron's El Segundo Refinery (Southern California) and/or Richmond Refinery (Northern California). (Martin Dec., ¶ 22, Ex. 51 (Further Response of Defendant Chevron U.S.A., Inc. to Plaintiffs' Preliminary Set of Interrogatories re Defendant Identification).) It is unknown when neat MTBE purchased by Chevron was blended into gasoline or if gasoline was shipped to or from a terminal that served the RGA. | 171. Disputed.<br><br>The District has provided ample evidence that Tesoro directly supplied neat MTBE and MTBE gasoline to Chevron during the relevant time period, and that Chevron directly supplied each of these stations in Response to Paragraphs 141-150 *supra*. |
| 172.    The stations where Plaintiff alleges | **172. Disputed** on the grounds that the District |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Tesoro liability based on Tesoro's sales of neat MTBE to CUSA were supplied by CUSA with branded gasoline during the entire relevant period and MTBE gasoline between October 1992 and January 2003, with the exception of 12541 Seal Beach Blvd., Seal Beach, where deliveries of MTBE gasoline ceased by December 31, 2002. The stations were owned by CUSA between 1986 and December 2003, with the exception of 5992 Westminster Blvd., Westminster, which CUSA owned until January 2002. (Roy Dec., Ex. 80.) | alleges that Tesoro directly supplied neat MTBE and MTBE gasoline to Chevron during the relevant time period as set forth in Response to Paragraphs141-150, *supra*. |
| 173.    Plaintiff has no evidence to support its claims of Tesoro liability at these CUSA affiliated stations based on Tesoro's sales of neat MTBE to CUSA. (Martin Dec., ¶¶ 15, 22.) Reliance on records that Tesoro supplied MTBE in Los Angeles County during one month (December 2002) amounts to mere speculation, not evidence, that such MTBE was eventually blended into gasoline delivered to the RGA or any of the 34 focus plume stations. (Roy Dec., Ex. 80.) | **173. Disputed.** The District has provided ample evidence that Tesoro directly supplied neat MTBE and MTBE gasoline to Chevron during the relevant time period, and that Chevron directly supplied each of these stations in Response to Paragraphs 141-150 *supra*. |
| 174.    In April 2014, Plaintiff alleged Tesoro liability at the following seven stations, based on Tesoro's exchange and terminalling agreements with Shell and Texaco at their respective Los Angeles County company-owned terminals: (1) 6502 Bolsa Ave., Huntington Beach; (2) 5981 Westminster Ave., Westminster; (3) 8471 Warner Ave., Huntington Beach; (4) 8520 Warner Ave., Fountain Valley; (5) 9475 Warner Ave., Fountain Valley; (6) 10035 Ellis Ave., Fountain Valley; and (7) 1501 W. MacArthur Blvd., Santa Ana. (Martin Dec., ¶ 15, Ex. 45 (T. O'Reilly letter to D. Martin, | **174. Undisputed** as to the District's assertion that Tesoro directly supplied Shell, Texaco and Equilon.  Disputed on the grounds that the District's basis for its claims against Tesoro at these stations is based on far broader evidence than identified by Tesoro, including, but not limited to the claim that Tesoro supplied neat MTBE directly to Shell at its refinery utilized to supply the focus sites. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Apr. 15, 2014).) | |
| 175.    In its June 3, 2014 revised station matrix, Plaintiff did not allege a Tesoro nexus at 10035 Ellis Ave., Fountain Valley, or 1501 W. MacArthur Blvd., Santa Ana. (Martin Dec., ¶ 15.) | **175. Undisputed.**  The District did not, however, withdraw any of its assertions that Tesoro directly supplied neat MTBE and MTBE gasoline to these defendants. |
| 176.    In November 2008, the Shell Defendants indicated they had exchange agreements with Tesoro at some point since 1979 at the Wilmington Terminal. (Martin Dec., ¶ 23, Ex. 52 (Shell Defendants' Objections and Responses to Plaintiff OCWD's Third Set of Interrogatories to Defendants).) Based on a review of electronic records, Tesoro did not-purchase, sell, or exchange gasoline with the Shell Defendants at the Wilmington terminal through December 2003. (Mills Dec., ¶ 14.) | **176. Disputed.**  The District has set forth substantial evidence, based on spreadsheets prepared by Tesoro's own expert, that Tesoro supplied substantial volumes of MTBE gasoline to Texaco and Shell at Carson and Los Angeles terminals throughout the relevant time period as set forth in Response to Paragraphs 141-150 *supra*. |
| 177.    Tesoro utilized the Shell Carson terminal (Los Angeles County) in 1998 and Texaco Los Angeles terminal from 1993-1995. (Mills Dec., ¶ 11.) | **177. Undisputed.**  Tesoro also sold substantial volumes of MTBE gasoline to Shell at this terminal as set forth in Response to Paragraph 141 *supra*. |
| 178.    Tesoro did not purchase, sell, or exchange gasoline with the Shell Defendants at the Shell Carson terminal in 1998. (Mills Dec., ¶¶ 12, 15.) | **178. Disputed.**  Tesoro's own expert documented substantial sales of MTBE gasoline to Shell at the Carson terminal.  (Hydrick Decl., Ex. 1.)  The District has submitted other evidence of Tesoro's supply of gasoline to Shell and its related entities in Response to Paragraphs 141-150 *supra*.  The District objects to the Declaration of Robert Mills relied up by Tesoro on the grounds that it is being provided long after fact discovery closed, and more than six years after Shell served its discovery responses |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | identified in Paragraph 176. Tesoro's submission of newly disclosed rebuttal evidence is improper and the evidence should be stricken, particularly as Tesoro did not disclose its relationship with either Shell or Texaco in its discovery responses. |
| 179.    Tesoro acquired product from Texaco on exchange at the Texaco Los Angeles terminal in 1993 and 1994. Tesoro did not provide Texaco with gasoline at the Texaco Los Angeles terminal at any time between 1993 and 1995. (Mills Dec., ¶ 16.)<br>180. Tesoro cannot be in the chain-of-title for sales of gasoline to Shell or Texaco based on exchange agreements, as there is no evidence Tesoro provided Shell or Texaco with gasoline, on exchange or otherwise, at the Shell Carson or Wilmington terminals or the Texaco Los Angeles terminal. (Martin Dec., ¶ 23; Mills Dec., ¶¶ 11, 12, 14-16.) | **179. Disputed.**<br><br>Texaco identified Petro Diamond as a supplier of MTBE gasoline from 1999 to 2003 at the Wilmington location. (O'Reilly Decl., Ex. 16, Shell Resp. to 1st Rogs. at 7.) There is ample evidence that Tesoro supplied MTBE gasoline to Petro Diamond during the relevant time period. (O'Reilly Decl., Ex. 14, Mills Amended CMO #4 Decl. (Feb. 25, 2005) at ¶ 4, p. 2.) From July 2001 to December 2001, Petro Diamond had a Product Sales Contract for MTBE containing gasoline with Tesoro. (O'Reilly Decl., Ex. 15, Keating Depo. (March 23, 2010) at 19: 11-14, 65:16-67:5 and Ex. 15.)<br><br>Spreadsheets prepared by Tesoro's own expert, Schink, confirm that Tesoro, fact, sold 26,715,939 gallons of Carb Unl 2% to PDI in 2001 which contained MTBE. (Hydrick Decl., Ex. 1.) The spreadsheets (which are entitled "sales") also confirm voluminous "sales" by Tesoro directly to Texaco.<br><br>The District objects to the Declaration of Robert Mills relied up by Tesoro on the grounds that it is being provided long after fact discovery closed, and more than two years after the deposition of Tesoro's expert Schink. Tesoro's submission of newly disclosed rebuttal evidence is improper and the evidence should be stricken. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 181.   The existence of a terminalling agreement does not mean Tesoro provided gasoline to Shell or Texaco; it simply means Tesoro paid a fee to be able to ship product to these terminals and sell the product FOB to Tesoro's customers. (Mills Dec., ¶ 13.) There is no evidence Tesoro sold this product to Shell or Texaco. (Mills Dec., ¶¶ 15-16.) | **181. Disputed** for the reasons set forth in Response to Paragraphs 141-150, and 179 supra.<br><br>The District objects to this statement as containing primarily legal argument rather than facts that are purportedly undisputed. The District's memorandum in opposition to defendants' summary judgment motion on Issue No. 5 addresses the legal argument raised in this "fact" concerning the legal significance and relevance of "exchange agreements" as asserted by Tesoro.<br><br>The District further objects to the Declaration of Robert Mills relied up by Tesoro on the grounds that it is being provided long after fact discovery closed, and more than six years after Shell served its discovery responses identifying Tesoro as an exchange partner. Tesoro's submission of newly disclosed rebuttal evidence is improper and the evidence should be stricken, particularly as Tesoro did not disclose its relationship with either Shell or Texaco in its discovery responses. |
| 182.   Stations where Plaintiff alleges Tesoro liability based on Tesoro's exchange and terminalling agreements with Shell (1998) and Texaco (1993-1995) were supplied by Shell, Texaco, or Equilon with gasoline during the relevant period. (Roy Dec., Ex. 80.) | 182. Disputed on the grounds that the District alleges that Tesoro directly supplied neat MTBE and MTBE gasoline to Shell and Texaco during the relevant time period as set forth in Response to Paragraphs supra 141-150 and 179 supra. |
| 183.   Shell ended its relationship at 8471 Warner Ave., Huntington Beach by 1984, prior to the alleged exchange and terminalling agreements between Tesoro and Shell or Texaco and prior to any sales by Tesoro of | 183. The District has dismissed the 8471 Warner Avenue, Huntington Beach, and is thus no longer asserting claims against Tesoro for this station only. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| MTBE or MTBE gasoline in California. (Martin Dec., ¶¶ 23, 27, Ex. 52 (Shell's Resp. to OCWD's 3rd Interrog. to Defendants; Dep. Tr. of Hosn, at 23:14-21; 60:2-19); Mills Dec., ¶¶ 14, 16.) | |
| 184.    Plaintiff has no evidence to support its claims of Tesoro liability at the Shell/Texaco/Equilon affiliated stations based on Tesoro's exchange and terminalling agreements with Shell and Texaco. (Martin Dec., ¶¶ 23, 27; Mills Dec., ¶¶ 11, 12, 14-16.) Reliance on records of exchange or terminalling agreements, with no record that Tesoro supplied the Shell Defendants with gasoline, amounts to mere speculation, not evidence, that gasoline was delivered to the RGA or any of the 34 focus plume stations. (Mills Dec., ¶¶ 14-16.) In addition, these stations were either supplied by the Shell Defendants with branded gasoline during the period of exchange and terminalling agreements with Tesoro or closed prior to those agreements. (Roy Dec., Ex. 80.) | 184.  **Disputed** on the grounds that the District alleges that Tesoro directly supplied neat MTBE and MTBE gasoline to Shell and Texaco during the relevant time period and for the reasons set forth in Response to Paragraphs 141-150, and 179, *supra*.<br><br>The District objects to this statement as containing primarily legal argument rather than facts that are purportedly undisputed. The District's memorandum in opposition to defendants' summary judgment motion on Issue No. 5 addresses the legal argument raised in this "fact" concerning the legal significance and relevance of "exchange agreements" as asserted by Tesoro.<br><br>The District further objects to the Declaration of Robert Mills relied up by Tesoro on the grounds that it is being provided long after fact discovery closed, and more than six years after Shell served its discovery responses identifying Tesoro as an exchange partner. Tesoro's submission of newly disclosed rebuttal evidence is improper and the evidence should be stricken, particularly as Tesoro did not disclose its relationship with either Shell or Texaco in its discovery responses.<br><br>Tesoro's market share expert testified that the spreadsheets he prepared represented "terminal sales," and that he spoke directly with Mr. Mills to assist him in preparing |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | these spreadsheets. (O'Reilly Decl., Ex. 5, Schink Depo. at 33:3-14, 34:1-23, 50:1-12.) |
| 185.    In April 2014, Plaintiff alleged Tesoro liability at the following seven stations, based on Tesoro's sales of gasoline to Unocal and ConocoPhillips: (1) 8971 Warner Ave., Huntington Beach; (2) 9525 Warner Ave., Fountain Valley; (3) 14972 Springdale, Huntington Beach; (4) 6322 Westminster Ave., Westminster; (5) 4002 Ball Rd., Cypress; (6) 10035 Ellis Ave., Fountain Valley; and (7) 1501 W. MacArthur Blvd., Santa Ana. (Martin Dec., ¶ 15, Ex. 45 (T. O'Reilly letter to D. Martin, Apr. 15, 2014).) | **185. Undisputed.** |
| 186.    In response to Preliminary Interrogatories re Defendant Identification served in August 2004, Union Oil identified Tesoro as having supplied gasoline in California in July 1993, June-August 1995, March, April, June, and October 1996. Union Oil does not know if this gasoline contained MTBE. (Martin Dec., ¶ 24, Ex. 53 (Further Response of Defendant Union Oil Company of California to Plaintiffs' Prelim. Interrog.) | **186. Disputed** for the reasons set forth in Response to Paragraphs 141-150, *supra*. The spreadsheets prepared by Tesoro's expert Schink specifically show that Tesoro provided MTBE gasoline to Unocal. (Hydrick Decl., Ex. 1.) Unocal's internal records state that "[w]ith the implementation of the 1992 CA OXY . . ., 1995 Federal RFG (Year-round) and the 1996 CARB RFG Programs MTBE ahs been added to all of Unocal's gasolines sold in California for sometime." (O'Reilly Decl., Ex. 21, Nov. 19, 1996, Memorandum.) Discovery responses provided by Unocal/Union Oil also state: "Starting in late 1992, all grades of gasoline sold at the Unocal stations contained MTBE during the wintertime months. . . . In 1995, Unocal started adding MTBE on year round basis." (O'Reilly Decl. Ex. 20, Unocal/Union Oil Resp. to 2nd Rogs. at 5-7.) |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 187.    In its responses to Preliminary Interrogatories re Defendant Identification served in October 2004, ConocoPhillips identified Tesoro as having supplied MTBE-blended gasoline to ConocoPhillips in California between 1997 and 2003. (Martin Dec., 125, Ex. 54 (Defendant ConocoPhillips Co.'s Revised 1st Supp. Resp. to Plaintiffs' Prelim. Interrogs. re Defendant Identification).) | **187.  Undisputed.** |
| 188.    The stations where Plaintiff alleged Tesoro liability based on Tesoro's sales of gasoline to Unocal and ConocoPhillips were supplied by these Defendants, in most cases with branded gasoline. (Roy Dec., Ex. 80.) The stations supplied by Union Oil were generally supplied prior to any Tesoro sales to Union Oil in Los Angeles County. (Roy Dec., Ex. 80; Mills Dec., ¶ 9.) | **188.  Disputed** on the grounds that the District alleges that Tesoro directly supplied neat MTBE and MTBE gasoline to Unocal and Conoco during the relevant time period and for the reasons set forth in Response to Paragraphs 141-150, and 186 *supra*. |
| 189.    Plaintiff has no evidence to support its claims of Tesoro liability at these Unocal/ConocoPhillips affiliated stations based on Tesoro's sales of gasoline to Unocal and/or ConocoPhillips. (Martin Dec., ¶¶ 15, 24-25.) Reliance on records that Tesoro supplied gasoline to Unocal does not support Plaintiff's allegations, as any Tesoro-provided product was sold after the stations ceased operating (or at best, during a single month of operation). Reliance on records that Tesoro provided product to ConocoPhillips anywhere in California amounts to mere speculation, not evidence, that gasoline provided by Tesoro was delivered to the RGA or any of the 34 focus plume stations. In addition, these seven stations were supplied by Unocal and ConocoPhillips, in most cases, with branded gasoline. (Roy Dec., Ex. 80.) | **189.  Disputed** on the grounds that the District alleges that Tesoro directly supplied neat MTBE and MTBE gasoline to Shell and Texaco during the relevant time period and for the reasons set forth in Response to Paragraphs 141-150, and 179, *supra*.<br><br>The District objects to this statement as containing primarily legal argument rather than facts that are purportedly undisputed. The District's memorandum in opposition to defendants' summary judgment motion on Issue No. 5 addresses the legal argument raised in this "fact" concerning the legal significance and relevance of "exchange agreements" as asserted by Tesoro. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 190.     In Plaintiff's Supplemental Responses to Tesoro's Second Set of Interrogatories dated November 2010, Plaintiff alleges a Tesoro nexus to the following three stations: (1) 9024 Warner Ave., Fountain Valley; (2) 3470 Fairview St., Costa Mesa; and (3) 16230 Harbor Blvd., Fountain Valley. (Martin Dec. ¶ 7.) Plaintiff provides no basis to support an alleged nexus at these stations and Tesoro is unaware of any such evidence. | 190.  As reflected in Service Station Matrix atthed to CMO #116 dated July 16, 2014, the Disrict is not longer assertion claims against Tesoro for these stations only. |
| 191.     These stations were supplied by ExxonMobil Defendants during the relevant period. (Roy Dec., Ex. 80.) | 191.  As reflected in Service Station Matrix atthed to CMO #116 dated July 16, 2014, the Disrict is not longer assertion claims against Tesoro for these stations only.   The District reserves its right to assert disputed facts in response to these allegations in the event additional Exxon or Mobil stations are at issue in later phases of this litigation. |
| 192.     Plaintiff has no evidence to support its claims of Tesoro liability at these ExxonMobil affiliated stations. Tesoro has no connection to the ExxonMobil Defendants and Plaintiff has not made any such allegation. Accordingly, Tesoro cannot be in the chain of title for gasoline to these three stations. | 192. As reflected in Service Station Matrix atthed to CMO #116 dated July 16, 2014, the Disrict is not longer assertion claims against Tesoro for these stations only.   The District reserves its right to assert disputed facts in response to these allegations in the event additional Exxon or Mobil stations are at issue in later phases of this litigation |
| 193.     Plaintiff did not allege a Tesoro nexus at the following three stations in any of their May 14, 2010, November 2, 2010, April 17, 2013, or April 15, 2014 discovery responses or correspondence: (1) 3195 Harbor Blvd., Costa Mesa; (2) 2921 Bristol St., Santa Ana; and (3) 3450 W. Ball Rd., Anaheim. (Martin Dec., ¶¶ 5-8, 15.) Plaintiff provides no basis to support an alleged nexus at these stations and Tesoro is unaware of any such evidence. | 193. As reflected in Service Station Matrix atthed to CMO #116 dated July 16, 2014, the Disrict is not longer assertion claims against Tesoro for these stations only.   The District reserves its right to assert disputed facts in response to these allegations in the event Exxon or Mobil stations are at issue in later phases of this litigation. |
| 194.     These stations were supplied by other | 194. As reflected in Service Station Matrix |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Defendants during the relevant period:<br>a.       3195 Harbor Blvd., Costa Mesa was leased by Mobil Oil Corporation to operators from at least 1986 to December 2003; Mobil branded gasoline  was sold at the station throughout the Relevant Time Period;<br>b.       2921 S. Bristol Ave., Santa Ana was leased by Mobil Oil Corporation to an operator from 1968 until 1998;<br>Mobil-branded gasoline was supplied to the station from before 1986 until 1998; and<br>c.       3450 West Ball Rd., Anaheim was supplied by BP with Arco branded MTBE gasoline between 1989 and 1993 and supplied by Valero  Defendants from January 2002 through at least December 2003.<br><br>(Roy Dec., Ex. 80; Martin Dec., ¶ 26.) | atthed to CMO #116 dated July 16, 2014, the Disrict is not longer assertion claims against Tesoro for these stations only.   The District reserves its right to assert disputed facts in response to these allegations in the event Exxon or Mobil stations are at issue in later phases of this litigation. |
| 195.     Plaintiff has not alleged a Tesoro connection to Mobil Oil Corporation or 3195 Harbor Blvd., Costa Mesa or 2921 S. Bristol Ave., Santa Ana. Accordingly, Plaintiff cannot allege Tesoro is in the chain of title for gasoline to these stations. | 195. As reflected in Service Station Matrix atthed to CMO #116 dated July 16, 2014, the Disrict is not longer assertion claims against Tesoro for these stations only.   The District reserves its right to assert disputed facts in response to these allegations in the event Exxon or Mobil stations are at issue in later phases of this litigation. |
| 196.     Since Tesoro did not supply the BP Defendants until 1996 at the earliest, Tesoro cannot be in the chain of title for gasoline delivered to 3450 West Ball Rd., Anaheim based on sales to the BP Defendants prior to that date. (Martin Dec., ¶ 21, Ex. 50 (Defs. Atlantic Richard, et al. Answers to Plaintiffs 1st Interrog. re Def. Identification, Resp. to #1, Aug. 30, 2004 at 3-4, Attach. A to Ex. 1).) Plaintiff has not made any allegation of a Tesoro connection to the Valero defendants. | 196. As reflected in Service Station Matrix atthed to CMO #116 dated July 16, 2014, the Disrict is not longer assertion claims against Tesoro for these stations only.   The District reserves its right to assert disputed facts in response to these allegations in the event Exxon or Mobil supplied stations are at issue in later phases of this litigation. |

**Facts Regarding VMSC and VRC-CA**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 197.     In the Declaration of the Valero Defendants Pursuant to Case Management Order #4 ("CMO #4 Declaration"), VMSC and VRC-CA state that they "sold gasoline containing MTBE to jobbers listed on attached Exhibit A, who may have in turn supplied the product to locations within the Relevant Geographic Area." (Parker Dec., ¶ 17, emphasis added.) Exhibit A to the CMO #4 Declaration contained a list of approximately 237 jobbers, including Southern Counties Oil. ( *Id.*) | **197.  Disputed** as irrelevant.  The District's claims, however, relate to the manufacture, supply and distribution of MTBE and MTBE gasoline to refiners who supplied focus sites. *See* Response to Paragraph 67 *supra*. |
| 198.     VMSC and VRC-CA herein incorporate by reference Paragraphs 72-73 of the 56.1 Statement, Goodrum Valero Dec. ¶ 6, and Parker Dec. ¶ 3, Ex. 18 (Memorandum of Agreement (Los Angeles Area) Between Valero Refining Company-California and World Oil Marketing Company, November 16, 2001) at p. 3. | **198.  Disputed.**<br><br>The District incorporates herein its Responses to Paragraphs 72-73 *supra*. |
| 199.     VMSC and VRC-CA herein incorporate by reference Paragraph 256 of the 56.1 Statement, Parker Dec., ¶ 4, Ex. 19 (A. Brown Report, Appendix B.26, Facility Summary Report-World Oil 39, May 28, 2011) at pp. 2-4, and Parker Dec., ¶ 5, Ex. 20 (A. Brown Depo., February 1, 2012) at 1179:20-1180:11 and 1272:11-20. | **199. Disputed.**<br><br>The District incorporates herein its Responses to Paragraph 256 *infra.* |
| 200.     VMSC became qualified to do business in California on March 16, 2000; however, VMSC did not purchase, distribute, or market gasoline or other products in the State of California prior to May 15, 2000. (E. Jones Dec., ¶ 4.) VRC-CA became qualified | **200.  Undisputed** that VMSC is a considered distributor by VMSC.  **Disputed** on the grounds that for all intents and purposes these entities operate as one supply and distribution chain in California. The District further contends that both of these entities are the |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| to do business in California on March 16, 2000. (*Id.*, ¶ 6.) VRC-CA did not refine crude oil into gasoline or other products in the State of California prior to May 15, 2000. (*Id.*) | successors for Ultramar. *See* Response to Paragraph 65 *supra*. |
| 201.    Byway of letter dated April 21, 2014, Plaintiff informed counsel for VMSC and VRC-CA that it would be pursuing successor liability against VMSC and VRC-CA. (Parker Dec., ¶ 14, Ex. 22 (Letter from Tracey O'Reilly to Amy Parker, April 21, 2014).) This letter was the first time in this litigation that Plaintiff indicated it would be pursuing this theory of liability. (*Id.*) | **201. Undisputed** that counsel sent letter. **Disputed** as to allegations of its content.<br><br>As the numerous discovery responses attached to the District's opposition to Valero's motion demonstrates, all the Valero entities responded to discovery as one entity. The District, moreover, repeatedly identified all Valero entities as one defendant and did not distinguish between these defendants. Finally, counsel for the District previously asserted these same types of claims in the City of Fresno MTBE matter. |

### Facts Regarding Ultramar Inc.

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 202.    In the CMO #4 Declaration, Ultramar Inc. states that it "sold gasoline containing MTBE to jobbers listed on attached Exhibit A, who may have in turn supplied the product to locations within the Relevant Geographic | **202. Disputed** as irrelevant.  The District's claims, however, relate to the manufacture, supply and distribution of MTBE and MTBE gasoline to refiners who supplied focus sites. *See* Response to Paragraph 67 *supra*. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Area." (Parker Dec., ¶ 17, emphasis added.) Exhibit A to the CMO #4 Declaration contained a list of approximately 237 jobbers, including Southern Counties Oil. (*Id.*) | |
| 203.    Ultramar Inc. is a Nevada corporation with operations primarily in Wilmington, California. (E. Jones Dec., ¶ 7.) It was incorporated on April 10, 1931. (*Id.*) On December 3, 1996, Ultramar Corporation merged with Diamond Shamrock, Inc. to form Ultramar Diamond Shamrock Corporation. (*Id.*, ¶ 8.) After this merger, Ultramar Inc. continued in existence as a subsidiary of Ultramar Diamond Shamrock Corporation. (*Id.*) On December 31, 2001, Ultramar Diamond Shamrock Corporation merged with and into Valero Energy. (*Id.*, ¶ 9.) At that time, Ultramar Inc. became a subsidiary of Valero Energy. (*Id.*) | **203. Disputed** as set forth in the District's Response to Paragraph 65 *supra*. |
| 204.    Ultramar Inc. has continued to operate as a subsidiary of Valero Energy since December 31, 2001. (E. Jones Dec., ¶ 10.) VMSC and VRC-CA are also subsidiaries of Valero Energy. (*Id.*) | **204. Disputed** as set forth in the District's Response to Paragraph 65 *supra*. |
| 205.    Ultramar Inc. did not merge with or into VMSC. (E. Jones Dec., ¶ 11.) With respect to the focus plume stations at issue in this litigation, Ultramar Inc. has not transferred or assigned any liabilities, obligations or property to VMSC, nor has VMSC assumed or received any liabilities, obligations or property from Ultramar Inc. (*Id.*) Ultramar Inc. did not merge with or into VRC-CA. (*Id.*, ¶ 12.) With respect to the focus plume stations at issue in this litigation, Ultramar Inc. has not transferred or assigned any liabilities, obligations or property to | **205. Disputed** as set forth in the District's Response to Paragraph 65 *supra*.  The District further objects to this Paragraph in the grounds that it is a legal argument and not a statement of fact.  The District's memorandum in opposition to defendants' summary judgment motion further addresses this legal argument. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| VRC-CA, nor has VRC-CA assumed or received any liabilities, obligations or property from Ultramar Inc. ( *Id.*) | |
| 206.    Ultramar Inc. continues to exist and conduct business as of the date of Mr. Jones's Declaration. (E. Jones Dec., 1 13.) Thus, neither VMSC nor VRC-CA is a successor-in-interest to Ultramar Inc. ( *Id.*) | **206. Disputed** as set forth in the District's Response to Paragraph 65 *supra.*  The District further objects to this Paragraph in the grounds that it is a legal argument and not a statement of fact.  The District's memorandum in opposition to defendants' summary judgment motion further addresses this legal argument. |

**Facts Regarding Shell**

| 207.    The Shell Defendants refer to and incorporate Fact Nos. 32-39. | **207.  Disputed** as set forth in ¶¶ 32-39. |
|---|---|

**Proving Direct Causation Was Impossible.**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 208.    Case Management Order No. 4, which was issued at the onset of this litigation in 2004, required each Defendant to, among other things, state whether it manufactured neat MTBE; identify each refinery that supplied gasoline containing MTBE to the Orange County area; specify proprietary pipelines, terminals, and other distribution facilities and proprietary marine tankers, barges, and tank trucks that supplied gasoline to the Orange County area; and for each topic to designate the person most qualified to testify on the Defendant's behalf (DiChello Dec., ¶¶ 4, 8 (citing Case Management Order #4, entered | 208.  **Undisputed.** |

125

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| on October 19, 2004, pp. 9-12). | |
| 209.   In addition, CMO #4 required Defendants to identify the addresses of gasoline stations they owned, operated, or leased, or that were subject to a retail supply contract. (CMO #4, Subsection III(B)(1)(c)(ii).) CMO #4 also required Defendants to provide declarations pertaining to the Relevant Geographic Area ("RGA") that (i) identified jobbers they supplied with gasoline containing MTBE; (ii) identified the entities to whom they sold or delivered neat MTBE and/or TBA; (iii) outlined refinery ownership history; (iv) disclosed the first and last date of MTBE usage; and (v) provided product code information. (CMO #4, Subsection III(B)(2).) | 209.  Undisputed. |
| **210.   Plaintiff Orange County Water District's Preliminary Set of Interrogatories re: Defendant Identification dated June 30, 2004 demanded, in part, that each Defendant provide the identities of each entity from whom MTBE was purchased for use at a refinery owned or operated by Defendants that supplied gasoline to the Orange County area, the dates on which MTBE was obtained from each entity, and the name of the refinery that obtained MTBE, as well as the identities of each terminal (including proprietary terminals) used by Defendants to supply MTBE-gasoline to the Orange County area and the dates when Defendants used the terminals. (DiChello Dec., ¶¶ 4-5 (citing OCWD's Prelim. Interrogs. re: Defendant Identification), Interrog. Nos. 2 and 3, p. 3) (a copy of these interrogatories will be** | 210.  Undisputed. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| provided upon the Court's request).). OCWD requested this same information, as well as the identity of each pipeline used to supply gasoline for the terminals, in its Third Set of Interrogatories to Defendants served in September 2008. (DiChello Dec., ¶¶ 4-5 (citing OCWD's 3rd Interrogs., Interrog. Nos. 6 and 7, p. 3) (a copy of these interrogatories will be provided upon the Court's request).). | |
| 211.    In addition, Plaintiff's Preliminary Set of Interrogatories re: Defendant Identification required Defendants to identify suppliers of gasoline containing MTBE (CMO 1, Subsection V(E).), and Plaintiff's Third Set of Interrogatories to Defendants required Defendants to identify the jobbers, franchisees, and/or distributors to whom they supplied MTBE gasoline within the RGA. (Chen Dec., ¶ 4.) (copies of any Defendant's responses referenced herein and not included within the exhibits to declarations submitted with Defendants' Motion for Summary Judgment will be provided upon the Court's request.) | 211.  Undisputed. |
| 212.    Southern Counties Oil Co. is named as a supplier defendant in the Third Amended Complaint. (Third Amended Complaint, ¶ 32.) | 212.  Undisputed. |
| 213. OCWD's counsel, Mr. Miller, participated in a September 23, 2003 MDL status conference where he discussed the need for jobber information. (Roy Dec., ¶ 2, Ex. 55 (Sept. 23, 2003 Transcript), p. 106:10-12, 14-15.) | 213.  Undisputed.  Dispute that jobbers had responsive records.  Multiple subpoenas to jobbers in MDL cases have produced multiple certificates or statements of no records. Southern Counties, a major jobber who is a defendant in this case, for example, after an extended discovery dispute, provided a |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | declaration of no records.  See ¶¶ 226-227. |
| 214.    Plaintiff referenced its ability to trace product in 2006 and 2010. (Roy Dec., ¶ 3, Ex. 56 (Nov. 13, 2006 letter from T. O'Reilly to Judge Warner re: Compliance with Pre-Trial Order Nos. 9 and 18) p. 3; Roy Dec., ¶ 9, Ex. 62 (June 24, 2010 letter from M. Axline to B. Parseghian).) | 214. Disputed.   The word "referenced" is ambiguous and on that basis the District disputes this statement.  The ability to trace product is dependent, in part, on defendants' disclosures, responses to discovery and production of documents reflecting gasoline sales.  Defendants did not provide all records necessary to trace product. |
| 215.    In June 2010, OCWD provided a list of what it maintained were many of the largest distributors serving the Orange County Water District service area. The list included seven jobbers: ITL, Southern Counties Oil Co., Falcon Fuels, World Oil, Cool Fuel, Inc., USA Petroleum, and Petro-Diamond. (Roy Dec., ¶ 9, Ex. 62 (June 24, 2010 letter from M. Axline to B. Parseghian).) | 215. Undisputed. |
| 216.    As part of their CMO #4 responses, the BP, Shell, Tesoro, and Valero Defendants identified Southern Counties Oil Co. as a jobber to whom they sold gasoline containing MTBE that could have been delivered to the RGA. (Chen Dec., ¶ 7.) The Chevron and Unocal Defendants identified Southern Counties Oil Co. as a jobber to whom they sold gasoline or potentially MTBE containing gasoline in Orange County. (Chen Dec., ¶ 7.) | 216.  Undisputed. |
| 217.    The ConocoPhillips Defendants identified Southern Counties Oil Co. as a jobber to whom they sold gasoline containing MTBE that could have been delivered to the RGA. (Chen Dec., 1 8.) | 217.  Undisputed. |

128

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 218.    In March 2010, Petro Diamond, Inc. identified Southern Counties Oil Co. as a trucking firm and/or wholesaling customer it used. (Chen Dec., ¶ 9.) | 218.**Undisputed.** |
| 219.    The Tesoro and Valero Defendants identified the seven jobbers referenced in Plaintiff's June 24, 2010 letter in their CMO #4 responses. The BP Defendants identified four. (Chen Dec., ¶ 11.) | 219.  **Disputed** as vague. |
| 220.    In April 2010, Plaintiff served records subpoenas on USA Petroleum, The Jankovich Company, Nuckles Oil Co., and Nickey Petroleum. (Chen Dec., ¶¶ 11-12.) 221. USA Petroleum is the only company identified in Plaintiff's June 24, 2010 letter as among "the largest distributors in the area" that received a records subpoena in April 2010. (Chen Dec., ¶ 11.) | 220. **Undisputed.** |
| 221.USA Petroleum is the only company identified in Plaintiff's June 24, 2010 letter as among "the largest distributors in the area" that received records subpoena in April 2010. (Chen Dec. ¶ 11.) | **221. Disputed.** Several other companies listed in this letter were defendants and the subject of discovery, rather than subpoenas. |
| 222.    On February 10, 2011, Plaintiff served its Second Supplemental Responses to Tesoro's Third Set of Interrogatories. In response to Interrogatory No. 1, for 29 of the 34 focus plume stations, Plaintiff identified at least one station operator who had relevant information and knowledge regarding "the relationship between each defendant and each Bellwether station," including, among other things, jobber agreements and supply contracts. (Chen Dec., ¶ 16.) | **222. Disputed.** The responses do not state that each witness possessed each category of knowledge. |
| 223.    Plaintiff took the deposition of Petro Diamond, Inc. in March 2010. (Chen Dec., 1 | **223.  Undisputed.** |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 9.) | |
| 224.    Plaintiff noticed Southern Counties Oil Co. for a deposition in July 2010. Plaintiff never took Southern Counties Oil Co.'s deposition in this case. (Chen Dec., ¶ 10; Bollar Dec., ¶ 9) | **224. Disputed.**<br><br>Defendants do not reference or provide the draft CMO 75 Southern Counties submitted in lieu of the deposition.  (Massey Decl., ¶ 17, Ex. 16.)  That draft declaration stated that Southern Counties had never delivered, sold, or shipped gasoline to any of the Orange County focus stations, that Southern Counties never had any agreement to supply any such stations, and that any records Southern Counties may have had related to "other jobbers" to which Southern Counties may have supplied "minor amounts of petroleum" had been destroyed.  (*Ibid.*)<br><br>Southern Counties plainly did not have any documents related to the Orange County focus plume stations and thus the deposition was never scheduled.  Southern Counties failed to finalize its draft declaration, in violation of CMO No. 75.  (*Ibid.*)  Defendants were aware of these facts but omitted them from their separate statement.<br><br>The District incorporates ¶ 226-227, *infra.* |
| 225.    Miller & Axline were counsel for Crescenta Valley Water District in the case captioned Crescenta Valley Water District v. Exxon Mobil Corporation, et al., Case No. 07 Civ. 9453 (SAS). (Roy Dec., ¶ 10.) | **225. Undisputed.** |
| 226.    Miller & Axline deposed Robert Bollar, General Counsel for Southern Counties Oil Co., in the Crescenta Valley Water District case on May 18, 2010. During | **226. Disputed.**<br><br>Mr. Bollar's testimony was that (1) there were no records prior to 1997; (2) it was not |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| his deposition, Mr. Bollar testified about Southern Counties Oil Co.'s available records, explaining they could search historic records for station addresses and they had hard copy records, including invoices, delivery records, and bills of lading, dating back to 1997. (Roy Dec., ¶ 10, Ex. 63, (May 18, 2010 Bollar Depo.), pp. 12:7-12, 19:2-14, 27:24-25; Bollar Dec., ¶¶ 7-8.) | possible to electronically search by customer or station; (3) it was not possible to search the hard copies of the records by station because the records were not organized by station; and (4) it was not possible to search the hard copies of the records by customer because the records were not organized by customer. (Miller Ex. 3 [Bollar Depo., May 18, 2010, pp. 11-12, 16-19].)

Southern Counties submitted a draft CMO No. 75 declaration to the District in lieu of the deposition. (Massey Decl., ¶ 17, Ex. 16.) That draft declaration stated that Southern Counties had never delivered, sold, or shipped gasoline to any of the Orange County focus stations, that Southern Counties never had any agreement to supply any such stations, and that any records Southern Counties may have had related to "other jobbers" to which Southern Counties may have supplied "minor amounts of petroleum" had been destroyed. (*Ibid.*)

Southern Counties plainly did not have any documents related to the Orange County focus plume stations and thus the deposition was never scheduled. Southern Counties failed to finalize its draft declaration, in violation of CMO No. 75. (*Ibid.*) |
| 227. At a September 2010 hearing before Special Master Warner, Plaintiff's counsel acknowledged the need to obtain documents from Southern Counties Oil Co. (Roy Dec., ¶ 10, Ex. 63 (Sept. 20, 2010 Hearing Transcript), pp. 46:16-20.) Southern Counties provided Plaintiff's counsel a draft stipulation following the September 2010 hearing. Plaintiffs counsel confirmed receipt of the | **227. Disputed.**

Southern Counties submitted a draft CMO No. 75 declaration to the District. (Massey Decl., ¶ 17, Ex. 16.) That draft declaration stated that Southern Counties had never delivered, sold, or shipped gasoline to any of the Orange County focus stations, that Southern Counties never had any agreement |

| **DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE:** | **PLAINTIFF'S RESPONSE AND EVIDENCE** |
|---|---|
| draft stipulation but did not follow up further with Southern Counties. (Bollar Dec., ¶¶ 9-11.) | to supply any such stations, and that any records Southern Counties may have had related to "other jobbers" to which Southern Counties may have supplied "minor amounts of petroleum" had been destroyed. (*Ibid.*)<br><br>Southern Counties plainly did not have any documents related to the Orange County focus plume stations and thus the deposition was never scheduled. Southern Counties failed to finalize its draft declaration, in violation of CMO No. 75. (*Ibid.*) |
| 228.    Plaintiff's Third Set of Interrogatories to certain Defendants propounded on August 26, 2008 required Defendants to identify station owner/operator information. (Chen Dec., 1 13.) | **228. Undisputed** that Plaintiff served a third set of interrogatories in August and September of 2008 (not all sets were propounded on August 26, 2008) to some defendants. **Dispute** any suggestion that every defendant fully responded to Plaintiff's Third Set of Interrogatories to Certain Defendants, such as Arco's Supplemental Responses to Plaintiff's Third Set of Interrogatories which were served during the final week of discovery on August 25, 2010. |
| 229.    Plaintiff's Sixth Set of Special Interrogatories to all Defendants propounded on March 24, 2010 required Defendants to identify station owner/operator information. (Chen Dec., ¶ 14.) | **229. Undisputed** that Sixth Set of Special Interrogatories to all Defendants propounded on March 24, 2010. **Dispute** any suggestion that every defendant fully responded thereto. |
| 230.    In July and August 2010, Plaintiff subpoenaed nearly 40 station operators. (Chen Dec., ¶ 15.) | **230. Undisputed** that Plaintiff subpoenaed station operators. Twenty one station operators deposed by plaintiffs said they had no responsive records. Wallace Decl., Ex. 3 & 4. |
| 231.    During the discovery period, Lyondell provided OCWD with a declaration derived from its business records that listed entities with addresses in Southern California who | **231. Undisputed.** |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| purchased MTBE from Lyondell between 1987 and 2002 that, conditioned upon the limits of knowledge, may have been added to gasoline for delivery to the Orange County area. (DiChello Dec., ¶ 13, Ex. 29 (Declaration of Defendant Lyondell Chemical Company, ¶¶ 3-4, pp. 1-2, Ex. A).) | |
| 232.    OCWD knew during the discovery period that "[g]iven the fungibility of the MTBE product and the nature of the market for gasoline components, one cannot determine, based upon Lyondell's records alone, how much of the MTBE manufactured by Lyondell was ever actually added to any gasoline that was in fact delivered to the geographic area relevant to this case," and that to trace the destination of Lyondell-supplied MTBE OCWD would need to pursue discovery from Lyondell's customers, whose names were provided to OCWD. (DiChello Dec., ¶ 13, Ex. 29 (Declaration of Defendant Lyondell Chemical Company, ¶ 4, p. 2).) | **232. Disputed.** The document cited for support for 232 is a self-serving declaration by Lyondell. Lyondell's responses provided extensive information on deliveries of MTBE that ultimately went to Orange County. *See supra* ¶ 120. |
| 233.    OCWD's expert James Barrington opined that "manufacturers and suppliers of gasoline, including MTBE gasoline, that has been released at service stations may be identified through standard industry record keeping practices, as well as through interviews with industry personnel," and to that end, "identified ... defendants who supplied MTBE for use at refineries and terminals which served [OCWD's] service area." Mr. Barrington identified 16 terminals utilized by Defendants which may have served the RGA. (Roy Dec., ¶ 14, Ex. 67 (Barrington Report), pp. 3-5, 8-9.) | **233. Undisputed.** The District incorporates ¶ 264 herein. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 234.    On January 22, 2009, OCWD served notices of deposition with document requests on Chevron, the ExxonMobil Defendants, and Texaco seeking information and documents regarding storage, supply, and distribution of gasoline and MTBE at Orange County terminals, but OCWD never took the depositions. (DiChello Dec., ¶ 11.) | **234. Disputed.**<br><br>The District received stipulations and discovery responses, including sales records, from these defendants that made depositions unnecessary. |
| 235.    On February 6, 2009, OCWD served notices of deposition with document requests on Arco, Chevron, the ExxonMobil Defendants, Shell, Texaco, and Union Oil seeking information and documents regarding, among other things, receipt, storage, quantity received and used in gasoline, blending into gasoline, and shipment in gasoline of MTBE from Lyondell and other MTBE suppliers at refineries in Southern California, but OCWD never took the depositions. (DiChello Dec., ¶ 12.) This is in addition to OCWD's failure to pursue discovery from a single third party supplier of MTBE to Defendants. (DiChello Dec., ¶ 10.) | **235.  Disputed.**<br><br>The District received stipulations and discovery responses, including sales records, from these defendants that made depositions unnecessary. |
| 236.    Although some petroleum product pipelines in the Los Angeles Basin ("LA Basin"), which includes the portions of Orange County served by OCWD, are common carrier pipelines jointly owned by several suppliers, other pipelines have single owners and operate on a proprietary basis. These proprietary pipelines run directly from the LA Basin refineries to proprietary -terminals serving the LA Basin market. The common carrier pipelines primarily service more distant areas that are not relevant to this | **236. Undisputed** that Mr. O'Brien testified there was a lesser degree of gasoline commingling occures in the L.A, Basin gasoline supply chains.  **Dispute** any implication that commningling does not occur.  Mr. O'Brien also refers to "the commingling of fungible gasoline at many terminals."  DiChello Decl ¶ 14, Ex. 30, O'Brien Report at 58. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| case, such as Riverside/San Bernardino, San Diego, Las Vegas, and Phoenix. The existence of proprietary pipelines and terminals in the LA Basin means that a lesser degree of product commingling takes place than elsewhere in the country, and that the LA Basin gasoline supply chain exhibits more product segregation, or company-segregated gasoline supply chains, than exists in other markets. (DiChello Dec., ¶ 14, Ex. 30 (Expert Report of John B. O'Brien), ¶¶ 79, 101, 124, 127, pp. 39, 47, 57-58, 60, n.4.) | |
| 237.    Defendants Arco, Chevron, Mobil, Shell, Texaco, and Union Oil utilized proprietary pipelines, terminals, and/or other gasoline distribution facilities, and/or proprietary marine tankers, barges, and/or tank trucks, at relevant times to supply gasoline containing MTBE to service stations located in the Orange County area, including Focus Stations. (DiChello Dec., ¶ 6, Ex. 26 (Arco's Answers to Plaintiff's 1st Interrogs. re: Defendant Identification, pp. 6-7, Ex. 1 (Hammond Dec.), ¶ 14, p. 17, Attach. C; Chevron's Further Resp. to Plaintiffs' Prelim. Interrogs. re: Defendant Identification, pp. 15-16; Exxon's Resp. to Plaintiffs' Prelim. Interrogs. re: Defendant Identification, pp. 9, 11, Attach. C; Shell's Resp. to Plaintiff's 1st Interrogs., pp. 89; Union Oil's Further Response to Plaintiffs' Prelim. Interrogs., pp. 11-14).); (DiChello Dec., ¶ 7, Ex. 27 (Arco's Answers to OCWD's 3rd Spec. Interrogs., Interrog. No. 7; Chevron's Resp. to OCWD's 3rd Spec. Interrogs., pp. 15-16; Exxon's Resp. to OCWD's 3rd Interrogs., pp. 14-15; Shell's Resp. to OCWD's 3rd Interrogs., pp. 20-23; Union Oil's Resp. to OCWD's 3rd Spec. | **237.  Undisputed** that these defendants provided MTBE gasoline to their service stations located in Orange County, including focus plume stations. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Interrogs., pp. 16-18).); (DiChello Dec., 19, Ex. 28 (Arco's Resp. to Discovery Requests in CMO #4, pp. 12-14, Ex. 8 (Dec. of James Emerson), ¶¶ 5-6, 10, Attach. A; Dec. of Jon Mauer in Compliance with CMO #4, ¶ 4, pp. 1-2, Ex. A; Exxon Mobil Corp.'s Dec. on behalf of Former Mobil Corp. in Resp. to CMO #4, Subsecs. III(B)(2)(ix)(3)-(4), III(B)(2)(ix)(5), Attach. C; Exxon Mobil Corp.'s Dec. on behalf of Former Exxon Corp. in Resp. to CMO #4, Subsec. III(B)(2)(ix)(5); Sexton Dec., pp. 15-16; Dec. of Union Oil in Compliance with CMO #4, ¶ 58, pp. 9-10).) | |
| 238.    According to OCWD's counsel, it is possible to trace Lyondell-supplied MTBE in gasoline to service stations located in Southern California. (DiChello Dec., ¶ 16.) | **238 Undisputed** as to some stations and some time periods.  **Disputed** as to all stations and time periods. |

**OCWD Failed To Disclose In Discovery That It Intended To Pursue a Commingled Product Theory.**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 239.    OCWD filed its initial complaint in May 2003. OCWD subsequently amended its complaint three times. The Third Amended Complaint is the operative complaint. (Third Amended Complaint.) | **239.  Undisputed.** |
| 240.    The Third Amended Complaint does not allege that Plaintiff would rely on the commingled product theory to prove causation. (See generally, Third Amended Complaint.) | **240. Disputed.**<br><br>Disputed that the Complaint was required to use the term "commingled product theory." Disputed that causation was not properly alleged in the TAC, which includes but is not |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | limited to the statement that, "the manufacturer/supplier defendants sold, exchanged, supplied, distributed, delivered, and/or otherwise provided gasoline containing MTBE and/or TBA to retail gasoline stations and/or other gasoline delivery systems within or near the District's boundaries." Han Decl. ¶ 15. |
| 241.    Fact discovery closed in the OCWD case on August 31, 2010. (CMO #57, ¶ 8.) | **241.  Undisputed in part and disputed in part.**<br><br>Undisputed that the schedule for fact discovery closed on August 31, 2010. **Disputed** that defendants provided all fact discovery by the close of discovery. *See, e.g.,* Han Decl. Ex. 14. |
| 242.    Plaintiff notified Defendants it would be using the commingled product theory to prove causation for the first time during an April 8, 2014 meet and confer. (Roy Dec., 126, Ex. 78 (Apr. 16, 2014 Transcript), p. 26:1-6.) | **242. Disputed.**<br><br>The District described its causation theory in prior discovery responses and correspondence prior to April 8, 2014 and defendants defended the case accordingly. *See* ¶¶ 259-270, *infra. See also* Han Decl. Ex. 10 & 12. |
| 243.    In its Supplemental Response to Interrogatory No. 1 of Certain Defendants' Second Set of Interrogatories and its responses to Tesoro-specific discovery, OCWD did not assert that it was relying on the commingled product theory to prove causation as to Lyondell or Tesoro, nor did it assert that MTBE manufactured or sold by Lyondell was part of a commingled product of gasoline containing MTBE distributed to any of the Focus Stations. (Roy Dec., 15, Ex. 59 (OCWD's Supp. Resp. to Certain Defendants' 2nd Interrogs.), Interrog. No. 1, | **243. Disputed.**<br><br>The District included as part of its response to Interrogatory Nos. 5 and 6 that discovery was ongoing, that defendants had still not fully responded to discovery and that expert testimony was necessary to answer the interrogatory. The District incorporates its response to ¶¶ 40-54, 242-243, 265-270. *See also* Han Decl. Ex. 10 & 12. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| pp. 1-48); (Martin Dec., 115-7.) In addition, when Defendants specifically asked OCWD in the Second Set of Interrogatories if OCWD intended to pursue an alternative theory of liability, OCWD asserted objections and refused to respond. (Roy Dec., ¶ 5, Ex. 59 (OCWD's Supp. Resp. to Certain Defendants' 2nd Interrogs.) Interrog. No. 5, p. 50.) | |
| 244.    At no time after serving its Supplemental Responses to Certain Defendants' Second Set of Interrogatories on May 14, 2010, or its responses Tesoro-specific discovery, did OCWD amend any of its responses to assert that it was relying on the commingled product theory to prove causation as to Lyondell or Tesoro, or to assert that MTBE manufactured or sold by Lyondell was part of a commingled product of gasoline containing MTBE distributed to any of the Focus Stations. (DiChello Dec., ¶ 19; Martin Dec., ¶¶ 5-8.) | **244. Disputed.**<br><br>The District incorporates its response to ¶¶ 40-54, 242-243, 265-270. *See also* Han Decl. Ex. 10 & 12. |
| 245.    OCWD did not disclose to Lyondell or Tesoro that it was relying on the commingled product theory to prove causation as to Lyondell or Tesoro, or as to Lyondell that it was alleging that MTBE manufactured or sold by Lyondell was blended into gasoline that became part of a commingled product that was distributed to any of the Focus Stations, until April 8, 2014, which is more than two years after fact and expert discovery ended. (DiChello Dec., ¶ 20; Martin Dec., ¶ 14.) | **245. Disputed.**<br><br>The District incorporates its Response to No. 243. The District responded to Interrogatory Nos. 5 and 6 that discovery was ongoing, that defendants had still not fully responded to discovery and that expert testimony was necessary to answer the interrogatory. The District incorporates its response to ¶¶ 40-54, 242-243, 265-270.*See also* Han Decl. Ex. 10 & 12. |
| 246.    Plaintiff has not presented any evidence that MTBE gasoline supplied by Texaco Refining and Marketing Inc. was | **246. Disputed.**<br>The District incorporates its response to ¶ |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| spilled, released or discharged at Huntington Beach Arco or that any spill, release or discharge of MTBE gasoline occurred during the period that Texaco Refining and Marketing Inc. supplied gasoline to Huntington Beach Arco. The first evidence of a gasoline release presented by Plaintiffs experts was in 1994, and the first MTBE detection was in 1997. (Condron Dec., Ex. 40, Moreau Rpt. for Huntington Beach Arco at 2-3.) | 256, *infra*. |
| 247.    Plaintiff has not presented any evidence that MTBE gasoline supplied by Texaco Refining and Marketing Inc. was spilled, released or discharged at G&M Oil # 24 or that any spill, release or discharge of MTBE gasoline occurred during the period that Texaco Refining and Marketing Inc. supplied gasoline to G&M Oil #24. The first evidence of a gasoline release presented by Plaintiffs experts was in 1996, and the first MTBE detection was in 1997. (Condron Dec., Ex. 40, Moreau Rpt. for G&M #24 at 2-3.) | **246.  Disputed.** The District incorporates its response to ¶ 256, *infra*. |

**F.     Issue No. 6: OCWD Cannot Prove Direct Causation Because It Lacks Evidence Tracing Particular Defendants' Gasoline From The Stations To The Wells.**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 248.    Plaintiff's groundwater modeling expert, Dr. Stephen Wheatcraft, repeatedly testified that he conducted no station-to-well-specific analysis; that is, that he did not connect contamination at any particular station to an impact or threatened impact to any particular production well. (See e.g., Roy Dec., Ex. 73 | **248. Disputed** The District designated *plumes* rather than individual stations.  The District defined a *plume* as "A body of contaminated groundwater flowing from one or more sources."  (Axline Decl., Ex.9, Plaintiff's |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| (Jan. 16, 2012 Deposition of Stephen Wheatcraft), p. 115:23-24 ("I didn't breakdown any of the analysis that I did by station"); *Id.*, p. 116:22117:20 ("Q. And did you, for purposes of the work that you performed in this case, at any time where there are several service stations potentially impacting grids, model the individual stations to determine what impact they may have in the future on potable water supplies? [Objection] THE WITNESS: We haven't done any models in which we isolated a particular source and ran only that source, no. BY MR. STACK: Q. Did you, in the course of your work, do any analysis in which you allocated responsibility from several service stations impacting grid cells in your model to assign a percentage of the responsibility for contamination being detected at some future date in a potable water supply well? [Objection] THE WITNESS: No, we -- we did not analyze or isolate any particular station in the course of our analysis in modeling."); *Id.*, p. 122:14 ("[W]e didn't analyze, again, which -- whether it was coming from this particular site or that site in terms of an origin. That wasn't a question we were looking at."); Roy Dec., Ex. 73 (Jan. 17, 2012 Wheatcraft Depo.), pp. 368:19-369:9 ("Q. Okay. And with respect to Unocal 5226, do you have an opinion, to a reasonable level of scientific certainty, as to whether or not MTBE released at that station has or will in the future contaminate any one or more drinking water wells with MTBE? [Objection] THE WITNESS: I haven't done any analysis. As we, again, talked about yesterday, that identifies MTBE from a specific station and whether it mingles or commingles with other plumes and whether or not MTBE from a particular station reaches a particular well."); *Id.*, p. 370:2-5 ("I | Supp. Resp. Conoco 2nd Rogs (Nov. 5, 2007) at 3 ("Resp. to Conoco 2nd Rogs").) The District designated multiple stations within "plumes" because "they are in proximity to one another and in proximity to the wells that are listed" and "because contamination, MTBE and TBA contamination . . . identified at these sits are believed to have commingled or could commingle . . . and consequently referred to as the focus plumes." (Axline Decl., Ex.10, Bolin Depo. (July 30, 2008) at 72:11-73:15.) The District advised defendants that MTBE releases from all stations in multiple station plumes has "resulted in a commingled plume." (Axline Decl., Ex. 9, Resp. to Conoco 2nd Rogs at pp. 3-4.)<br><br>Dr. Wheatcraft was retained to prepare a groundwater contaminant transport model of the MTBE released from focus sites. (Declaration of Stephen W. Wheatcraft, Ph.D. in Support of Plaintiff's Opposition to Motion for Summary Judgment (July 21, 2014) ¶¶ 1-3 (Wheacraft Decl.).)<br><br>Dr. Wheatcraft utilized a separate MTBE source term for each focus plume station that was calculated utilizing actual MTBE groundwater data collected from monitoring wells and other sampling by defendants' consultants at each site. (Wheatcraft Decl. ¶ 4.) The MTBE source term thus represents the MTBE released to groundwater at each focus plume station. (*Id.*) The transport model prepared by Dr. Wheatcraft thus depicts the transport of MTBE released at each focus plume station through the aquifer to production wells |

140

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| haven't done any analysis to identify which station or stations is responsible or are responsible for MTBE concentrations in specific production wells."); *Id.*, p. 370:9-18 ("Is it true that you do not have an opinion whether or not gasoline containing MTBE from that site has in the past reached any drinking water well in Orange County Water District? [Objection] THE WITNESS: I haven't formulated any opinion."); *Id.*, pp. 371:20-372:5 ("I haven't performed any analysis to look at any individual station as to whether -- what the pathway is from that station to any ultimate well."); *Id.*, p. 372:7-20 ("Q. Okay. And then looking forward, into the future, would your answer be the same if I asked it about each individual station listed, the 34 stations, that you have no opinion about whether any MTBE from that particular station will ever reach a drinking water well in Orange County Water District? [Objection] THE WITNESS: I don't have a specific opinion as to which station contributes MTBE to which production well. So I'm -- I'm - that's stated a little differently than what you said, but that's my answer to your question."); *Id.*, p. 405:11-405:21 ("Q. But as of today, your deposition in this case, you have no opinion that any MTBE from 5226 has or ever will reach a drinking water well, right? [Objection] THE WITNESS: I haven't done any analysis to isolate whether MTBE -- the MTBE from a specific station has reached any specific production well.") | within the District service area, although the model does not isolate each station. (*Id.*)<br><br>Dr. Wheatcraft's model shows that as MTBE migrates off-site from a station, that MTBE mixes with MTBE from other nearby stations to form MTBE plumes. (Wheatcraft Decl. ¶ 5; see also Axline Decl., Ex. 11, Wheatcraft Depo. (Jan 17, 2012) at 374:13-375:2.) Dr. Wheatcraft's model shows that as the MTBE plumes migrate deeper into the aquifer, the contamination will converge in the subsurface. (Wheatcraft Decl. ¶¶ 6-7.) The model thus shows that MTBE from each focus plume station has contributed to a focus plume. (Id..)<br><br>Wheatcraft's model shows that MTBE has impacted or will impact all of the drinking water wells associated with the focus plumes. (Wheatcraft Decl. ¶ 8.) Specifically, "the MTBE transport model predicts . . . 108 district production wells [will] exceed 5.0 ug/l MTBE [originating from the focus plume stations, including these four stations] after 10 years . . . ." (*Id.*)<br><br>"A significant amount of MTBE has been released to groundwater within" the District's service area, and "[t]his MTBE, if not remediated, will impact water production wells . . ." (Axline Decl., Ex. 2, Expert Report of Stephen W. Wheatcraft, Ph.D. (June 22, 2011) at ¶¶ 2-3, p. 8.)<br><br>The District's principle hydrogeologist confirmed: |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
|  | "Each focus plume (with associated stations) is located within a pumping depression [of a major supply well or wells]. Based on the prevalent downward hydraulic gradient beneath each station, MTBE that has migrated off-site from each station will move downward into the principal aquifer and be carried to the pumping wells that created the pumping depressions."<br><br>(Declaration of Roy Herndon in Support of Plaintiff Orange County Water District's Opposition to Omnibus Motion for Summary Judgment (July 21, 2014) ¶ 3 ("Herndon Decl.").)<br><br>Sampling and vulnerability studies conducted by the District confirm that MTBE has been detected in over fifty-six drinking water wells throughout the District's service area since 2010. (Bolin Decl. ¶ 6.)<br><br>The District has already incurred substantial costs to conduct CPT and other groundwater sampling with respect to the Focus Plumes, as well as other non-station specific costs. (Bolin Decl. ¶ 7.) |
| 249.    Plaintiff's expert Graham Fogg repeatedly testified that he did not do a station-to-well-specific analysis, for example, by stating he had conducted no analysis concerning whether any particular station poses a short- or long-term threat of MTBE contamination to any particular production well. (See, e.g., Roy Dec., Ex. 74 (Jan. 21, 2012 Deposition of Graham Fogg), pp. 91:19-92:3 ("Q. Do you have an opinion, Dr. Fogg, that | **249. Disputed.**<br><br>Dr. Fogg concluded that "significant MTBE mass [is present] beyond the monitoring well networks . . ." of the stations, and that the only way to prevent this MTBE from reaching public drinking water wells is to clean up the [MTBE] contamination before it gets to supply wells." (Axline Decl., Ex. 12, Fogg Depo. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| MTBE from any of the 34 stations in this case poses a short- or long-term threat of MTBE contamination to any particular well in Orange County Water District? [objections] THE WITNESS: I - my opinions are not that specific."); see also *Id.*, pp. 227:25-228:1 ("I have not made estimates of which wells will be hit in the future."); *Id.*, p. 97:17-19 ("But the specific supply wells connected to specific sites, again, is beyond the scope of my testimony."); *Id.*, p. 98:7-11 ("If you mean that I don't have an opinion that a specific contaminant site can be anticipated to contribute MTBE to a specific water supply well or wells, that's correct, that [sic] my opinion is not that specific."); *Id.*, pp. 229:14-230:7 (Q. "And I guess what I'm looking for is someone on the plaintiffs' [sic] side of this case who has some degree of ability to quantify when, where, and how much MTBE is going to hit in drinking water wells in Orange County based on the history we have already lived through. Are you that man? [Objection.] THE WITNESS: I don't have such an opinion. I did not do modeling analysis."); *Id.*, pp. 76:25-77:6 ("Q. Dr. Fogg, I need to know, just so we have some definition for this case, do you have an opinion in this case with respect to any of the 34 focus stations that that station or more than on station has an inadequate monitoring well network? A. My opinion is of the sites as a whole.. .."); *Id.*, p. 96:16-25 (Q. Can you tell me, with respect to any of the 76 stations ... whether any of those stations poses a threat of MTBE contamination to any particular wells within the Orange County Water District? [objections.] THE WITNESS: That's beyond the scope of my opinions.) | (Jan. 21, 2012) at 110:9-24.) Dr. Fogg testified that approximately 90% of water within the District's service area exits the basin through wells, and that "[t]o the extent . . . the system contamination . . . most of that contamination will ultimately end up exiting by wells." (*Id.* at 195:16-196:24.) As explained in Paragraph 248 *supra*, the District retained Dr. Wheatcraft to prepare a groundwater contaminant transport model of the MTBE released from focus sites. |
| 250.   Plaintiffs expert Robert Stollar | **250. Disputed** as to relevance. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| repeatedly testified that he did not conduct any station-to-well-specific well analysis. (See e.g., Roy Dec., Ex. 72 (Jan. 10, 2012 Deposition of Robert Stollar), p. 42:16-21 ("Q. Were you asked to determine whether contaminants from a specific release had actually reached a well pumping from an aquifer. [objections.] The Witness: No, I was not."); *Id.*, p. 44:2-9 ("Q. Were you asked to determine whether it was more likely than not that a release from a given site could get to a specific well? [objections] The Witness: I was not asked to do that."); *Id.*, pp. 47:24-48:1 ("Q. Have you analyzed the capture zone of any of the production wells in this case? A. I have not."); Roy Dec., Ex. 72 (Jan. 11, 2012 Stollar Depo), p. 248:8-10 ("But we were not asked to calculate how far the MTBE could have moved or did move.") | As explained in Paragraph 248 *supra*, the District retained Dr. Wheatcraft to prepare a groundwater contaminant transport model of the MTBE released from focus sites. |
| 251.    Plaintiff's expert Marcel Moreau repeatedly testified that he does not have opinions regarding whether contaminants from any particular station even have moved off-site. (See e.g., Roy Dec., Ex. 68 (Sept. 22, 2011 Deposition of Marcel Moreau), p. 576:15-17 ("In general, I don't have any opinions about fate and transport of MTBE on or off of a particular site."); *Id.*, p. 587:16 ("I do not have expertise in fate and transport."); Roy Dec., Ex. 68 (Aug. 17, 2011 Moreau Depo), pp. 541:18-543:7 ("THE WITNESS: My opinions have to do with documenting releases that may have occurred at the site and reviewing information, primarily soil contamination information, that may help to establish that releases have occurred and when they might have occurred. The effectiveness or the - or any other aspect of the remediation system is not part of my opinion. BY MR. ANDERSON: Q. And is it also true that your opinion does not | **251. Disputed** as to relevance.<br><br>As explained in Paragraph 248 *supra*, the District retained Dr. Wheatcraft to prepare a groundwater contaminant transport model of the MTBE released from focus sites. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| touch on whether or not the contamination is still at or near the site? A. Correct - [Objections.] That is correct that I'm- I'm primarily interested in establishing a relationship between contamination and specific storage system components. Whether or not that contamination persists over time is not a subject of my opinions."); *Id.*, pp. 543:19-544:1 ("I have no opinions about whether the MTBE may have - or any MTBE that may have escaped from the storage system or released through a spill, whether that MTBE may have left the site or not.") | |
| 252.    Plaintiff's expert Anthony Brown repeatedly testified that he did not conduct any station-to-well-specific analysis. (See e.g., Roy Dec., Ex. 71 (Dec. 29, 2011 Deposition of Anthony Brown), p. 28:2-5 ("I have not been asked as part of my retention in this matter to offer opinions as to the specific source of the contamination in individual water supply wells); *Id.*, p. 30:3-5 ("As part of my work, I have not offered opinions as to whether the threat to water supply wells is specific to an individual well."); *Id.*, p. 39:12-24 ("Can you state to a reasonable degree of scientific certainty that it's more likely than not that any of the MTBE measured in NB-TAMD came from ARCO 1095? [Objections.] THE WITNESS: As I indicated in response to previous questions, I have not been asked to offer such an opinion, and I have not performed the level of analysis that would be required to develop such an opinion."); Roy Dec., Ex. 71 (Feb. 1, 2012 Brown Depo.), p. 1274:6-9 ("I could not conclude that it is more likely than not that the release at World Oil 39 poses a threat to water supply wells. I could only conclude that it is a possible threat.").) | **252. Disputed.**

As explained in Paragraph 248 *supra*, the District retained Dr. Wheatcraft to prepare a groundwater contaminant transport model of the MTBE released from focus sites. Mr. Brown confirmed that sufficient MTBE had migrated off-site from nearly all of the focus sites such that additional remediation actions were warranted. (Condron Decl. Exh. 2 (Exhibit 36 to the Deposition of Anthony Brown ("Brown Exh. 36").)

Additionally, as explained in the District's opposition to defendants' motion concerning lack of injury and damages, Mr. Brown's testified that the limits of the "threat" analysis that he performed was preliminary and limited.  (Plaintiffs Local Rule 56.1 Statement of Disputed and Material Facts in Opposition to Defendants' Motion for Summary Judgment Due to Lack of Injury and Damages at Certain Trial Sites (July 21, 2014) at ¶¶ 4-5.) |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 253.    Mr. Brown testified that he believed that at some point the alleged contamination released from G&M #4 would reach Well LIMP-HB. (Roy Dec., Ex. 71 (Feb. 1, 2012 Brown Depo.), pp. 1168:23-1169:14.) | **253. Undisputed.** *See also* Response to Paragraph 252 *supra*. |
| 254.    Mr. Brown, however, testified that he could not offer any opinion on what concentration of MTBE would be present at this well and when because he had not performed that level of an analysis or the analysis necessary to determine the capture zone at this well. Roy Dec., Ex. 71 (Jan. 3, 2012 Brown Depo.), p. 827:8-25; Roy Dec., Ex. 71 (Jan. 25, 2012 Brown Depo.), p. 888:13-18.) | **254. Disputed** for the reasons set forth in Response to Paragraph 252, *supra*. |
| 255.    With respect to the remaining other stations Mr. Brown analyzed, when asked if he had any opinions that MTBE, in fact, will reach any particular well, he stated: "That is not an opinion I was asked to offer, and I have not performed that level of analysis." (Roy Dec., Ex. 71 (Feb. 1, 2012 Brown Depo.), p. 1169:10-14.) | **255. Disputed** for the reasons set forth in Response to Paragrah 252, *supra*.<br><br>As explained in Paragraph 248 *supra*, the District retained Dr. Wheatcraft to prepare a groundwater contaminant transport model of the MTBE released from focus sites. |

**G.    Issue No. 7: There are Disputed Issues of Fact Whether the Issue 7 Stations Are Barred by the Statute of Limitation.**

<u>Facts Regarding World Oil #39</u>

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 256.    The only documented release at World Oil #39 happened before 1996. (See e.g. Parker Dec., ¶ 4, Ex. 19 (A. Brown Report, Appendix B.26, Facility Summary Report-World Oil 39, May 28, 2011) at p. 2 | **256. Disputed.**<br><br>Undisputed that releases occurred before 1996.  **Disputed** that releases did not occur after 1996. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| ("[The] widespread nature [of the MTBE plume] suggests that MTBE was released before March 1996."); p. 3 ("[T]he MTBE spatial distribution in soil (and groundwater samples) indicate that a major MTBE-gasoline release occurred at the facility before February 1996."); and p. 4 ("MTBE was historically released at the facility prior to February 1996. . .").) (See also Parker Dec., 15, Ex. 20 (A. Brown Depo., February 1, 2012) at 1179:20-1180:11 ("Q. [With respect to World Oil 39] do you known when the MTBE was released at that site? ... THE WITNESS: Only that it would have been sometime prior to February of 1996 when MTBE was detected in a soil sample at the facility.") and 1272:11-20 ("Q. Do you have an opinion of how long before March of 1996 that the release occurred? ... THE WITNESS: I have not performed an analysis that would allow me to determine the exact period of time, just that it occurred clearly prior to 1996, and given the extent of the contamination detected in 1996 occurred sometime - some significant time prior to 1996.").) | The District's expert Marcel Moreau has testified that all UST's and dispensing systems leak over time, in multiple ways. Han Decl. ¶ 7 & Ex. 5 (April 15, 2011 Report of M. Moreau at VI-1-VI-2.) Moreau provided a detailed history of defendants' knowledge concerning leaks and spills of MTBE gasoline at service stations. Moreau opined that "Leaks from UST systems have long been recognized by petroleum marketers and were considered 'inevitable.'" *Id.* at III-23.) Moreau reinforced that opinion in his rebuttal report, "The oil industry was well aware that commonly used storage system technology was not adequate to contain MtBE." Han Decl. ¶ 7, Ex. 5 at June 3, 2011 Expert Rebuttal Report of Marcel Moreau at 16.

Moreau opined that "Traditional storage and handling were inadequate to prevent groundwater contamination from MtBE." *Id.* at April 15, 2011 Moreau Report at IV-56. MtBE leaks plagued the industry even from state-of-the-art storage systems and commonly used leak detection technologies "were woefully inadequate." *Id.* at VI-1. *See also In re MTBE*, 739 F. Supp. 2d 576, 607 n. 192.

World Oil #39 is defendant focus plume station, and defendants selected this station in mid-January, 2010. Han Decl. ¶ 6.

While the highest levels of MTBE detections at World Oil #39 occurred in 1996, free product was measured at MW-11 in November, 2000. Han Decl. ¶ 5, Ex. 4, Wheatcraft Facility Summary Report for |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | World Oil 39 at App. A, at 101-102, and § 3.1 at 9.<br><br>MTBE gasoline supplied to World Oil was supplied by:  BP from mid-1989 through 1993); the Valero defendants (mid-1990s); ExxonMobil Corporation (7/01/97 - 5/14/2000); and the Valero defendants (5/15/00 - 12/31/14).  Han Decl. ¶2, Ex. 1 (Stip. at 21, 28); Han Decl. ¶ 5, Ex. 4 (Rehklau Depo. at 36-37, 69, 75 & Rehklau Depo. Ex. 6 (11/16/01 Memorandum of Agreement between Valero and World Oil.)<br><br>Counsel for Valero (and Ultramar) was present at the deposition of World Oil Operator Pete Rehklau when he testified that World Oil bought gasoline from Ultramar between 1994 and 1997.  Han Decl. ¶5, Ex. 4 (Rehklau Depo. at 5).<br><br>The District has not identified Tesoro with World Oil.  Han Decl. ¶ 2, Ex. 1, CMO 116 at 11. |

**Facts Regarding Chevron #9-5568 and Mobil 18-HEP.**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 257.    In response to OCWD's accrual date assertions in its Local Rule 56.1 Statement in Support of Response to Defendants' Further Supplemental Brief on Statute of Limitations, Defendants noted that with respect to Chevron #9-5568, "The District asserts accrual at this station based on a detection in | **257. Disputed.**<br><br>Defendants' fail to cite any independent evidence in support of Issue 7 regarding Chevron 9-5568.  Instead, defendants rely on the 56.1 Statement prepared two years prior to the completion of discovery and three years |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| monitoring well MW-10 at a level of 54 ppb on October 13, 1997. . . . By so stating, the District concedes its claims at this site accrued prior to May 6, 2000 and are barred by the statute of limitations." (Parker Dec., ¶ 18, Ex. 24 (Plaintiff's Local Rule 56.1 Statement in Support of Response to Defendants' Further Supplemental Brief on Statute of Limitations, June 3, 2009) at p. 2.) On June 3, 2009, OCWD conceded this point, stating in response: "No response necessary." ( *Id.*) | prior to the close of expert discovery.  The District specifically stated in the 2009 56.1¶ 67 that there was inadequate information to ascertain an accrual date, but subsequently identified an accrual date of October 13, 1997.  As a reply, the District noted, "No response necessary," because there were no additional disputed facts to add at that time. This was in no way a concession that the claim should be dismissed. Subsequent evidence has shown that more likely than not, additional releases and spills of MTBE occurred at Chevron 9-5568 after May 6, 2000.  The District incorporates its Response to ¶ 256.

Chevron owned the USTs at the 9-5668 station and all MTBE gasoline supplied to this station was supplied by Chevron.  Han Decl. ¶2, Ex. 1 at 14.  The District's expert noted that MTBE was detected at 360 ug/L as recently as 2011 in well MW-02A.  Han Decl. ¶ 3, Ex. 2 (A. Brown "Facility Summary Report" at B.25). |
| 258.    MTBE was detected at Mobil 18-HEP in on-site monitoring wells from August 5, 1999 at 67,000 ppb and at 100,000 ppb on February 7, 2000. (Parker Dec., ¶ 19, Ex. 25 (OCWD-MTBE-001-252690, Groundwater Monitoring Data, Former Mobil Service Station 18HEP).) | **258.  Disputed in part and undisputed in part.**

Undisputed that releases at this site occurred prior to May 6, 2000.

Mobil Oil leased the property and owned the USTs at the station from 1982 until 1998 when the station closed and all MTBE gasoline delivered to the station was supplied by Mobil.  Han Decl. ¶2, Ex. 1 (Stip. at 23). The extent of MTBE was not known in early 2000.  Han Decl. ¶4, Ex. 3 at 4 (Site Specific Report of M. Moreau for Mobil-HEP.)  An off-site well installed in 2000 detected |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | enormous amounts of MTBE – 1,200,000 ppb MTBE – were detected at the first testing in **September, 2000**. *Id*. at 5.  In 2001, as part of remediation efforts, subsurface piping was uncovered and removed and 1230 cu yds (1521 tons) of impacted soil had to be removed and 45,900 gallons of groundwater had to be pumped and removed from the site. *Id*.  In January, 2004, more contaminated soil and groundwater had to be removed from the site in order to prepare the site for redevelopment. (*Id*. at 6.)<br>Dispute that no releases occurred subsequent to May 6, 2000. The District incorporates its Response to ¶ 256. |

**H.**     **Issue No. 8: The District Disclosed Information to Issue 8 Defendants and the District Disputes Issue 8.**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 259.    On February 26, 2010, OCWD answered Certain Defendants' Second Set of Interrogatories. Interrogatory No. 1 stated:<br>        Separately for each FOCUS PLUME, identify which Defendant(s) YOU contend caused alleged DAMAGES arising from such FOCUS PLUME.<br>(Roy Dec., ¶ 5.) | **259.  Undisputed in part and disputed in part.**<br><br>Undisputed as to language in interrogatories. Disputed that the District responded only on February 26, 2010.  The District responded by reference to prior responses relevant to these interrogatories.  The District also objects that although defendants submit over 700 pages of exhibits, they omit the District's response to this interrogatory.<br><br>The District objects to 259 because defendants omitted the District's response, in part and in full, to the second set of interrogatories, which is the basis for Issue 8. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 260.    OCWD responded on February 26, 2010 by providing Defendants associated with facts generally related to each Focus Plume. (Roy Dec., ¶ 5.) | **260. Disputed.**<br><br>The District's discovery responses were specific and specifically identified each defendant that was identified with each specific plume.  Han Decl. ¶ 8 Ex. 6 (Excerpts from OCWD Resp. to Second Set of Interrogatories at 4-7); and Han Decl. ¶ 9, Ex. 7 (OCWD's 2008 Responses to Certain Sub-Parts of Interrogatory Nos. 18, 20-26, 36-37 and 41 of Defendant Conoco-Phillips Company's Second Set of Interrogatories at 3-9, 13-17.)<br>Moreover, this Court has recognized that a party is not required to "lay out all of the evidence of every defendant at every site" in response to a contention interrogatory.  Han Decl. Ex. 6 at 8/19/13 Trans. at 68. |
| 261.    The parties engaged in a meet and confer over the sufficiency of the responses. (Roy Dec., ¶ 5.) OCWD eventually agreed to supplement the responses to provide information specific to each station and to identify which defendants were targeted at each station. (Roy Dec., ¶ 5, Ex. 58.) | **261. Disputed.**<br><br>Defendants mis-characterize discovery, the meet and confer process, and Roy Ex. 58. Roy Ex. 58 is a letter from the District's counsel stating the answers were responsive and identified specific defendants that damaged each plume, provided detailed information on the specific activities of defendants that led to MTBE gasoline being delivered to the OCWD service area and included lengthy information about how gasoline was delivered.  The District's counsel nevertheless indicated she was willing to provide additional detail regarding the stations. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 262.   On May 14, 2010, OCWD provided supplemental responses to Certain Defendants' Second Set of Interrogatories, where OCWD associated particular Defendants with particular stations. (Roy Dec., ¶ 5, Ex. 59.) To date, OCWD has never revised or supplemented these responses. (Roy Dec., ¶ 5.) | **262.  Disputed in part and undisputed in part.**<br><br>Undisputed that the District provided additional responses to defendants' second set of interrogatories on May 14, 2010. Disputed that the District's responses were limited or that the District was required to provide additional responses beyond what was provided.  Han Decl. Exs. 1, 6 and Ex. 7. Defendants' statements of fact do not include a single quote from the 116 page February 26, 2010, response that the May 14, 2010 responses supplemented.  The Supplemental Responses specifically incorporated prior responses.  Han Decl. ¶ 8, Ex. 6 at 1; Han Decl. Ex. 12 (5/31/13 letter from T. O'Reilly to P. Condron). |
| 263.   The supplemental responses served on May 14, 2010 do not identify the Defendants in Appendix I as potential targets at the stations listed in Appendix I. (Roy Dec., ¶ 5, Ex. 59, pp. 1-48.) | **263. Disputed.**<br><br>The supplemental responses incorporated the initial responses which identified each and every defendant in Appendix I. Han Decl. ¶ 8 Ex.6 at 5/14/10 Supplemental Resp. at 1; see also Han Decl. Ex. 6, 2/26/10 Responses at 3-9, 13-17. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 264.    Similarly, OCWD's expert witnesses did not identify the Defendants in Appendix I as potential targets at the stations listed in Appendix I. (Roy Dec., 1 6.) | **264. Disputed.**<br><br>The District's expert James Barrington identified each defendant and discussed their supply into the OCWD service area which supplied the service stations in the area.   Han Decl. Ex. 8 (Report of James Barrington at 2-3).   Mr. Barrington is unfortunately now deceased. |

### Facts Specific To Lyondell

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 265.    In its Supplemental Responses to Interrogatory No. 1 of Certain Defendants' Second Set of Interrogatories, OCWD did not identify Lyondell among the Defendants that it contends caused the alleged damages arising from any of the Focus Stations. (Roy Dec., 15, Ex.59 (OCWD's Supp. Resp. to Certain Defendants' 2nd Interrog.), Interrog. No. 1, pp. 1-48.) | **265. Disputed.**<br><br>The District's May 2010 supplemental responses specifically incorporate original responses which identified Lyondell as associated with each plume and included a 20-page description of Lyondell's conduct. Han Decl. Ex. 9; see also Han Decl. Ex. 6 (5/14/10 Supp. Resp. at 1).   The District also incorporates its response to Nos. 260-263. |
| 266. When specifically asked which Defendants that OCWD contends caused the alleged damages arising from the Focus Stations, OCWD gave detailed responses identifying other Defendants as responsible for the alleged damages arising from each Focus Station and providing evidence to establish causation as to those Defendants at each Focus Station, but made no mention whatsoever of Lyondell. (Roy Dec., ¶ 5, Ex.59 (OCWD's Supp. Resp. to Certain | **266. Disputed.**<br><br>The District's May 2010 supplemental responses specifically incorporate the original responses which identified Lyondell as associated with each plume and included a 20-page description of Lyondell's conduct. Han Decl. Ex. 9; see also Han Decl. Ex. 6 (5/14/10 Supp. Resp. at 1).   The District also incorporates its response to Nos. 260-263, and 265. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Defendants' 2nd Interrog.), Interrog. No. 1, pp. 1-48.) | |
| 267.    At no time after serving its Supplemental Responses to Certain Defendants' Second Set of Interrogatories on May 14, 2010 did OCWD amend any of its responses to indicate that it was asserting any claims against Lyondell at any of the Focus Stations. (DiChello Dec., ¶ 17.) | **267. Disputed.** The District incorporates its response to Nos. 262, 265 and 266. |
| 268.    In the Service Station Matrix, OCWD asserts claims against Lyondell at all Focus Stations other than USA #141, 14600 Edwards Street, Westminster, notwithstanding the fact that OCWD did not make any mention of such claims in its Supplemental Responses to Certain Defendants' Second Set of Interrogatories. (Roy Dec., Ex. 80 (Plaintiffs Service Station Matrix.); (Roy Dec., ¶ 5, Ex. 59 OCWD's Supp. Resp. to Certain Defendants' 2nd Interrog.), Interrog. No. 1, pp. 1-48.) | **268. Disputed.** The District incorporates its Response to Nos. 259-266. |
| 269.    In its Supplemental Response to Interrogatory No. 1 of Certain Defendants' Second Set of Interrogatories, OCWD did not assert that it was relying on the commingled product theory to prove causation as to Lyondell or that MTBE manufactured or sold by Lyondell was part of a commingled product of gasoline containing MTBE distributed to any of the Focus Stations. (Roy Dec., ¶ 5, Ex. 59 (OCWD's Supp. Resp. to Certain Defendants' 2nd Interrog.), Interrog. No. 1, pp. 1-48.) In addition, when Defendants specifically asked OCWD in the Second Set of Interrogatories if OCWD intended to pursue an alternative theory of liability, OCWD asserted objections and | **269. Disputed.** The District incorporates its Response to No. 243; see also Han Decl. Ex. 10 (OCWD Resp. to Second Set of Interrogatories Resp. to Nos. 5 & 6, at 100, 104). This Court stated in April, 2014, "they never denied, they just objected.  It seems to me that under our rule, which is very limited on interrogatories, it was probably an appropriate objection.  Unless you had asked me to overrule it, and then I would have said while it is an appropriate objection in this case, it would be wise to know, you have to answer. But that never happened.  Given that you had an objection, not a denial, I don't think I can |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| refused to respond. (Roy Dec., ¶ 5, Ex. 59 (OCWD's Supp. Resp. to Certain Defendants' 2nd Interrogs.) Interrog. No. 5, p. 50.) | say that Mr. Axline misled you. All he did was object to your question. He didn't deny that he was going to use it." Han Decl. ¶ 12, Ex. 10, 4/16/04 Trans. at 12. |
| 270.    At no time after serving its Supplemental Responses to Certain Defendants' Second Set of Interrogatories on May 14, 2010 did OCWD amend any of its responses to assert that it was relying on the commingled product theory to prove causation as to Lyondell or that MTBE manufactured or sold by Lyondell was part of a commingled product of gasoline containing MTBE distributed to any of the Focus Stations. (DiChello Dec., 1 19.) | **270. Disputed.** While the District did not use the term "commingled product," it explained the causation theories and evidence upon which it intended to rely at trial. Han Decl. Exs. 1, 6, 7, 8 & 10. The District also incorporates its Response to Nos. 242-244, 259-264 and 269. |
| 271.    OCWD did not disclose to Lyondell that it was relying on the commingled product theory to prove causation as to Lyondell or alleging that MTBE manufactured or sold by Lyondell was blended into gasoline that became part of a commingled product that was distributed to any of the Focus Stations until April 8, 2014, which is more than two years after fact and expert discovery ended. (DiChello Dec., ¶ 20.) | **271. Disputed.** The District incorporates its Response to Nos. 242-244, 262, 264, 269-270. |

**Facts Specific To Tesoro**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 272.    Tesoro herein incorporates by reference Paragraphs 40-50 of the 56.1 Statement and Martin Dec. ¶¶ 5-16, and Ex. 46. | **272. Disputed.** The District incorporates its Response to ¶¶ 40-50, and disputes the assertions in Ms. Martin's Decl. ¶¶ 5-16 and Ex. 46. |

**Facts Specific to VMSC and VRC-CA**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 273.　In OCWD's Supplemental Responses to Certain Defendants Second Set of Interrogatories (May 14, 2010), OCWD alleged that "Valero" "owned, operated, leased, or had a retail supply contract" of an undisclosed time and nature with three focus plume stations: G&M #4 (16990 Beach Blvd., Huntington Beach), G&M # 24 (3301 S. Bristol St., Santa Ana), and World Oil #39 (3450 W. Ball Road, Anaheim). (Parker Dec., ¶ 6.) With respect to a fourth focus plume station, USA Gasoline #141 (14600 Edwards Street, Westminster), OCWD alleged only that "USA gasoline stations in California have been supplied with gasoline by Tesoro, ConocoPhillips, and Valero." (Id.) | 273.　**Disputed.** <br><br> Defendants do not supply the complete sentence from which they quote. The sentence actually states,"*Valero has indicated in its discovery responses that it* owned, operated, leased, or had a retail supply contract with this station, but has not disclosed the exact time and nature of this relationship." (Emphasis added.)  The District further disputes that, "OCWD alleged only that "USA gasoline stations in California have been supplied with gasoline by Tesoro, ConocoPhillips, and Valero," which is contrary to multipe other discovery responses. See, e.g., Han Decl. ¶ 8, Ex. 6 at 5/14/10 Supp. Resp. at 15.  The District also incorporates its Response to ¶ 282, below. |
| 274.　In its Responses to Valero Defendants' First Set of Interrogatories (September 7, 2010), OCWD alleged that "Valero" "sold and distributed gasoline to jobbers who have, in turn, sold gasoline to stations on the Bellwether Plume list, including, but not limited to, Southern Counties Oil, Petro Diamond, Inc., World Oil Co., USA Petroleum Inc., and Williams Tank Lines." (Parker Dec., 1 7.) | 274.　**Disputed.** <br><br> Defendants do not supply the complete sentence from which they quote. The sentence actually states, "*Valero admitted that it* sold and distributed gasoline to jobbers who have, in turn, sold gasoline to stations on the Bellwether Plume list, including, but not limited to, Southern Counties Oil, Petro Diamond, Inc., World Oil Co., USA Petroleum Inc., and Williams Tank Lines." (Emphasis added.)  The District disputes that the responses were limited to this one sentence.  Han Decl. Ex. 6 at 5/14/10 Supp. Resp. at 15; Han Decl. Ex. 11 at 15.  The District also incorporates its Response to ¶ 282, below. |
| 275.　In April 2013, OCWD issued a | 275.　**Undisputed in part and disputed in** |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| revised station matrix alleging that "Valero" is liable as a "refiner/supplier" at 32 focus plume stations: ARCO #1887 (16742 Beach Boulevard, Huntington Beach); G&M #4 (16990 Beach Boulevard, Huntington Beach); Texaco #8520/Texaco #121608 (8520 Warner Avenue, Fountain Valley); Unocal #5376 (8971 Warner Avenue, Huntington Beach); Exxon #4283/Chevron #208552 (8980 Warner Avenue, Fountain Valley); Mobil #18-G6B (9024 Warner Avenue, Fountain Valley); Texaco #121681 (9475 Warner Avenue, Fountain Valley); Unocal #5399 (9525 Warner Avenue, Fountain Valley); Mobil #18-HDR (3195 Harbor Boulevard, Costa Mesa); ARCO #6131 (3201 Harbor Boulevard, Costa Mesa); Mobil #18-JMY (3470 Fairview Road, Costa Mesa); ARCO #1912 (18480 Brookhurst Street, Fountain Valley); Thrifty #383 (18520 Brookhurst Street, Fountain Valley); ARCO #1905 (18025 Magnolia Street, Fountain Valley); Beacon Bay Car Wash FV (10035 Ellis Avenue, Fountain Valley); Mobil #18-HEP (2921 South Bristol Street, Santa Ana); G&M #24 (3301 South Bristol Street, Santa Ana); ARCO #3085 (3361 South Bristol Street, Santa Ana); Chevron #1921 (3801 South Bristol Street, Santa Ana); Huntington Beach ARCO (6002 Bolsa Avenue, Huntington Beach); Shell #6502 (6502 Bolsa Avenue, Huntington Beach); USA Gasoline #141 (14600 Edwards Street, Westminster); Unocal #5123 (14972 Springdale Street, Huntington Beach); Westminster Shell (5981 Westminster Avenue, Westminster); Chevron #95401 (5992 Westminster Boulevard, Westminster); Thrifty #368 (6311 Westminster Boulevard, Westminster); | part.<br><br>The District prepared a matrix at the direction of the Court, in an effort to condense hundreds of thousands of documents and hundreds of depositions into a table reflecting the focus plume stations and which defendants were associated with each station. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Unocal #5226 (6322 Westminster Avenue, Westminster); Unocal #5792/ConocoPhillips #5792 (4002 Ball Road, Cypress); ARCO #6036 (13142 Goldenwest Street, Westminster); Chevron #9-5568 (12541 Seal Beach Boulevard, Seal Beach); Mobil #18-668 (16230 Harbor Boulevard, Fountain Valley); and World Oil #39 (3450 West Ball Road, Anaheim). (Parker Dec., ¶ 8.) | |
| 276.    On March 25, 2014, in advance of a scheduled April 8, 2014 meet and confer session between the parties, Defendants received a letter from Plaintiffs counsel which stated, in part: "In order to make the meet and confer meeting as efficient and productive as possible, we hereby request that [] defendants who have [] factually based objections to specific stations on the Service Station Matrix serve these objections no later than Friday, March 28, 2014, so that we have adequate time to vet and respond to these issues." (Parker Dec., ¶ 10; Roy Dec., ¶ 25, Ex. 77 (March 25, 2014 Letter).) | **276.  Undisputed in part and disputed in part.**<br><br>Undisputed as to the language of correspondence.  Dispute the remaining paragraph. |
| 277.    By way of letter dated March 28, 2014, Amy Parker, counsel to VMSC and VRCCA, responded to Plaintiffs counsel's March 25, 2014 request. (Parker Dec., ¶ 11, Ex. 21 (Letter from Amy Parker to Tracey O'Reilly, March 28, 2014).) Ms. Parker's response letter was an effort to identify those factual issues which pertained to VMSC and VRC-CA's inclusion on the revised station matrix. ( *Id.*) Ms. Parker noted that VMSC and VRC-CA were unaware of the evidence linking them to those stations at which they had been listed as liable under the revised station matrix. ( *Id.*) In the absence of such evidence, Ms. Parker requested that VMSC | **277.  Undisputed in part and disputed in part.**<br><br>Undisputed that correspondence was exchanged between counsel for the parties on the dates noted.  Dispute the remaining paragraph and further state that the District explained the evidence regarding the Valero defendants in its prior discovery responses, in a letter dated May 31, 2013, and also responded in a letter dated April 21, 2014. Han Decl. Ex. 12. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| and VRC-CA be dismissed from such stations. ( *Id.*) Ms. Parker requested a response to her March 28, 2014 letter by April 4, 2014, in advance of the scheduled April 8, 2014 meet and confer session. ( *Id.*) Plaintiff's counsel failed to so respond. ( *Id.*, ¶ 12.) | |
| 278.    On April 8, 2014, Ms. Parker participated in an in-person meet and confer session with Plaintiffs counsel. (Parker Dec., ¶ 13.) At this meet and confer, Plaintiff's counsel informed Ms. Parker that it was not prepared to provide her clients with any connection evidence that might link VMSC and VRC-CA to a focus plume station. ( *Id.*) Instead, Plaintiffs counsel indicated for the first time its intent to rely on a commingling theory of causation to allege VMSC and VRC-CA liability in this case. ( *Id.*) | **278.  Disputed.** Defendants mis-characterize the meet and confer process and the District incorporates its Response to Nos. 242-244, 262-264, 269, 273-275, 277, and 282. |
| 279.    At the April 16, 2014 status conference, this Court instructed Plaintiff's counsel to respond to Ms. Parker's March 28, 2014 correspondence with a "letter that identifies which stations have direct evidence [of supply by VMSC, VRC-CA, and Ultramar], and the rest he is relying on the alternative theory." (Parker Dec., ¶ 14; Roy Dec., ¶ 26, Ex. 78 (Status Conference Transcript, April 16, 2014) at 27:16-28:14.) Plaintiff's counsel thereafter provided a response to Ms. Parker's March 28, 2014 letter on April 21, 2014. (Parker Dec., ¶ 14, Ex. 22 (Letter from Tracey O'Reilly to Amy Parker, April 21, 2014).) Ms. O'Reilly's response letter was wholly insufficient, as it failed to provide the evidence on which OCWD was relying to tie VMSC and | **279.  Undisputed in part and disputed in part.** Undisputed that the transcript contains the quoted language and undisputed that the District responded to Ms. Parker's letter on April 21, 2014.  Dispute the remaining paragraph.  Han Decl. Ex. 6 (2/26/10 Resp. at 5, 7; Han Decl. Ex. 13). Han Decl. Ex. 13, Affidavit of the Valero Defendants In Response to Plaintiffs' Preliminary Discovery at 1-2; see also Han Decl. ¶ 15.  The District incorporates its Response to Nos. 242-244, 264, 273-278, 269, and 282. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| VRC-CA to the focus plume stations, as required by the Court. (*Id.*) Moreover, Ms. O'Reilly's letter indicated, for the first time in this litigation, that Plaintiff would be pursuing successor liability against VMSC and VRC-CA. (*Id.*) | |
| 280.   On April 30, 2014, Ms. Parker emailed Plaintiff's counsel regarding two focus plume stations at which Plaintiff continues to assert improper causes of action for permanent nuisance, negligence, and strict liability. (Parker Dec., 115, Ex. 23 (Email from Amy Parker to Michael Axline, April 30, 2014).) Ms. Parker received no response from Plaintiff's counsel. (*Id.*, ¶ 16.) | **280.  Undisputed in part and disputed in part.** Undisputed that Ms. Parker corresponded with counsel on April 30, 2014.  Dispute the remaining paragraph and dispute the assertions in the referenced correspondence. |
| 281.   On June 3, 2014, Plaintiff submitted a revised station matrix. (Parker Dec., ¶ 20.) Plaintiff now alleges that VMSC and VRC-CA are liable at 30 focus plume stations: ARCO #1887 (16742 Beach Boulevard, Huntington Beach); G&M #4 (16990 Beach Boulevard, Huntington Beach); Texaco #8520/Texaco #121608 (8520 Warner Avenue, Fountain Valley); Unocal #5376 (8971 Warner Avenue, Huntington Beach); Exxon #4283/Chevron #208552 (8980 Warner Avenue, Fountain Valley); Mobil #18-G6B (9024 Warner Avenue, Fountain Valley); Texaco #121681 (9475 Warner Avenue, Fountain Valley); Unocal #5399 (9525 Warner Avenue, Fountain Valley); Mobil #18-HDR (3195 Harbor Boulevard, Costa Mesa); ARCO #6131 (3201 Harbor Boulevard, Costa Mesa); Mobil #18-JMY (3470 Fairview Road, Costa Mesa); ARCO #1912 (18480 Brookhurst Street, Fountain Valley); Thrifty #383 (18520 Brookhurst Street, Fountain Valley); ARCO #1905 | **281.  Disputed.** In 2008, the District identified plaintiff focus plumes and the stations that contributed to those plumes.  The District's responses to the second set of interrogatories specifically identified all Valero defendants at each plaintiff focus plume and referenced the specific contaminating stations.  Han Decl. Ex. 6, 2/26/10 Resp. at 5, 71; Han Decl. Ex. 7; Han Decl. Ex. 11. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| (18025 Magnolia Street, Fountain Valley); Beacon Bay Car Wash FV (10035 Ellis Avenue, Fountain Valley); Mobil #18-HEP (2921 South Bristol Street, Santa Ana); G&M #24 (3301 South Bristol Street, Santa Ana); ARCO #3085 (3361 South Bristol Street, Santa Ana); Chevron #1921 (3801 South Bristol Street, Santa Ana); Huntington Beach ARCO (6002 Bolsa Avenue, Huntington Beach); Unocal #5123 (14972 Springdale Street, Huntington Beach); Westminster Shell (5981 Westminster Avenue, Westminster); Chevron #95401 (5992 Westminster Boulevard, Westminster); Thrifty #368 (6311 Westminster Boulevard, Westminster); Unocal #5226 (6322 Westminster Avenue, Westminster); Unocal #5792/ConocoPhillips #5792 (4002 Ball Road, Cypress); ARCO #6036 (13142 Goldenwest Street, Westminster); Chevron #9-5568 (12541 Seal Beach Boulevard, Seal Beach); Mobil #18668 (16230 Harbor Boulevard, Fountain Valley); and World Oil #39 (3450 West Ball Road, Anaheim). ( *Id.* ) . | |

**Facts Specific to Ultramar Inc.**

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 282.   OCWD's Supplemental Responses to Certain Defendants Second Set of Interrogatories (May 14, 2010) neither mentioned nor made allegations against Ultramar Inc. (Parker Dec., ¶ 6.) | **282. Disputed.**<br><br>The District's May 14, 2010 Supplemental Responses incorporated its February 26, 2010 Responses which identified Ultramar at every plaintiff Focus Plume and referenced every station at the focus plumes as incorporated therein.  Han Dec. Ex. 6, 5/14/10 Supp. Resp. |

161

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| | at 1; *id.* at 2/26/10 Resp. at 5; Han Decl. Ex. 7.<br><br>Valero's discovery responses in the case uniformly responded on behalf of the "Valero defendants," including Ultramar, without distinguishing between these entities.  Han Decl. Ex. 13 (Excerpts of the "Valero defendants" collective responses and requests. Ultramar engaged in wholesale/ bulk marketing and/or selling gas with MTBE in California from 1994 to 2002.  (Han Decl. Ex. 13 at Defendant Ultramar, Inc.'s Disclosure Pursuant to June 9, 2005 Directive as Amended by the Court on August 12, 2005 at 2.)  In 2005, Valero Marketing and Supply Company (VMSC)  took over and continued Ultramar's duties and obligations relating to MTBE activities. *Id.*  Ultramar Inc. is now known as Valero Energy Corp., and Ultramar's liability rests with Valero. According to Ultramar's own description, then, VMSC was a mere continuation of Ultramar, and is liable for Ultramar's activities. |
| 283.     OCWD's April 2013 revised station matrix alleges that "Ultramar" is liable as a "refiner/supplier" at 10 focus plume stations: Unocal #5376 (8971 Warner Avenue, Huntington Beach); Mobil #18-G6B (9024 Warner Avenue, Fountain Valley); Unocal #5399 (9525 Warner Avenue, Fountain Valley); Mobil #18-HDR (3195 Harbor Boulevard, Costa Mesa); Mobil #18JMY (3470 Fairview Road, Costa Mesa); Mobil #18-HEP (2921 South Bristol Street, Santa Ana); Unocal #5123 (14972 Springdale Street, Huntington | **283.  Undisputed in part and disputed in part.**<br><br>The District prepared a matrix at the direction of the Court, in an effort to condense hundreds of thousands of documents and hundreds of depositions into a table reflecting the defendants associated with focus plume stations. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Beach); Unocal #5226 (6322 Westminster Avenue, Westminster); Unocal #5792/ConocoPhilliss #5792 (4002 Ball Road, Cypress); and Mobil #18-668 (16230 Harbor Boulevard, Fountain Valley). (Parker Dec., ¶ 9.) | |
| 284.    Ultramar Inc. herein incorporates by reference Paragraph 276 of the 56.1 Statement, Parker Dec., ¶ 10, and Roy Dec., ¶ 25, Ex. 77 (March 25, 2014 letter). | **284.  Undisputed in part and disputed in part.** <br> The District incorporates its Response to No. 276. |
| 285.    By way of letter dated March 28, 2014, Amy Parker, counsel to Ultramar Inc., responded to Plaintiff's counsel's March 25, 2014 request. (Parker Dec., ¶ 11, Ex. 21 (Letter from Amy Parker to Tracey O'Reilly, March 28, 2014).) Ms. Parker's response letter was an effort to identify those factual issues which pertained to Ultramar Inc.'s inclusion on the revised station matrix. (*Id.*) Ms. Parker noted that Ultramar Inc. was unaware of the evidence linking it to those stations at which it had been listed as liable under the revised station matrix. (*Id.*) In the absence of such evidence, Ms. Parker requested that Ultramar Inc. be dismissed from such stations. (*Id.*) Ms. Parker requested a response to her March 28, 2014 letter by April 4, 2014, in advance of the scheduled April 8, 2014 meet and confer session. (*Id.*) Plaintiff's counsel failed to so respond. (*Id.*, ¶ 12.) | **285.  Undisputed in part and disputed in part.** <br><br> Undisputed that correspondence was exchanged between counsel for the parties on the dates noted.  Dispute the remaining paragraph and further state that the District explained the evidence regarding the Valero defendants in its prior discovery responses, in a letter dated May 31, 2013, and also responded in a letter dated April 21, 2014. Han Decl. Ex. 12 (5/31/13 Letter) & 13 (4/21/14 Letter). |
| 286.    On April 8, 2014, Ms. Parker participated in an in-person meet and confer session with Plaintiff's counsel. (Parker Dec., ¶ 13.) At this meet and confer, Plaintiffs counsel informed Ms. Parker that it was not | **286.  Disputed.** <br><br> Defendants mis-characterize the meet and confer process and the District incorporates its Response to Nos. 242-244, 264, 273-275, |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| prepared to provide her clients with any connection evidence that might link Ultramar Inc. to a focus plume station. ( *Id.*) Instead, Plaintiffs counsel indicated for the first time its intent to rely on a commingling theory of causation to allege Ultramar liability in this case. ( *Id.*) | 277, and 281-285. |
| 287.    At the April 16, 2014 status conference, this Court instructed Plaintiffs counsel to respond to Ms. Parker's March 28, 2014 correspondence with a "letter that identifies which stations have direct evidence [of supply by VMSC, VRC-CA, and Ultramar], and the rest he is relying on the alternative theory." (Parker Dec., ¶ 14; Roy Dec., 126, Ex. 78 (Status Conference Transcript, April 16, 2014) at 27:16-28:14.) Plaintiffs counsel thereafter provided a response to Ms. Parker's March 28, 2014 letter on April 21, 2014. (Parker Dec., ¶ 14, Ex. 22 (Letter from Tracey O'Reilly to Amy Parker, April 21, 2014).) Ms. O'Reilly's response letter was wholly insufficient, as it failed to provide the evidence on which OCWD was relying to tie Ultramar Inc. to the focus plume stations, as required by the Court. ( *Id.*) | **287.  Undisputed in part and disputed in part.** Undisputed that the language in the transcript of the April 16, 2014 hearing is accurate and undisputed that the District responded to Ms. Parker's letter on April 21, 2014.  Dispute the remaining paragraph.  Han Decl. Ex. 6 at 5, 7; Han Decl. Ex. 13 at 1-2; see also Han Decl. ¶15. The District incorporates its Response to Nos. 242-244, 264, 273-278, and 281-286. |
| 288.    On June 3, 2014, Plaintiff submitted a revised station matrix. (Parker Dec., 1 20.) Plaintiff now alleges that Ultramar Inc. is liable at 30 focus plume stations: ARCO #1887 (16742 Beach Boulevard, Huntington Beach); G&M #4 (16990 Beach Boulevard, Huntington Beach); Texaco #8520/Texaco #121608 (8520 Warner Avenue, Fountain Valley); Unocal #5376 (8971 Warner Avenue, Huntington Beach); Exxon #4283/Chevron #208552 (8980 Warner | **288. Disputed.** In 2008, the District identified plaintiff focus plumes and the stations that contributed to those plumes.  The District's responses to the second set of interrogatories specifically identified all Valero defendants at each plaintiff focus plume and referenced the specific contaminating stations.  Han Decl. Exs. 6, 2/26/10 Resp. at 5, 71); Han Decl. Ex. 7, 11 & 13. |

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE: | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| Avenue, Fountain Valley); Mobil #18-G6B (9024 Warner Avenue, Fountain Valley); Texaco #121681 (9475 Warner Avenue, Fountain Valley); Unocal #5399 (9525 Warner Avenue, Fountain Valley); Mobil #18-HDR (3195 Harbor Boulevard, Costa Mesa); ARCO #6131 (3201 Harbor Boulevard, Costa Mesa); Mobil #18-JMY (3470 Fairview Road, Costa Mesa); ARCO #1912 (18480 Brookhurst Street, Fountain Valley); Thrifty #383 (18520 Brookhurst Street, Fountain Valley); ARCO #1905 (18025 Magnolia Street, Fountain Valley); Beacon Bay Car Wash FV (10035 Ellis Avenue, Fountain Valley); Mobil #18-HEP (2921 South Bristol Street, Santa Ana); G&M #24 (3301 South Bristol Street, Santa Ana); ARCO #3085 (3361 South Bristol Street, Santa Ana); Chevron #1921 (3801 South Bristol Street, Santa Ana); Huntington Beach ARCO (6002 Bolsa Avenue, Huntington Beach); Unocal #5123 (14972 Springdale Street, Huntington Beach); Westminster Shell (5981 Westminster Avenue, Westminster); Chevron #9-5401 (5992 Westminster Boulevard, Westminster); Thrifty #368 (6311 Westminster Boulevard, Westminster); Unocal #5226 (6322 Westminster Avenue, Westminster); Unocal #5792/ConocoPhillips #5792 (4002 Ball Road, Cypress); ARCO #6036 (13142 Goldenwest Street, Westminster); Chevron #9-5568 (12541 Seal Beach Boulevard, Seal Beach); Mobil #18668 (16230 Harbor Boulevard, Fountain Valley); and World Oil #39 (3450 West Ball Road, Anaheim). (1d.) | |

Date: July 21, 2014

Respectfully submitted,

By: _____

Michael D. Axline
Miller & Axline
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825-4225
Telephone:  (916) 488-6688
Counsel for Plaintiff
Orange County Water District